Christopher J. Blake (*pro hac vice pending*)
NELSON MULLINS RILEY & SCARBOROUGH LLP
301 Hillsborough Street, Suite 1400
Raleigh, North Carolina 27603
Telephone: (919) 329-3808
Facsimile: (919) 329-3799
chris.blake@nelsonmullins.com

Peter J. Haley
NELSON MULLINS RILEY & SCARBOROUGH LLP
One Financial Center
Boston, MA  02111
Tel: (617) 217-4714
Fax: (617) 217-4750
peter.haley@nelsonmullins.com

Alan F. Kaufman
NELSON MULLINS RILEY & SCARBOROUGH LLP
280 Park Avenue, 15th Floor West
New York, NY  10017
Tel: (646) 428-2600
Fax: (646) 428-2610
alan.kaufman@nelsonmullins.com

*Counsel for Defendants Aspida Holdco, LLC
and Aspida Financial Services, LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>PB LIFE AND ANNUITY CO., LTD., *et. al.*,<br><br>      Debtors in Foreign Proceedings. | Chapter 15<br><br>Case No. 20-12791 (LGB)<br>(Jointly Administered) |

JOHN JOHNSTON and RACHEL FRISBY as Joint
Provisional Liquidators on behalf of PB LIFE AND
ANNUITY CO., LTD., *et. al.*,

Plaintiffs,

v.

GREGREY EVAN LINDBERG aka GREG
EVAN LINDBERG, *et al*.

Defendants.

Adversary Proceeding
Case No.  23-01000 (LGB)


# MEMORANDUM OF LAW OF DEFENDANTS ASPIDA HOLDCO, LLC AND ASPIDA FINANCIAL SERVICES, LLC IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT

## <u>TABLE OF CONTENTS</u>

**Page**

Table of Authorities ............................................................................................. ii

Introduction ......................................................................................................... 1

Procedural History ............................................................................................. 3

      A.     Related Proceedings ................................................................... 3

           i.     The Bankruptcy Case .................................................... 3

           ii.     The Pavonia Rehabilitation Proceeding ........................... 4

      B.     Allegations Against Aspida Holdco and Aspida Financial in the
Amended Complaint ................................................................... 8

Argument ........................................................................................................... 10

    I.     Applicable Standard ............................................................................. 10

    II.     The Amended Complaint Fails to State a Claim Under Rule 12(b)(6) ................. 10

      A.     The Michigan Rehabilitation Orders Bar The Prosecution Of This
Action Against Aspida Holdco and Aspida Financial ............................ 10

      B.     The Amended Complaint Fails To Identity Any "Voidable
Transfers" To Aspida Holdco Or Aspida Financial Or To Meet The
Pleading Standard For Fraud ................................................... 19

           i.     Aspida Holdco's $25 Million Loan Transaction,
Subordination Agreement And Use Of Loan Proceeds ............... 20

           ii.     Purchase Of Membership Units Of Global Bankers
Insurance Group, LLC .................................................... 22

           iii.     The Amended Complaint Alleges No Claim of Fraud
Against Aspida Holdco Or Aspida Financial ............................. 23

      C.     Plaintiffs' Amended Complaint Fails To Make A Short And Plain
Statement Of The Claim For Relief Against Aspida Holdco And
Aspida Financial ..................................................................... 25

      D.     Aspida Holdco And Aspida Financial Are Entitled To Proceed
Now With Their Motion To Dismiss ...................................... 26

Conclusion ......................................................................................................... 27

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Anita G. Fox as Director of the Michigan Department of Insurance and Financial Services v. Pavonia Life Insurance Company of Michigan*, Case No. 19-504-CR ................................................................................................................2

*Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) ..................................10

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)..........................................................................................................................10

*Brass v. Am. Film Techs., Inc.*, 987 F.2d 142 (2d Cir.1993) ..........................................................4

*Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943)...............................18

*Chambers v. Time Warner, Inc.*, 282 F.3d 147 (2d Cir.2002) ........................................................4

*Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976).......................................................................................19

*Di Vittorio v. Equidyne Extractive Indus. Inc.*, 822 F.2d 1242 (2d Cir.1987).............................23

*In re Fedders North America, Inc.,* 405 B.R. 527 (Bankr. D. Del. 2009) ....................................19

*Krys v. Pigott*, 749 F.3d 117 (2d Cir.2014) .................................................................................10

*Law Enforcement Insur. Co. v. Corcoran*, 807 F.2d 38 (2d Cir.1986), *cert. denied*, 481 U.S. 1017, 107 S.Ct. 1896, 95 L.Ed.2d 503 (1987)........................................12

*Levy v. Lewis*, 635 F.2d 960 (2d Cir.1980)...................................................................................13

*In re Merrill Lynch & Co., Inc.,* 218 F.R.D. 76 (S.D.N.Y.2003) ..................................................25

*Mondrus v. Mutual Benefit Life Insurance Co.,* 775 F.Supp. 1155 (N.D.Ill.1991) ......................13

*New Orleans Public Serv., Inc. v. Council of the City of New Orleans, 491 U.S. 350, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989)* ...........................................................19

*O'Connell v. Arthur Andersen LLP (In re AlphaStar Ins. Grp. Ltd.),* 383 B.R. 231 (Bankr.S.D.N.Y.2008) .............................................................................................23

*O'Connell v. Penson Fin. Services, Inc. (In re Arbco Capital Mgmt., LLP),* 498 B.R. 32 (Bankr.S.D.N.Y.2013)...................................................................................23

*Papasan v. Allain*, 478 U.S. 265, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986) ..................................10

*In re Philips Offset Co., Inc.*, 152 B.R. 836 (Bankr. S.D.N.Y. 1992) ...........................................13

*Renco Group, Inc. v. Wilmington Trust, N.A. (In re Magnesium Corp. of America)*, 583 B.R. 637 (Bankr. S.D. N.Y. 2018) ...................................................................10

*Silverman Partners, L.P. v. First Bank*, 687 F.Supp. 2d 269 (E.D.N.Y. 2010)............................23

*Simmons v. Abruzzo*, 49 F.3d 83 (2d Cir.1995) .........................................................................25

*Underwriters Nat Assur Co v N Carolina Life & Acc & Health Ins. Guar. Ass'n*, 455 US 691 (1982)...................................................................................................................16

**Rules**

Fed R. Bankr. P. 7008 ...........................................................................................................1, 25

Fed. R. Civ. P. 8(a) ......................................................................................................................1

Fed. R. Civ. P. 12(b)(6)..........................................................................................................1, 10

Rule 9(b) ....................................................................................................................................23

Rule 2004 ...................................................................................................................................24

**Statutes**

15 U.S.C. §§ 1011-1015 .............................................................................................................13

MCL 500.100 *et seq.*...................................................................................................................4

MCL §§ 8121(1)(f), (l), (m), (r), and (u) .....................................................................................14

MCLA § 500.8101 ......................................................................................................................13

MCLA § 500.8105 ......................................................................................................................15

MCLA § 500.8113(1) .............................................................................................................14, 17

MCLA § 500.8114(2) ..................................................................................................................14

**Other Authorities**

McCarran-Ferguson Act ..............................................................................................................19

Michigan Insurance Code Chapter 81............................................................................................13

Defendants Aspida Holdco, LLC ("Aspida Holdco") and Aspida Financial Services, LLC ("Aspida Financial") submit this Memorandum of Law in support of their Motion to Dismiss the Plaintiffs' Amended Complaint in this action.

## **INTRODUCTION**

Plaintiffs' Amended Complaint filed on September 27, 2023 (Dkt. No. 129) contains a 30-page caption, totals 500 pages in length, and alleges 48 separate counts of recovery. Yet, Aspida Holdco and Aspida Financial, just two of the 949 entity Defendants named in the Amended Complaint, are barely mentioned in Plaintiffs' allegations, and are loosely grouped and defined by Plaintiffs – without any factual support – as part of a group of Defendants defined as the "Lindberg Affiliates." (Am. Compl., ¶ 6, n. 4). Despite its length and attempt to set forth detailed factual allegations, the Amended Complaint is unintelligible with respect to any alleged wrongdoing by Aspida Holdco and Aspida Financial and fails: (1) to set forth a claim upon which relief can be granted against Aspida Holdco or Aspida Financial as required by Fed. R. Civ. P. 12(b)(6); or (2) to afford Aspida Holdco or Aspida Financial with the short and plain statement of Plaintiffs' claim against Aspida Holdco and Aspida Financial as required by Fed. R. Civ. P. 8(a) as incorporated by Rule 7008 of the Federal Rules of Bankruptcy Procedure.

Notably, the Amended Complaint includes Aspida Holdco and Aspida Financial within Plaintiffs' definition of "Lindberg Affiliates" but fails to allege that Aspida Holdco or Aspida Financial are companies that are somehow owned or controlled directly or indirectly by Defendant Greg Lindberg ("Lindberg"). (Am. Compl., ¶¶ 167 – 168).[1] Plaintiffs and their counsel know that Aspida Holdco and Aspida Financial are not in any way affiliated with

---

[1] Of the 941 entity Defendants named in the Amended Complaint that are included within the definition of "Lindberg Affiliates," only eight Defendants are not alleged to be "owned or controlled" by Lindberg: (1) AAPC Voting Trust (Am. Compl., ¶ 107); (2) AR Management (Arevio) Trust (*Id.*, ¶ 150); (3) AR Management (GGH) Trust (*Id.*, ¶ 151); (4) Aspida Holdco (*Id.*, ¶ 167); (5) Aspida Financial (*Id.*, ¶ 168); (6) CC Mortgage Trust (*Id.*, ¶ 288); (7) Axar Capital Management LP (*Id.*, ¶ 787); and (8) Strategic Consolidated Income Fund, LLC (*Id.*, ¶ 921).

Lindberg because Plaintiffs and their counsel are aware of the Michigan state court[2] orders entered in connection with the Michigan rehabilitation of Pavonia Life Insurance Company of Michigan ("Pavonia"), in which the Michigan state court authorized and approved the transfer of the membership units of Pavonia's subsidiary Global Bankers Insurance Group, LLC to Aspida Holdco in July 2021 free and clear of all claims, including Plaintiffs' claims asserted in the Amended Complaint.[3]

Plaintiffs' unsupported attempt to include Aspida Holdco and Aspida Financial as "Lindberg Affiliates" casts the net too broadly. As a result of the court-approved acquisition of the membership units of Global Bankers Insurance Group, LLC, Plaintiffs know that Aspida Financial successfully removed and separated itself from Lindberg and the intricate web of entities he created, and the potential exposure to liability arising from any alleged financial misconduct engaged in by Lindberg and his associates. Further, the Amended Complaint fails to allege that Plaintiffs were in any way: (1) damaged or defrauded by Aspida Holdco or Aspida Financial; (2) that any of Plaintiffs' assets or funds were diverted or transferred to Aspida Holdco or Aspida Financial; or (3) that there was not fair and reasonable consideration for any of the transactions that Aspida Holdco and Aspida Financial were parties to. The Court should dismiss all claims against Aspida Holdco and Aspida Financial – which are alleged without any factual support – so that Aspida Holdco and Aspida Financial can move forward without the taint of allegations made against Lindberg and his associates in both criminal and civil proceedings,

---

[2] The Michigan rehabilitation court was the Circuit Court for the 30th Judicial Circuit, Ingham County, Michigan (the "Michigan Court"), *Anita G. Fox as Director of the Michigan Department of Insurance and Financial Services v. Pavonia Life Insurance Company of Michigan, Case No. 19-504-CR* (the "Michigan Proceeding"). Copies of the relevant court orders are attached hereto and discussed below.

[3] Following the transfer of the membership units, Global Bankers Insurance Group, LLC was renamed "Aspida Financial Services, LLC."

which continue to impact Aspida Holdco and Aspida Financial in their ongoing business and operations, and subject Aspida Holdco and Aspida Financial to unwarranted reputational harm.[4]

Aspida Holdco and Aspida Financial respectfully request that the Court address their arguments separate and apart from the hundreds of other entity Defendants named in the Amended Complaint. The legal arguments of Aspida Holdco and Aspida Financial set forth below are unique to them, and do not involve any of the other entity Defendants.

## **PROCEDURAL HISTORY**

### A.    **Related Proceedings**

####    *i.    The Bankruptcy Case*

The debtors in the jointly administered foreign proceedings ("Debtors") are companies incorporated in Bermuda. One of the Debtors is PB Life and Annuity Co., Ltd., f/k/a Private Bankers and Annuity Co., Ltd., ("PBLA"). (Am. Compl., p 1). On September 25, 2020, the Supreme Court of Bermuda entered orders appointing Rachelle Frisby and John Johnston of Deloitte Ltd. ("Deloitte") as the joint provisional liquidators of the Foreign Debtors (the "JPLs"). *See* Case No. 20-12791 (Dkt. No. 2, ¶ 1). On December 3, 2020, at the direction of the JPLs, the Foreign Debtors filed Chapter 15 petitions for foreign recognition in this Court. The Court granted recognition of the Foreign Debtor's Bermuda Proceedings as jointly administered foreign main proceedings on January 5, 2021, and recognized the JPLs as their foreign representatives in the Chapter 15 proceeding. Case No. 20-12791 (Dkt No. 33). The JPLs are the Plaintiffs in this adversary proceeding.

---

[4] As alleged in the Amended Complaint, Lindberg is currently a defendant in a number of criminal and civil proceedings. Lindberg is scheduled for a retrial of federal bribery and fraud charges in November 2023 in the United States District Court for the Western District of North Carolina. Lindberg is also: (1) a defendant in a separate federal criminal case alleging wire fraud, money laundering, conspiracy and false entries about insurance business finances; (2) a defendant in a federal civil action brought by the Securities and Exchange Commission; and (3) a defendant in a number of other civil actions arising from the insolvency and liquidation of insurance companies in North Carolina.

Plaintiffs commenced this adversary proceeding with the filing of their Complaint on January 4, 2023. (Dkt. No. 1).  On March 10, 2023, counsel for the Plaintiffs notified counsel for Aspida that Plaintiffs intended to file an Amended Complaint, which would supersede the original Complaint.  On the basis of Plaintiffs' representation, Aspida agreed to enter a Stipulation to Extend Time to Respond to Complaint which was accepted by the Court on March 17, 2023. (Dkt. No. 101).  The Plaintiffs filed their Amended Complaint on September 27, 2023. (Dkt. No. 129).

ii.    <u>*The Pavonia Rehabilitation Proceeding*</u>

Pavonia was a Michigan domiciled life, accident, and health insurance company authorized to conduct insurance business in Michigan under the Insurance Code of 1956, MCL 500.100 *et seq.* (the "Michigan Insurance Code").  Pavonia received its Michigan certificate of authority on January 1, 1996.  *See generally, Stipulated Order Placing Pavonia Life Insurance Company of Michigan Into Rehabilitation, Approving Compensation of Special Deputy Rehabilitators, and Providing Injunctive Relief* (Michigan Proceeding, July 9, 2019) (attached hereto as Exhibit A).[5]

Pavonia was acquired by GBIG Holdings, Inc. ("GBIG Holdings") in 2017 and became part of an insurance holding company system within the meaning of the Michigan Insurance Code. Exhibit A, page 2. Global Bankers Insurance Group, LLC was a wholly owned subsidiary of Pavonia, providing "all executive management, regulatory oversight review, and administrative services for Pavonia's operations." (Exhibit A, pp. 2 – 3).[6]  On July 9, 2019,

---

[5] The Court may on a motion to dismiss consider pleadings and other material submitted if subject to judicial notice. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir.2002); *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir.1993).

[6] In addition to Pavonia, Global Bankers Insurance Group, LLC also provided administrative services to other entities within the insurance company holding system.

Pavonia was placed into a rehabilitation proceeding by the Michigan Court in accordance with the terms of the Rehabilitation Order and pursuant to the Michigan Insurance Code. (Exhibit A). At the time of the Rehabilitation Order, Lindberg was Pavonia's ultimate upstream owner and ultimate controlling person. (*Id.*, p. 3). The Pavonia Rehabilitation Order was based on a court-approved rehabilitation plan which included a stock purchase agreement whereby GBIG Holdings agreed to sell Pavonia to Aspida Holdco. (*Id.*, p. 5).

Ultimately, the sale of Pavonia to Aspida Holdco was not consummated, as GBIG Holdings and Lindberg objected to the sale and appealed orders approving the sale to the Michigan Court of Appeals. Stipulated Order Approving Sale of Subsidiary Entity and Entry Into Related Services Agreement, attached hereto as Exhibit B (the "Sale Order"), pp. 2 – 3.[7]  To resolve disputes concerning objections to the sale of Pavonia to Aspida Holdco, the Pavonia Rehabilitator, Aspida Holdco and GBIG Holdings entered into an Interim Settlement Agreement:

- Providing for the sale of the membership units of Global Bankers Insurance Group, LLC to Aspida Holdco free and clear of all liens or other encumbrances, and allowing Global Bankers Insurance Group, LLC to resume it operations subject to Scheduled Liabilities, (*Id*. p. 4);

- The payment by Aspida Holdco of $5.5 million to the Pavonia rehabilitation estate for the purchase of the membership units, (*Id*.);

- The entry of a Services Agreement allowing for the provision of administrative and operational services to Pavonia for a monthly fee totaling $9.1 million per year, (*Id*.); and

- Effecting a separation of Global Bankers Insurance Group, LLC from Lindberg and from the North Carolina Insurance Affiliates of Pavonia,[8] (*Id.)*

---

[7] The terms of the Sale Order define Global Bankers Insurance Group, LLC as "ServiceCo" and Aspida Holdco as "Aspida".

[8] Pavonia's North Carolina Affiliates were four North Carolina domiciled insurance companies: (1) Colorado Bankers Life Insurance Company; (2) Southland National Reinsurance Corporation; (3) Southland National Insurance Corporation; and (4) Bankers Life Insurance Company (the "North Carolina Insurance Companies"). (Exhibit A, p. 2).

Additionally, the Pavonia Rehabilitator requested approval of the Interim Settlement Agreement and an Order from the Court: (a) restoring Scheduled Liabilities to Global Bankers Insurance Group, LLC; (b) ordering that no other liabilities would be restored to Global Bankers Insurance Group, LLC; and (c) ordering that after closing, Global Bankers Insurance Group, LLC would not have any obligation for any other Unscheduled Liabilities. (*Id*., pp. 5 – 6).  The Sale Order also provides: (a) that Aspida Holdco had represented to the Court that it would not have entered into the Interim Settlement Agreement or sale agreement without the releases, discharges and extinguishment of liability set forth in the Sale Order; (b) that upon closing of the sale of the membership units, neither Lindberg nor any other "Global Group" controlling person would have, nor could they exercise, any control over Global Bankers Insurance Group, LLC; and (c) that the consideration being paid by Aspida Holdco to acquire the membership units was reasonably equivalent value, and protected the Pavonia rehabilitation estate which was the recipient of the purchase price paid by Aspida Holdco. (*Id.*, pp. 7 – 8).

In the final Sale Order dated June 24, 2021, the Michigan Court approved the sale of the membership units of Global Bankers Insurance Group, LLC to Aspida Holdco.[9]  Paragraph 8 of the Sale Order provides that:

> … the Rehabilitator shall cause Pavonia Life to sell convey, assign, transfer, and deliver to Aspida, and Aspida shall purchase, acquire, and accept from the Rehabilitator, all of Pavonia's right, title and interest in ServiceCo consisting of all of the outstanding membership units of ServiceCo (the "Units"), ***free and clear of all liens or other encumbrances***, and ServiceCo shall resume its operations subject to the applicable 'Scheduled Liabilities' as defined in the Plan and previously determined during these rehabilitation proceedings.

(*Id.*, p. 4 (emphasis added)).  The Sale Order at Paragraph G states that:

---

[9] Pursuant to the Sale Order and the Services Agreement contemplated therein, Aspida Financial did continue to provide administrative and operational services to Pavonia in rehabilitation. At the request of the North Carolina Department of Insurance, Aspida Financial also provided services and operational support to the North Carolina Insurance Companies through October 2021.

> Upon Closing, ServiceCo shall be vested with good, valid, and marketable title in and to all ServiceCo Assets, ***free of any and all liens, security interests, or encumbrances of whatever kind or nature, adverse claims***, defenses (including, without limitation, rights of setoff and recoupment), and interests of third parties of any kind or nature, other than the Scheduled ServiceCo Liabilities and ServiceCo Permitted Claims, if any.

(*Id.*, p. 11 (emphasis added)).   The Sale Order further directly enjoins any third party from pursuing any claims against the membership units being sold, Global Bankers Insurance Group, LLC or Aspida Holdco other than Scheduled Liabilities. (*Id.*, pp 12 – 13). The Plan of Rehabilitation, attached hereto as Exhibit C, defines Scheduled Liabilities. (*See* Exhibit C, pp. 4 – 5). The claims asserted by the Plaintiffs in this action ***do not*** fall within the definition of Scheduled Liabilities.   Instead, Plaintiffs' claims against Global Bankers Insurance Group, LLC – which is separately named as a Defendant in this adversary proceeding (Am. Compl. ¶ 523) – fall within the definition of Unscheduled Liabilities which the Sale Order specifically provides were not transferred to Aspida Holdco as part of the sale approved by the Court.[10]

With GBIG Holdings' contribution of the Global Bankers Insurance Group, LLC membership units to Pavonia in concert with the Order of Rehabilitation placing Pavonia into court-supervised rehabilitation on July 9, 2019, Lindberg ceded administrative control of Global Bankers Insurance Group, LLC to the Rehabilitator of Pavonia. The Rehabilitator maintained control of Global Bankers Insurance Group, LLC through the sale of the membership units to Aspida Holdco on July 8, 2021.  Following the sale of the membership units to Aspida Holdco, Lindberg has had no relationship or affiliation with, and has exercised

---

[10] Ultimately, Pavonia was sold to Axar Capital, LLC ("Axar") in 2022. *See* Joint Notice Regarding Closing of Sale of Pavonia Under Stock Purchase Agreement attached hereto as Exhibit D.  Neither Aspida Holdco not Aspida Financial have any affiliation with Axar.  Pursuant to the Services Agreement approved by the Sale Order, Aspida Financial provided some services and operational support related to Pavonia to Axar through July 2023.

no control whatsoever over, Aspida Financial.  Since the acquisition of the membership units, Aspida Financial has conducted business operations that are completely removed and separated from any prior relationship that Global Bankers Insurance Group, LLC had with Lindberg.

### B. Allegations Against Aspida Holdco And Aspida Financial In The Amended Complaint

The Amended Complaint identifies Aspida Holdco and Aspida Financial as Defendants in Paragraphs 167 and 168, alleging that they are necessary parties and entities existing under the laws of the State of Delaware. (Am. Compl., ¶¶ 167 – 168).  The Amended Complaint's only further allegations concerning Aspida Holdco and Aspida Financial are set forth in Paragraphs 1703 – 1713 under a heading entitled "Additional Efforts to Bolster NCIC Liquidity."  In that section of the Amended Complaint, Plaintiffs allege the following:

- Shortly after the rehabilitation of the North Carolina Insurance Companies in North Carolina, Lindberg "engineered and consented" to the rehabilitation of Pavonia in Michigan with the Director of the Michigan Department of Insurance and Financial Services, at a time when Pavonia was not insolvent and not in need of rehabilitation (Am. Compl., ¶ 1704);

- The rehabilitation of Pavonia was occasioned and intended by Lindberg as a vehicle to facilitate the sale of Pavonia and its subsidiary Global Bankers Insurance Group, LLC to a third party, with the goal of separating Pavonia from Lindberg for the benefit of the North Carolina Insurance Companies and ultimately Lindberg (*Id.*);

- The proposed sale of Pavonia was to Aspida Holdco in exchange for cash to be paid at closing and an immediate $25 million loan from Aspida Holdco to GBIG Holdings (*Id.*, ¶ 1705);

- The loan from Aspida Holdco was secured by GBIG Holdings stock and the stock of Pavonia, with which PBLA's assets are somehow "intertwined" (*Id.*, ¶ 1706);

- The North Carolina Insurance Companies and certain Lindberg Affiliates executed a Subordination Agreement under which PBLA's debt "was

> subordinated in favor of the [North Carolina Insurance Companies'] debt to Aspida Holdco (*Id.*, ¶ 1707);

- Representatives of the North Carolina Insurance Companies in rehabilitation and representatives of GBIG Holdings communicated as to the use of the proceeds of the $25 million loan from Aspida Holdco (*Id.*, ¶¶ 1709 – 1709);

- While the loan from Aspida Holdco was completed, Lindberg reneged on the sale of Pavonia to Aspida Holdco. To settle ensuing litigation, the Aspida Holdco, GBIG Holdings and the Pavonia rehabilitator agreed only to sell the membership units of Global Bankers Insurance Group, LLC to Aspida Holdco, and to refinance and repay the $25 million loan to Aspida Holdco through another entity (*Id.*, ¶ 1710);

- Lindberg caused GBIG Holdings to sell Pavonia to Axar in January 2022 for the sum of $75 million. (*Id.*, ¶ 1711);

- Lindberg executed the Aspida Holdco and Axar transactions without notice to the Plaintiffs (*Id.*, ¶ 1712);

- Neither PBLA nor the PBLA ULICO Trust received any of the proceeds of the sale of Pavonia to Axar (*Id.*, ¶ 1713).

Other than references in connection with these transactions, Aspida Holdco and Aspida Financial are not specifically named or identified in any of the individual causes of action in the Amended Complaint. The Amended Complaint contains no allegations: (a) of any alleged misconduct by Aspida Holdco or Aspida Financial in connection with the Pavonia rehabilitation proceeding or in connection with Aspida Holdco's acquisition of the membership interests of Global Bankers Insurance Group, LLC in July 2021; and (b) of any funds of PBLA or any other Plaintiff being fraudulently transferred to Aspida Holdco or Aspida Financial as part of the Sale Order approved by the Michigan state court or at any other time.

Counts 1, 2, 4, 5, 6, 11, 12, 13, 14, 17, 18, 19, 20, 21, 33, 34, 35, 36, 37, 42 and 43 of the Amended Complaint name the "Lindberg Affiliates" as Defendants but contain no specific allegations against either Aspida Holdco or Aspida Financial.

**ARGUMENT**

I.    **APPLICABLE STANDARD.**

In evaluating a motion to dismiss under Rule 12(b)(6) the Court accepts the complaint's factual allegations as true, drawing all reasonable inferences in the plaintiff's favor. *See Krys v. Pigott*, 749 F.3d 117, 128 (2d Cir.2014).  The Court is not, however, "bound to accept as true a legal conclusion couched as a factual allegation." *Renco Group, Inc. v. Wilmington Trust, N.A. (In re Magnesium Corp. of America),* 583 B.R. 637, 645-46 (Bankr. S.D. N.Y. 2018) *quoting Papasan v. Allain*, 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986). Moreover, "[t]hreadbare recitals of the elements of a cause of action supported by conclusory statements" do not constitute sufficient factual allegations. *Id. citing Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (2009) (*quoting Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

II.    **THE AMENDED COMPLAINT FAILS TO STATE A CLAIM UNDER RULE 12(b)(6).**

    A.    **The Michigan Rehabilitation Orders Bar The Prosecution Of This Action Against Aspida Holdco and Aspida Financial.**

Aspida Holdco and Aspida Financial stand on different footing than all of the hundreds of other alleged "Lindberg Affiliates" in this proceeding.  Aspida Holdco has never been a company affiliated in any way with Lindberg or any of his related entities.  Aspida Financial successfully separated itself from Lindberg and was no longer a "Lindberg Affiliate" in any way as a result of a court-approved acquisition of the membership units of Global Bankers Insurance Group, LLC by Aspida Holdco through the insurance rehabilitation proceeding initiated by the

Insurance Commissioner for the State of Michigan.  The purpose of the Michigan rehabilitation proceeding was to salvage the assets of Pavonia under the supervision of the Michigan state court, including Global Bankers Insurance Group, LLC, in a manner designed to protect and promote the public interest, and in doing so eliminate the taint and overhang caused by the alleged wrongful actions of Lindberg and his associates.

The Amended Complaint includes an implausible and patently absurd allegation that Lindberg "engineered and consented to" the rehabilitation of Pavonia with the Michigan Commissioner of Insurance. (Am. Compl., ¶ 1704).  This allegation is not well pled and should not be accepted by the Court as true for purposes of this Motion to Dismiss.  If believed, it would mean that the Commissioner of a Michigan state executive agency appointed by the Governor of Michigan acted in concert with Lindberg to orchestrate an insurance rehabilitation proceeding under Michigan state law.  Not only do Plaintiffs allege no evidence to support this allegation, they also completely ignore that the Pavonia rehabilitation was supervised by the Michigan Court, and any transactions involving Pavonia and its assets were subject to review and approval by that state court.  Aspida Holdco and Aspida Financial do not dispute that Pavonia was not insolvent at the time of its rehabilitation as alleged by Plaintiffs (*Id.*) – that fact is plainly set forth in the Rehabilitation Order attached as Exhibit A.  However, the Rehabilitation Order goes on to explain in its findings why the rehabilitation of Pavonia was nonetheless appropriate for the following reasons: (1) that Pavonia was part of the GBIG Holdings insurance holding company system and there were concerns of whether the non-Pavonia affiliated companies had sufficient liquid assets to pay all outstanding financial obligations; (2) that Pavonia's ultimate owner Lindberg was under federal criminal indictment which disrupted Pavonia's relationships with its business partners; and (3) the rehabilitation of the North Carolina Insurance Companies triggered

the Michigan Commissioner's duties to take action to take action to continue Pavonia's financial stability. (Exhibit A, pp. 4 – 5).

The actions of the Michigan Court in administering the assets of Global Bankers Insurance Group, LLC as a wholly owned subsidiary of Pavonia, are without ambiguity or dispute. The Michigan Court, pursuant to the Michigan Insurance Code, authorized and approved the transfer of the membership units of Global Bankers Insurance Group, LLC to Aspida Holdco free and clear of all claims, including the claims asserted by the Plaintiffs in the Complaint. Plaintiffs and their counsel are aware that Aspida Financial has ceased to be a "Lindberg Affiliate" and are aware of the Michigan Court orders, all of which are matters of public record, and of which this Court can take judicial notice. In identifying Aspida Holdco and Aspida Financial as Defendants, (Am. Compl., ¶¶ 167 – 168), Plaintiffs just ignore this plain knowledge and hide behind the laziness of including Aspida Holdco and Aspida Financial as "Lindberg Affiliates" when Plaintiffs know such allegations to be demonstrably false based upon the orders entered by the Michigan Court in the Pavonia rehabilitation proceeding.

The orders from the Pavonia rehabilitation proceeding are what set Aspida Holdco and Aspida Financial apart from every other entity Defendant named in the Amended Complaint. The Second Circuit has recognized the importance of deference to state regulatory schemes governing insurers being rehabilitated or liquidated under state insurance laws. *See Law Enforcement Insur. Co. v. Corcoran*, 807 F.2d 38,44 (2d Cir.1986), *cert. denied*, 481 U.S. 1017, 107 S.Ct. 1896, 95 L.Ed.2d 503 (1987) (acknowledging a "complex administrative and judicial system for regulating and liquidating domestic insurance companies," the expertise of the Superintendent, the necessity of marshalling the claims and assets in one place, and the 'express

federal policy of noninterference in insurance matters' embodied in the McCarran-Ferguson Act.") *see also Levy v. Lewis*, 635 F.2d 960 (2d Cir.1980).

The Michigan rehabilitation proceeding for Pavonia was a proceeding in which the plaintiff was the state insurance commissioner acting under the Michigan Insurance Code to administer the assets of an insurer under Michigan state law.  In *Mondrus v. Mutual Benefit Life Insurance Co.,* 775 F.Supp. 1155 (N.D.Ill.1991), the United States District Court for the Northern District of Illinois addressed a similar insurance rehabilitation statute in place in New Jersey finding that:

> The McCarran–Ferguson Act, 15 U.S.C. §§ 1011–1015, specifically authorizes the states to continue serving their traditional role as the preeminent regulators of the insurance industry. Under this regulatory authority, most states, including New Jersey, have adopted complex and comprehensive schemes to govern the rehabilitation and liquidation of insolvent insurers. The New Jersey regulation entails the very type of "partnership" between the New Jersey state courts and the Commissioner of Insurance as discussed in Burford. The New Jersey courts issue the orders of rehabilitation, enjoin suits against the rehabilitator (*i.e.* the Commissioner of Insurance) to protect the proceedings, and oversee the assessment of claims against the insurer's estate.

*Id*. at 1158; *accord In re Philips Offset Co., Inc.*, 152 B.R. 836 (Bankr. S.D.N.Y. 1992).  These are the very things that took place in the Michigan Proceeding, including the final sale of the membership units of Global Bankers Insurance Group, LLC free and clear of the claims Plaintiffs seek to assert through the Complaint.  The Court should reject Plaintiffs' attempt to obtain this Court's interference in Michigan's regulatory scheme for rehabilitation of Michigan domiciled insurers.

Chapter 81 of the Michigan Insurance Code, entitled "Supervision, Rehabilitation and Liquidation," sets forth the statutory provisions for delinquency proceedings against an insurer under Michigan *state law*.  MCLA § 500.8101, *et seq*. Of significance, the McCarran–Ferguson Act, 15 U.S.C. §§ 1011-1015, exempts the business of insurance from most federal regulation

and keeps insurance regulation in the hands of the states. Included within the ambit of a state's

regulation of insurance are the rehabilitation and liquidation of insolvent or financially troubled

insurers who do not have the option of pursuing proceedings under the federal bankruptcy laws.

Upon appointment, the rehabilitator of a Michigan insurer is directed "*to take immediate

possession of the assets of the insurer*, and to administer them under the court's general

supervision" and the "order to rehabilitate the insurer shall by operation of law *vest title to all

assets of the insurer in the rehabilitator*." MCLA § 500.8113(1) (emphasis added). Pursuant to

the applicable Michigan statutes, the rehabilitator of a Michigan insurer:

> may take such action as he or she considers necessary or appropriate to reform
> and revitalize the insurer including, but not limited to, the powers in section
> 8121(1)(f), (l), (m), (r), and (u). The rehabilitator has all the powers of the
> directors, officers, and managers, whose authority shall be suspended, except as
> they are redelegated by the rehabilitator. The rehabilitator has full power to direct
> and manage, to hire and discharge employees subject to any contract rights they
> may have, and *to deal with the property and business of the insurer*.

MCLA § 500.8114(2) (emphasis added).

Throughout the rehabilitation proceeding, Global Bankers Insurance Group, LLC was a

wholly owned subsidiary of Pavonia, a Michigan domiciled life insurer that unquestionably was

subject to regulation in Michigan. Accordingly, the membership units of Global Bankers

Insurance Group, LLC were property and assets owned by Pavonia, the title to which became

vested in the Michigan rehabilitator when Pavonia was placed into rehabilitation. As a result, the

Michigan rehabilitator acquired title to Pavonia's ownership of the membership units in Global

Bankers Insurance Group, LLC just as any other property of that insurer (*e.g.*, cash, real estate,

accounts receivable, etc.). Moreover, the Michigan rehabilitator was granted the specific

statutory power to "deal with the property and business" of Pavonia subject to the general

supervision of the Michigan state court.

14

The Michigan rehabilitator's sale of membership units of Global Bankers Insurance Group, LLC to Aspida Holdco was part of an overall plan for the rehabilitation of Pavonia. That plan of rehabilitation could not be undertaken unilaterally by the Michigan rehabilitator or by Lindberg, but only after petitioning and receiving approval by the Michigan Court overseeing the rehabilitation. That plan of rehabilitation initially provided for the sale of Pavonia itself to Aspida Holdco. However, following objections to that sale by Lindberg and GBIG Holdings, and the execution of an Interim Settlement Agreement, the plan evolved by July 2021 into a sale of just the membership units of Global Bankers Insurance Group, LLC to Aspida Holdco. That sale of the membership interests to Aspida Holdco was approved by the Michigan Court as part of a plan to rehabilitate Pavonia on the following terms:

- Aspida Holdco paid the Pavonia rehabilitator $5.5 million for the membership units of Global Bankers Insurance Group, LLC;

- As part of the transaction, Aspida Holdco acquired title to the membership units subject only to certain "Scheduled Liabilities," which ***do not*** include the claims on which Plaintiffs seek recovery in this proceeding;

- Aspida Holdco took ownership of the membership units free and clear of any liens, security interests or encumbrances, as well as adverse claims of third parties of any kind or nature other than the "Scheduled Liabilities";

- Subject to injunctions entered by the Michigan state court under MCLA § 500.8105 which enjoined the pursuit of claims against Aspida Financial or the membership units acquired by Aspida Holdco; and

- The Michigan state court retained continuing, exclusive jurisdiction to hear and determine all claims controversies disputes and demands arising out of the Order approving of the sale of the membership interests to Pavonia.

On these terms, the Michigan rehabilitation court approved of the sale of the membership units to Aspida Holdco. As set forth in the Sale Order approving the sale, Aspida Holdco would not have entered into the agreement or paid $5.5 million for the membership units without the Michigan state court's approval of the terms and conditions of the sale. As a final decision of the Michigan Court with jurisdiction over the Pavonia rehabilitation proceeding, the Sale Order has preclusive effect under principles of collateral estoppel and *res judicata*, and is entitled to full, faith and credit in this Court. *See Underwriters Nat Assur Co v N Carolina Life & Acc & Health Ins. Guar. Ass'n*, 455 US 691, 715 (1982) (where receivership court decided it had subject matter, *in personam*, and *in rem* jurisdiction, trial court approving rehabilitation plan was *res judicata* and entitled to full faith and credit).

In pursuing their claims against Aspida Holdco and Aspida Financial in the Amended Complaint, Plaintiffs are asking this Court to ignore Michigan's overall statutory scheme for the rehabilitation of a Michigan insurer under Michigan state law, and to second-guess the Michigan rehabilitator and Michigan Court on how to best deal with the assets of Pavonia being rehabilitated under state law, and in the best interests of the insurer, its policyholders and creditors, and the public. In this case, the Michigan rehabilitator took title to the membership units in Global Bankers Insurance Group, LLC as part of the Pavonia rehabilitation proceeding after any alleged wrongful transfers to Global Bankers Insurance Group, LLC, and made the decision that it was in Pavonia's best interests to sell those membership units to Aspida Holdco for $5.5 million subject to the terms and conditions approved by the Michigan state court. Any

alleged liability for transfers to Global Bankers Insurance Group, LLC that predated the July 2021 Sale Order approved by the Michigan Court was not transferred to Aspida Holdco as part of the sale. Moreover, no funds of Plaintiffs were ever transferred to Aspida Holdco as part of the transaction.

The final order of the Michigan Court provides that Aspida Holdco acquired the membership units free and clear of the very claims Plaintiffs seek to pursue in the Amended Complaint, and this Court should not revisit matters previously and finally determined by the Michigan Court under its exclusive jurisdiction and the power and authority of the Michigan Director of the Department of Insurance and Financial Services to oversee the rehabilitation of a Michigan domiciled insurer. Allowing Plaintiffs' claims to proceed would: (a) allow Plaintiffs to circumvent the jurisdiction of the Michigan Court to oversee insurer rehabilitation proceedings; (b) re-open issues that were fully and finally litigated by the Michigan Court; and (c) improperly interject this Court into matters of insurance regulation specifically delegated to the states under federal law.

Finally, Plaintiffs have no argument that they did not have sufficient notice of the Pavonia rehabilitation proceeding. First, under the Michigan Insurance Code, Plaintiffs had constructive notice of the Pavonia rehabilitation because the filing or recording of the rehabilitation order "with the clerk of the circuit court or register of deeds for the county in which the principal business of the company is conducted, or the county in which its principal office or place of business is located, ***shall impart the same notice as a deed, bill of sale, or other evidence of title duly filed or recorded with that register of deeds would have imparted***." MCLA § 500.8113(1) (emphasis added). Second, Plaintiffs had constructive notice of the sale of the membership units in Global Bankers Insurance Group, LLC because the order approving the

sale of the membership interests to Aspida Holdco authorized the service of the approval order on all other potential interested persons or entities by posting the order on the Michigan rehabilitator's website, and found that such service was "reasonably calculated to give the listed individuals and entities, together with any other potentially interested individuals and entities, actual notice of the Order and is otherwise reasonable under the circumstances." Thus, even without actual notice, Plaintiffs had constructive notice of the Pavonia rehabilitation proceeding and the sale of the membership units of Global Bankers Insurance Group, LLC.

Moreover, the allegations of the Amended Complaint suggest that Plaintiffs were well aware of Pavonia's rehabilitation proceeding. Paragraph 1088 of the Amended Complaint references a Wall Street Journal article concerning Lindberg's alleged diversion of $2 billion, which "portrayed Lindberg in a manner that raised immediate reputational concerns." (Am. Compl. ¶ 1088). Lindberg's criminal indictment and arrest followed shortly thereafter on March 18, 2019 and April 2, 2019. (*Id.*, ¶¶ 1089 – 1090). Shortly following these well-publicized events, the Bermuda Monetary Authority imposed conditions to be added to the Certificates of Registration of PBLA, Omnia and Northstar, including that these three Debtors obtain approval before establishing bank accounts or moving assets, and restricting them from modifying the terms of any investments without prior approval. (*Id.*, ¶ 1658). Following all of these events, if the Debtors were not aware of and closely monitoring all proceedings involving Lindberg's insurance affiliates, including Pavonia, they were sticking their heads in the sand.

Based upon all of the foregoing, and honoring the precepts articulated in the *Burford* abstention doctrine, *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943)[11], the Court should: (a) refuse Plaintiffs attempt to have this Court circumvent the

---

[11] Where timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are "difficult

exclusive jurisdiction of the Michigan Court to oversee insurer rehabilitation proceedings under

Michigan state insurance law; (b) decline to re-open issues that were fully and finally litigated by

the Michigan Court; and (c) not interject itself into matters of insurance regulation specifically

delegated to the states under the McCarran-Ferguson Act.

### B. The Amended Complaint Fails To Identity Any "Voidable Transfers" To Aspida Holdco Or Aspida Financial Or To Meet The Pleading Standard For Fraud.

Although attempting to remedy deficiencies in their original pleading, new allegations in

Plaintiffs' Amended Complaint still fail to allege any improper transfer of funds and value to

Aspida Holdco or Aspida Financial in a manner that causes those transfers to be recoverable for

the benefit of the foreign estate of PBLA.  The critical information in evaluating and responding

to the Amended Complaint is understanding what transfers were made and when.  Despite its

length, the Amended Complaint is devoid of this basic information with respect to Aspida

Holdco or Aspida Financial.   In *In re Fedders North America, Inc.,* 405 B.R. 527 (Bankr. D.

Del. 2009) the court granted a motion to dismiss a fraudulent transfer action based on the

inability of the plaintiff to specify the actual transfers it sought to recover, observing that:

> The complaint also makes reference to "exorbitant salaries," "large bonuses," and
> "interest free" loans given to the Individual Defendants. (Compl. at ¶ 53). But
> with the exception of Salvatore Giordano, Jr., the complaint fails to state who
> received these perks, in what amounts, and under what circumstances. Instead, the
> complaint simply alleges that the transfers to the insiders and outside directors
> "included (but were not limited to) all forms of compensation that they received."
> (Compl. at ¶ 116). These vague references are insufficient to state a claim for
> actually fraudulent transfers.

*Id.* at 546.

---

questions of state law bearing on policy problems of substantial public import whose importance
transcends the result in the case then at bar"; or (2) where the "exercise of federal review of the question
in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with
respect to a matter of substantial public concern." *New Orleans Public Serv., Inc. v. Council of the City of
New Orleans, 491 U.S. 350, 361, 109 S.Ct. 2506, 2514, 105 L.Ed.2d 298 (1989) (quoting Colorado River
Water Conservation Dist. v. United States,* 424 U.S. 800, 814, 96 S.Ct. 1236, 1244-45, 47 L.Ed.2d 483
(1976)).

New allegations in the Amended Complaint concerning transactions involving Aspida Holdco and Aspida Financial still fail to state a claim against these Defendants.

    i.      *Aspida Holdco's $25 Million Loan Transaction, Subordination Agreement And Use Of Loan Proceeds.*

As alleged in the Amended Complaint, the original plan for the rehabilitation of Pavonia provided for a sale of Pavonia to Aspida Holdco, which involved an immediate loan of $25 million from Aspida Holdco to GBIG Holdings. (Am. Compl., ¶ 1705). The $25 million loan from Aspida Holdco did involve a Subordination Agreement, but not on the terms as alleged by Plaintiffs in the Amended Complaint. The Subordination Agreement (attached hereto as Exhibit E) subordinated certain debts owed to GBIG Holdings to the $25 million loan from Aspida Holdco. None of the indebtedness being subordinated in the Subordination Agreement was debt of any of the Debtors in this bankruptcy proceeding. (Exhibit E, Schedule 1). Moreover, the only debt involving the North Carolina Insurance Companies that was the subject of the Subordination Agreement was one 2016 loan to GBIG Holdings in which Southland National Insurance Company was one of 11 lenders participating in the loan. (*Id.*).[12] Simply put, the Subordination Agreement makes clear that nothing owed to the Debtors was the subject of the Subordination Agreement, contrary to the allegations of Paragraph 1707 of the Amended Complaint.

The Amended Complaint includes no allegation that Aspida Holdco had any involvement with the ultimate use of the proceeds of its $25 million loan. To the contrary, the Amended Complaint alleges that the use of the loan proceeds was the subject of discussions between and among Lindberg's "Senior Decision Makers" and representatives of the North Carolina Insurance Companies in rehabilitation. (Am. Compl., ¶¶ 1708 – 1709). The Amended Complaint

---

[12] Colorado Bankers Life Insurance Company was also a party to the Subordination Agreement, but only as a successor agent.

makes no allegation that Aspida Holdco had any involvement or input concerning the use of the loan proceeds once the $25 million loan was made.

The Amended Complaint further admits that following the $25 million loan, the relationship between Lindberg/GBIG Holdings and Aspida Holdco became adversarial, as Lindberg reneged on the sale of Pavonia to Aspida Holdco which resulted in litigation between Lindberg, GBIG Holdings and Aspida Holdco in the Michigan courts. (Am. Compl., ¶ 1710; *see also* Exhibit B, p. 3).  Given such adverse relationship, the Amended Complaint cannot sustain any allegation that Aspida Holdco was somehow acting in concert with Lindberg.  As part of a settlement of those disputes, the parties agreed to go forward with only a sale of the membership units of Global Bankers Insurance Group, LLC to Aspida Holdco, and to refinance and repay the $25 million loan from Aspida Holdco. (*Id*.). The funds to repay Aspida Holdco came from GBIG Holdings and another entity identified in the Amended Complaint as Strategic Income Fund, LLC.  Of significance, none of the funds to repay the Aspida Holdco loan are alleged to have come from any of the Debtors in this proceeding.  All that the Amended Complaint alleges with respect to this loan is that Aspida Holdco loaned $25 million to GBIG Holdings when there was an agreement for Aspida Holdco to acquire Pavonia, and when that agreement fell through because of Lindberg's objection, the funds loaned by Aspida Holdco were repaid by GBIG Holdings and another entity.  The fact that Aspida Holdco was repaid its own funds that were loaned to GBIG Holdings – without any allegation that any of Debtors' funds were utilized in the repayment – simply cannot create any liability on the part of Aspida Holdco to Plaintiffs for any of the claims alleged in the Amended Complaint.

ii.    *Purchase Of Membership Units Of Global Bankers Insurance Group, LLC.*

After the sale of Pavonia to Aspida Holdco fell through, Pavonia was eventually sold to Axar in exchange for $75 million. (Am. Compl. ¶ 1711), and Aspida Holdco ultimately purchased the only membership units of Global Bankers Insurance Group for $5.5 million. (*Id.*, ¶ 1710; *see infra*, pp. 10 – 18).  As discussed earlier, the Michigan Court Order approving the sale of the membership units to Aspida Holdco found that the consideration being paid by Aspida Holdco to acquire the membership units was reasonably equivalent value, and protected the Pavonia rehabilitation estate which was the recipient of the purchase price paid by Aspida Holdco. (Exhibit B, pp. 7 – 8).  The Amended Complaint includes no allegation that the consideration paid by Aspida Holdco to acquire the membership interests of Global Bankers Insurance Group, LLC was in any way insufficient.

Aspida Holdco and Aspida Financial would further point the Court's attention to the different treatment that the Amended Complaint gives to Axar, who was the ultimate purchaser of Pavonia.  Count 43 of the Amended Complaint includes a claim for a declaratory judgment as to PBLA's rights and interests with respect to Pavonia pursuant to North Carolina Law.  The defendants named in that cause of action are Lindberg, the Lindberg Affiliates, and Axar.  This is the only cause of action in which Axar is specifically named as a defendant, and as Axar is named separately from the "Lindberg Affiliates", it is apparent that Plaintiffs recognize that Axar **is not a Lindberg Affiliate**.  And unlike this declaratory judgment claim against Axar arising from its purchase of Pavonia, the Amended Complaint does not include any separate cause of action for a declaratory judgment concerning Aspida Holdco's acquisition of the membership units of Global Bankers Insurance Group, LLC.  As a result, it is unclear what possible separate theory of liability Plaintiffs have against Aspida Holdco and Aspida Financial when no separate

22

claim naming Aspida Holdco and Aspida Financial is included anywhere in the Amended Complaint.

>                iii.    *The Amended Complaint Alleges No Claim of Fraud Against*
>                        *Aspida Holdco Or Aspida Financial.*

Among the various theories cited by Plaintiffs for recovery against Aspida Holdco and Aspida Financial are purported claims for fraud.  However, all of Plaintiffs' fraud claims are premised on unspecified allegations that alleged transfers were all part of a "vast and intricate fraudulent scheme" engineered and implemented by Lindberg and his associates from 2017 – 2019, (Am. Compl., ¶ 6), and that any transfers to Aspida Holdco and Aspida Financial and all of the other defendants were "sham transactions" carried out to "siphon over $500 million of liquid assets directly from the Debtors for the benefit of Lindberg and the Lindberg Affiliates." *Id*. ¶ 6; *see Silverman Partners, L.P. v. First Bank*, 687 F.Supp. 2d 269, 288 (E.D.N.Y. 2010) (applying Rule 9(b) to breach of fiduciary duty, conversion, and unjust enrichment claims)  "[T]o state an actual fraudulent transfer claim with Rule 9(b) particularity, a party must ordinarily allege: (i) the property that was conveyed; (ii) the timing and, if applicable, frequency of the transfer; and (iii) the consideration (if any) paid for the transfer...in addition to specifically identifying the transfers to be avoided, a party must also sufficiently plead the element of fraudulent intent required by Rule 9(b)." *O'Connell v. Penson Fin. Services, Inc. (In re Arbco Capital Mgmt., LLP),* 498 B.R. 32, 40–41 (Bankr.S.D.N.Y.2013).   Plaintiffs cannot, as they have done here, rely upon a group pleading asserting that 949 different entity Defendants received the alleged benefit of an unknown number of transfers in unknown amounts on unspecified dates. "[G]roup pleading is generally forbidden because each defendant is entitled to know what he is accused of doing." *O'Connell v. Arthur Andersen LLP (In re AlphaStar Ins. Grp. Ltd.),* 383 B.R. 231, 257–58 (Bankr.S.D.N.Y.2008); *see also Di Vittorio v. Equidyne*

*Extractive Indus. Inc.*, 822 F.2d 1242, 1247 (2d Cir.1987) ("Where multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud.").  This is especially true for Aspida Holdco and Aspida Financial – unique from all other entity defendants named in the Amended Complaint – which accomplished a "clean break" from Lindberg and his associates when the membership units of Global Bankers Insurance Group, LLC were sold to Aspida Holdco.[13]

The allegations in the Amended Complaint make clear that any involvement of Aspida Holdco and Aspida Financial is limited to the transactions involving Pavonia and the Pavonia rehabilitation proceeding outlined above.  Despite being grouped by Plaintiffs within the broad definition of "Lindberg Affiliates" in the Amended Complaint, Aspida Holdco and Aspida Financial:

- Are not included as defendants in any of Plaintiffs' RICO claims in the Amended Complaint (Am. Compl. ¶¶ 1583 – 1625);

- Are not included as defendants associated with any of the allegedly fraudulent transactions causing harm to PBLA, Omnia, Northstar, or PBIHL (Am. Compl. ¶¶ 1164 – 1582);

- Are not included as parties to, or defendants associated with, alleged violations of the Memorandum of Understanding ("MOU") and Interim Amendments to Loan Agreement ("IALA") (Am. Compl. ¶¶ 1626 – 1702, 1714 – 1851);

---

[13] Aspida Holdco and Aspida Financial submit that Plaintiffs should not be provided an opportunity to conduct discovery in the hope of finding evidence to support claims against Aspida Holdco and Aspida Financial.  Plaintiffs allege in their Amended Complaint that they have spent more than 57,000 person-hours in pursuit their duties, and in reviewing and analyzing books and records of the Debtors and other custodians. (Am. Compl., ¶¶ 63 – 64).  What Plaintiffs fail to acknowledge, however, is that a large tranche of documents related to the time period prior to July 2021 related to Global Bankers Insurance Group, LLC and others was voluntarily provided to counsel for the Plaintiffs in the Fall of 2021.  On subsequent occasions, Aspida Financial cooperated with Rule 2004 requests for documents issued in connection with this proceeding.  If any of those books and records provided any support for any claim against Aspida Holdco or Aspida Financial, Plaintiffs would have included such allegations in the Amended Complaint.  The fact that such allegations have not been made is further support for Aspida Holdco's and Aspida Financial's arguments for a dismissal.

- Are not identified as "Debtor Investment Counterparties" on Exhibit A to the Amended Complaint;

- Are not identified in the list of Specified Affiliated Entities in Schedule I to the Amended Complaint;

- Are not identified in the list of MOU Affected Parties in Schedule II to the Amended Complaint; and

- Are not identified in the list of IALA Affected Parties in Schedule III to the Amended Complaint.

As the transactions involving Pavonia that Aspida Holdco and Aspida Financial were parties to through the Michigan rehabilitation proceedings with the approval of the Michigan Court were intended to distance and remove Aspida Holdco and Aspida Financial from Lindberg's intricate web of allegedly fraudulent transactions, the Amended Complaint fails to allege how any of these transactions involved any actionable fraud on Plaintiffs.

### C. Plaintiffs' Amended Complaint Fails To Make A Short And Plain Statement Of The Claim For Relief Against Aspida Holdco And Aspida Financial.

Plaintiffs have also failed to meet the requirement that they present the Court and Aspida Holdco and Aspida Financial with a short and plain statement of the claim for relief. Fed R. Bankr. P. 7008. The Amended Complaint is neither short, understandable nor coherent. *See, In re Merrill Lynch & Co., Inc.,* 218 F.R.D. 76, 77–78 (S.D.N.Y.2003) (dismissing ninety-eight (98) page complaint comprised of three hundred and sixty-seven (367) paragraphs and explaining that "[w]hen a complaint is not short and plain, or its averments are not concise and direct, 'the district court has the power, on motion or sua sponte, to dismiss the complaint ....' ") (*quoting Simmons v. Abruzzo*, 49 F.3d 83, 86 (2d Cir.1995)).

**D. Aspida Holdco And Aspida Financial Are Entitled To Proceed Now With Their Motion To Dismiss.**

Aspida Holdco and Aspida Financial submit that the Court should proceed to hear their Motion to Dismiss now, without waiting for other Defendants to respond to the Amended Complaint. The unfounded and demonstrably false allegations that Aspida Holdco and Aspida Financial are "Lindberg Affiliates" continue to impact Aspida Holdco's and Aspida Financial's business and inflict reputational harm. Since July 2021, Aspida Holdco and Aspida Financial have forged their own new path in the insurance industry separate and apart from any prior relationship Global Bankers Insurance Group, LLC had with Lindberg and his affiliated companies. However, because they and their affiliates operate in the insurance industry, Aspida Holdco and Aspida Financial are subject to regulation. Having to disclose that they have been named as defendants in a lawsuit like this, and to disclose that they are being accused of being an affiliate of Lindberg, creates problems for Aspida Holdco and Aspida Financial with insurance regulators, and reputational harm for being accused of being an affiliate of Lindberg who faces a myriad of criminal charges and civil claims that will not be resolved any time in the near future. Moreover, discovery and litigation of the claims in the Amended Complaint could take years to reach a resolution given the number of parties and the nature of the claims alleged. The only way for Aspida Holdco and Aspida Financial to remove themselves from the cloud of being allegedly associated with Lindberg is to move forward with their Motion to Dismiss Plaintiffs' Amended Complaint without delay, and not wait any longer for other Defendants to respond to the Amended Complaint.[14]

---

[14] In the related case originally filed in this Court by Universal Life Insurance Company ("ULICO"), Aspida Financial filed a similar Motion to Dismiss, that was not ruled upon by the Court. Instead, the Court dismiss ULICO's Complaint for lack of jurisdiction, and that decision was appealed to the Southern District of New York. In an Order dated July 31, 2023, the district court reversed this Court's dismissal of ULICO's Complaint. (Order attached hereto as Exhibit F). The district court's Order noted Aspida's

## CONCLUSION

Wherefore, the Defendants Aspida Holdco and Aspida Financial Services, LLC pray that the Court enter an order dismissing the Complaint against them, and that the Court grant such other and further relief as is just and proper.

ASPIDA HOLDCO, LLC and
ASPIDA FINANCIAL SERVICES, LLC


by its attorneys,


__*/s/ Peter J. Haley*_____
Peter J. Haley
NELSON MULLINS RILEY & SCARBOROUGH LLP
One Financial Center
Boston, MA  02111
Tel: (617) 217-4714
Fax: (617) 217-4750
peter.haley@nelsonmullins.com

Alan F. Kaufman
NELSON MULLINS RILEY & SCARBOROUGH LLP
280 Park Avenue, 15th Floor West
New York, NY  10017
Tel: (646) 428-2600
Fax: (646) 428-2610
alan.kaufman@nelsonmullins.com

Christopher J. Blake (pro hac vice pending)
NELSON MULLINS RILEY & SCARBOROUGH LLP
4140 Parklake Avenue, Suite 200
Raleigh, North Carolina 27612
Telephone: (919) 329-3800
Fax: (919) 329-3799
chris.blake@nelsonmullins.com

Dated: October 16, 2023

---

separate dismissal arguments which had not been addressed by the Court, noting that the Court should consider those arguments "in the first instance" on remand.  Because the district court's Order has now been appealed to the Second Circuit, the ULICO proceeding does not present any opportunity for Aspida Financial's arguments to be addressed "in the first instance."

# EXHIBIT A

STATE OF MICHIGAN
CIRCUIT COURT FOR THE 30TH JUDICIAL CIRCUIT
INGHAM COUNTY

ANITA G. FOX, DIRECTOR OF THE
MICHIGAN DEPARTMENT OF
INSURANCE AND FINANCIAL SERVICES,

      Petitioner,

      Case No. _19-504_ -CR

v

      Hon. _WANDA M. Stokes_

PAVONIA LIFE INSURANCE
COMPANY OF MICHIGAN,

      Respondent.

_____/

STIPULATED ORDER
PLACING PAVONIA LIFE INSURANCE COMPANY OF MICHIGAN
INTO REHABILITATION, APPROVING COMPENSATION OF
SPECIAL DEPUTY REHABILITATORS, AND
PROVIDING INJUNCTIVE RELIEF

At a session of said Court
held in the Circuit Courtrooms
in the City of Lansing, Michigan on the
_9_ day of _July_, 2019.

PRESENT: HONORABLE _WANDA M. STOKES_
Circuit Court Judge

WHEREAS, Petitioner Anita G. Fox, Director of the Michigan Department of

Insurance and Financial Services ("**Director**"), has filed a Stipulated Petition

seeking an Order Placing Pavonia Life Insurance Company of Michigan into

Rehabilitation, Approving the Compensation of the Special Deputy Rehabilitators,

and Providing Injunctive Relief (the "**Stipulated Rehabilitation Petition**");

WHEREAS, Respondent Pavonia Life Insurance Company of Michigan ("**Pavonia**" or the "**Company**"), is a Michigan domiciled life, accident, and health insurance company authorized to conduct insurance business in Michigan under the Insurance Code of 1956 ("**Insurance Code**"), MCL 500.100 *et seq.* Pavonia received its Michigan certificate of authority on January 1, 1996 under its former name, Hamilton National Life Insurance Company. Pavonia is also licensed to conduct insurance business in 48 other states, the District of Columbia, and Canada. Pavonia's insurance business includes, but is not limited to, term and whole life insurance policies, corporate-owned life insurance policies, credit life and disability insurance policies, and periodic payment annuities. As of January 2012, Pavonia ceased writing any new insurance business but continues to collect renewal premium on its existing insurance business and is currently in run-off;

WHEREAS, Pavonia became part of an insurance holding company system within the meaning of Section 115(c) of the Insurance Code, MCL 500.115(c), following the Company's acquisition by GBIG Holdings, Inc. ("**GBIG Holdings**") in December 2017. As a result of this acquisition, Pavonia is now a wholly-owned subsidiary of GBIG Holdings and an affiliated company (through common ownership by GBIG Holdings) of four other North Carolina domestic insurance companies: (1) Colorado Bankers Life Insurance Company; (2) Southland National Reinsurance Corporation; (3) Southland National Insurance Corporation; and (4) Bankers Life Insurance Company (collectively, the "**Pavonia Affiliates**"). Global Bankers Insurance Group, LLC ("**ServiceCo**"), is a wholly-owned subsidiary of

2

Pavonia and provides all executive management, regulatory oversight review, and administrative services for Pavonia's operations. Completing the relevant holding company structure, GBIG Holdings is a wholly-owned subsidiary of GBIG Capital, LLC, which in turn is wholly-owned by Greg E. Lindberg, a North Carolina resident. Mr. Lindberg is therefore Pavonia's ultimate upstream owner and the Company's ultimate controlling person;

WHEREAS, on June 27, 2019, the North Carolina Commissioner of Insurance ("**North Carolina Commissioner**") placed the Pavonia Affiliates into court-supervised rehabilitation. The Pavonia Affiliates, as well as their ultimate controlling person Greg E. Lindberg, consented to the rehabilitation. Pursuant to the verified petition resulting in the North Carolina order of rehabilitation, the North Carolina Commissioner developed reasonable concerns regarding whether the Pavonia Affiliates' investment activity in non-insurance affiliates provided sufficient liquidity to assure the Pavonia Affiliates' ability to meet their outstanding financial obligations;

WHEREAS, Pavonia is financially stable and has not engaged in the non-insurance affiliate investment activity encumbering the Pavonia Affiliates. As of December 31, 2018, Pavonia had total net admitted assets of $1,101,463,298, total liabilities of $1,027,707,037, and capital and surplus of $73,756,261. Premiums in 2018 were $45,264,153, and net income, adjusted for a change in reserve valuation basis, was $7,022,304;

3

WHEREAS, despite Pavonia's stable financial condition and lack of non-insurance affiliate investments, the Director has concerns about potential financial risk to Pavonia that warrant placing Pavonia into rehabilitation with the Company's consent for the protection of the Company, its assets, policyholders, and creditors, pursuant to this Stipulated Order Placing Pavonia into Rehabilitation, Approving Compensation of Special Deputy Rehabilitators, and Providing Injunctive Relief ("**Order**"). First, because Pavonia is part of a holding company system owned by parent GBIG Holdings, reasonable concerns exist regarding whether GBIG Holdings, the Pavonia Affiliates, and other companies affiliated with Pavonia through common ownership by GBIG Holdings all possess sufficient liquidity to assure their respective abilities to meet outstanding financial obligations. If these non-Pavonia affiliated companies lack sufficient liquid assets to pay all outstanding financial obligations, their financial condition could potentially threaten Pavonia's current financial stability to the detriment of Pavonia's policyholders and creditors;

WHEREAS, second, in April 2019, the Department of Justice ("**DOJ**") unsealed a federal criminal indictment in the Western District of North Carolina charging Pavonia's ultimate owner, Greg E. Lindberg, with conspiracy to commit wire fraud and bribery of a public official. Mr. Lindberg denies all charges. Nevertheless, issuance of these federal criminal charges disrupted Pavonia's relationship with significant business partners, including Pavonia's primary financial institution that terminated its relationship (Pavonia has since secured a

4

replacement financial institution) and Pavonia's audit firm that determined it could not issue its audit report as required by Section 1005 of the Insurance Code, MCL 500.1005;

WHEREAS, third, the North Carolina Commissioner placing the Pavonia Affiliates into court-supervised rehabilitation on June 27, 2019 triggers the Director's regulatory duties to take action ensuring the continued financial stability of Pavonia for the protection of the Company, its assets, policyholders, and creditors;

WHEREAS, given these and related potential risks, Pavonia has developed a proposed plan to protect its assets, policyholders, and creditors, which includes a sale of the Company through a court-approved rehabilitation plan (the "**Plan**"). Representatives of the seller, GBIG Holdings ("**Seller**"), and of the buyer, Aspida Holdco LLC, a Delaware holding company that is an affiliate of ARES Management Corporation ("**Buyer**," and collectively with the Seller, the "**Interested Parties**"), have been in direct communications with the Michigan Department of Insurance and Financial Services ("**DIFS**") staff regarding the Plan. The Interested Parties acknowledge and agree that the Buyer must request and secure Form A approval from DIFS for the Company's acquisition. The Plan includes a Stock Purchase Agreement ("**SPA**") that the Buyer and Seller executed on July 9, 2019, subject to Form A regulatory approval by DIFS, under which the Seller will sell the stock of Pavonia to the Buyer;

5

WHEREAS, among other things, the Plan contemplates filing of the
Stipulated Rehabilitation Petition and entry of this Order which, together with a
separate, forthcoming proposed procedural order,[1] provide for a 90-day claim
process with a bar date ("**Claim Procedure**") and ordinary course of business
operations, which the Interested Parties have requested in an effort to protect the
Company, its policyholders, and the Buyer from the above-described potential risks
arising from the Pavonia Affiliates and/or current owner.  Claims that must be
submitted through the Claim Procedure include those of federal, state, and local
governments, if any (*e.g.*, the Internal Revenue Service, state taxing authorities)
and of other third parties that may claim liabilities not scheduled in Pavonia's
financial statements.  Obligations due in the ordinary course of business will be
paid as Class 1 priority administrative expenses under MCL 500.8142(1)(a).  Other
scheduled obligations (including, *e.g.*, assumed reinsurance and other executory
contracts, such as insurance policies and annuities) will be excepted from the Claim
Procedure.  The sale closing will not occur unless and until after Form A approval is
received from DIFS, the Claim Procedure concludes, this Court approves the
rehabilitation Plan that includes the sale, and the rehabilitation of Pavonia is
terminated;

WHEREAS, the Director has determined, and Pavonia agrees, that
rehabilitation will help to protect Pavonia, its assets, policyholders, and creditors.

---

[1] Detailed procedures governing the bar date, claim process, and other aspects of the Plan are
contained in the forthcoming *Order (i) Setting Bar Date and Approving Mandatory Procedures for
Claims for Unscheduled Liabilities; (ii) Approving Procedures for Notice, Comment and Hearing
Concerning Plan of Rehabilitation and (iii) Approving Combined Notice* ("**Procedural Order**").

6

Specifically, the North Carolina Commissioner's order of rehabilitation with respect to the Pavonia Affiliates, although predominantly relating to the non-insurance affiliate investment activity of those companies that Pavonia has not engaged in itself, creates potential risks to Pavonia, its assets, policyholders, and creditors that can be mitigated through this rehabilitation and implementation of the Plan. Similarly, the federal criminal charges against Pavonia's ultimate owner, Greg E. Lindberg, although denied and unproven at this time, create potential risks to Pavonia, its assets, policyholders, and creditors that can be mitigated through this rehabilitation and implementation of the Plan;

WHEREAS, Pavonia, by and through its Board of Directors, has consented to being placed into Rehabilitation under Chapter 81 of the Insurance Code, MCL 500.8101 – 500.8159 ("**Chapter 81**"), under the terms and conditions determined by the Director to be appropriate;

WHEREAS, Pavonia has further stipulated to the relief sought in the Stipulated Rehabilitation Petition and to the entry of this Order; and

WHEREAS, the Court has reviewed the Stipulated Rehabilitation Petition and the terms of this Order, and being otherwise fully advised, finds as follows:

A.     MCL 500.8102 provides that a proceeding under Chapter 81, including a rehabilitation proceeding, may be applied to an insurer that: (a) is or has been transacting insurance business in this state and against which claims arising from that business may exist now or in the future; or (b) has insureds resident in this

7

state.  Pavonia satisfies both criteria and is therefore subject to rehabilitation or

any other proceeding authorized by Chapter 81.

     B.     MCL 500.8112 vests this Court with jurisdiction to consider the

Director's Stipulated Rehabilitation Petition and to enter this Order.

     C.     MCL 500.8112 authorizes the Director to petition this Court for an

order authorizing the Director to rehabilitate Pavonia based on one or more of

thirteen (13) listed grounds.  These grounds include:

               \*               \*               \*

   (*l*) The board of directors . . . request[s] or consent[s] to rehabilitation
under this chapter.

     D.     Pursuant to MCL 500.8112(*l*), this Order authorizing the Director to

rehabilitate Pavonia is proper and should be entered because Pavonia's Board of

Directors has consented to rehabilitation under Chapter 81.

     E.     Pavonia has further stipulated to the relief sought in the Stipulated

Rehabilitation Petition and to the entry of this Order.

     F.     As defined by MCL 500.8103(b), a "**Creditor**" is a person having a

claim against Pavonia, whether matured or unmatured, liquidated or unliquidated,

secured or unsecured, absolute, fixed, or contingent.

     G.     The owners, holders, and beneficiaries of insurance policies, annuities,

and other insurance contracts of Pavonia, including insurance liabilities and

obligations arising under policies, annuities, and contracts assumed or otherwise

reinsured by Pavonia (collectively, the "**Policies**"), are collectively referred to herein

as the "**Policyholders**."

8

H. The rights of Policyholders in or to Policies that are: (1) currently recorded on the books and records of Pavonia or ServiceCo on behalf of Pavonia; or (2) identified or scheduled in: (a) Pavonia's 2018 annual and first quarter 2019 financial statements prepared according to statutory accounting principles (**"Pavonia's SAP Statements"**); and (b) ServiceCo's 2018 annual and first quarter 2019 financial statements prepared according to generally accepted accounting principles (**"ServiceCo's GAAP Statements,"** and collectively with Pavonia's SAP Statements, the **"Financial Statements"**), are referred to herein as the **"Policyholder Liabilities."**

I. The rights of, and the liabilities or obligations owed to, non-Policyholder Creditors that Pavonia has not formally disputed and that: (1) are identified or scheduled in the Financial Statements; or (2) Pavonia agrees are due and payable by Pavonia or ServiceCo in the ordinary course of their respective business operations, are referred to herein as the **"Non-Policyholder Liabilities,"** and collectively with the Policyholder Liabilities, the **"Scheduled Liabilities."**

J. All other Creditor claims against Pavonia or ServiceCo not included within the definition of "Scheduled Liabilities" above (regardless whether matured or unmatured, liquidated or unliquidated, secured or unsecured, absolute, fixed, or contingent, asserted or unasserted, known or unknown) are collectively referred to herein as the **"Unscheduled Liabilities."**

9

K.    All Creditor claims against Pavonia are within the exclusive jurisdiction of this Court and will be determined, resolved, paid, and/or discharged, in whole or in part, according to the terms and conditions approved by the Court.

L.    Because this rehabilitation of Pavonia includes the Claim Procedure for Unscheduled Liabilities, the rights and liabilities of all Creditors holding claims for Unscheduled Liabilities, and of Pavonia and ServiceCo with respect to such claims, are fixed as of the date of entry of this Order pursuant to MCL 500.8118(2).

M.    Based upon MCL 500.8105(1), the Court is authorized to enter this Order including terms that the Court considers necessary and proper to prevent, among other actions:

a)    Interference with the Rehabilitator or with the rehabilitation proceeding;

b)    The institution or further prosecution of any actions or proceedings against Pavonia, its assets, or its Policyholders;

c)    The obtaining of preferences, judgments, attachments, garnishments, or liens against Pavonia, its assets, or its Policyholders;

d)    The levying of execution against Pavonia, its assets, or its Policyholders; and

e)    Any other threatened or contemplated action that might lessen the value of Pavonia's assets or prejudice the rights of its Policyholders, Creditors, or shareholders, or the administration of this rehabilitation proceeding.

N.    MCL 500.8114(2), in conjunction with MCL 500.8121(1)(m), authorizes the Rehabilitator "[t]o prosecute an action that may exist on behalf of the creditors, members, policyholders, or shareholders of the insurer against an officer of the insurer or another person."

10

O.    Pursuant to MCL 500.8116(2), the Rehabilitator may petition the Court at any time for an order terminating the rehabilitation of Pavonia. The Court shall also permit Pavonia's Board of Directors to petition the Court for an order terminating the rehabilitation of Pavonia and may order payment from Pavonia's estate for costs and other expenses of the petition as justice may require. If the Court finds that rehabilitation has been accomplished and that grounds for rehabilitation under MCL 500.8112 no longer exist, it shall order that Pavonia be restored to possession of its property and the control of its business. The Court may also make that finding and issue that order at any time upon its own motion.

P.    Action placing Pavonia into rehabilitation is necessary to protect the interests of Pavonia, its Policyholders, its Creditors, and the public.

THEREFORE, IT IS HEREBY ORDERED that:

1.    Pursuant to MCL 500.8112 and MCL 500.8113, the Director's Stipulated Rehabilitation Petition is GRANTED, and Pavonia is placed into rehabilitation under Chapter 81.

2.    Pursuant to MCL 500.8113(1), the Director is appointed Rehabilitator of Pavonia, and is further authorized to appoint one or more Special Deputy Rehabilitator(s) pursuant to MCL 500.8114(1). Hereafter, the Director shall be referred to as the "Rehabilitator."

3.    Pursuant to MCL 500.8113(1), the Rehabilitator shall take immediate possession of all the assets of Pavonia and administer those assets under the Court's general supervision. As a wholly-owned subsidiary of Pavonia, ServiceCo is

11

included as an "asset of Pavonia" and all references hereafter to "Pavonia" shall
include ServiceCo as Pavonia's wholly-owned subsidiary.

4.    Pursuant to MCL 500.8113(1), this Order shall by operation of law vest
legal title to all assets, accounts, and moneys of Pavonia in the Rehabilitator. The
filing or recording of this Order with the Clerk of the Circuit Court or the Register
of Deeds for the county in which the statutory home office, principal place of
business, or resident agent of Pavonia is located shall impart the same notice as
would a deed, bill of sale, or other evidence of title duly filed or recorded with that
Register of Deeds.

5.    Pursuant to MCL 500.8115(1) and paragraph 21(a) of this Order, all
actions or proceedings in which Pavonia is a plaintiff that are pending as of the date
this Order is entered are automatically STAYED for ninety (90) days plus such
additional time as is necessary for the Rehabilitator to obtain proper representation
and prepare for further proceedings. Pursuant to paragraph 21(a) of this Order, the
institution or continuation of any actions or proceedings in which Pavonia is a
defendant, or is obligated to defend another party, is PROHIBITED AND
ENJOINED until such time as this Court enters an order lifting the injunction or
the Rehabilitator agrees that the matter may proceed.

6.    The Rehabilitator, without being specifically set forth in this Order,
shall have: (a) all the powers contained in MCL 500.8114 and 500.8115; (b) all
applicable powers set forth in Chapter 81; and (c) such additional powers as the
Court shall grant from time to time upon petition of the Rehabilitator.

12

7.     Pursuant to MCL 500.8114(2), upon entry of this Order, all powers of the current directors, officers, and managers of Pavonia are suspended in their entirety, and the Rehabilitator shall have and exercise the full and complete power of such directors, officers, and managers.  In her sole discretion, the Rehabilitator may redelegate, in writing, some or all of her authority to a former director, officer, or manager of Pavonia.

8.     Among her plenary powers provided by law, the Rehabilitator shall have full power and authority to direct and manage Pavonia, to hire and discharge Pavonia's officers, managers, and employees subject to any contract rights that they may have, and to deal in totality with the property and business of Pavonia.

9.     Subject to any contract rights and applicable law, upon entry of this Order all officers, managers, and employees of Pavonia shall remain employed unless and until they are notified by the Rehabilitator or Special Deputy Rehabilitator(s) that they have been discharged.

10.    Any director, manager, officer, employee, or agent of Pavonia and any other person shall, upon written request by the Rehabilitator or Special Deputy Rehabilitator(s), vacate any building, office, or other premises of Pavonia.

11.    Pursuant to MCL 500.8114(2) and (4), the Rehabilitator may take such action as she considers necessary or appropriate to reform or revitalize Pavonia, and is empowered to pursue all avenues of reorganization, consolidation, conversion, reinsurance, merger, or other transformation of Pavonia to effectuate rehabilitation and maintain, to the greatest extent possible, a continuity of insurance coverage.

13

12.     Pursuant to MCL 500.8114(4), if the Rehabilitator determines that reorganization, consolidation, conversion, reinsurance, merger, or other transformation of Pavonia is appropriate, she shall prepare a plan to effect those changes and shall apply to the Court for approval of such plan.

13.     Pursuant to MCL 500.8116(1), if the Rehabilitator believes that further attempts to rehabilitate Pavonia would be futile or would substantially increase the risk of loss to Creditors, Policyholders, or the public, she may petition the Court for an order of liquidation.

14.     Pursuant to MCL 500.8116(2), the Rehabilitator may petition the Court at any time for an order terminating the rehabilitation of Pavonia.  The Court shall also permit Pavonia's Board of Directors to petition the Court for an order terminating the rehabilitation of Pavonia and may order payment from Pavonia's estate for costs and other expenses of the petition as justice may require.  If the Court finds that rehabilitation has been accomplished and that grounds for rehabilitation under MCL 500.8112 no longer exist, it shall order that Pavonia be restored to possession of its property and the control of its business.  The Court may also make that finding and issue that order at any time upon its own motion.

15.     In order to ensure the continuity of insurance coverage to Pavonia's Policyholders, and to minimize disruptions to Pavonia's business operations, the Rehabilitator shall pay: (a) all Creditor claims for Policyholder Liabilities arising from benefits payable and/or losses covered under Pavonia Policies, whether incurred or accrued before, on, or after the date of this Order, according to the

14

Company's normal claim processing procedures; (b) all Creditor claims for Non-Policyholder Liabilities incurred or accrued before the date of this Order as they become due in the ordinary course of business; and (c) all Creditor claims for Non-Policyholder Liabilities incurred or accrued on or after the date of this Order that are necessary for the continued operation and/or rehabilitation of Pavonia as they become due in the ordinary course of business.

16.    Pursuant to MCL 500.8137(4), claims made under pre-rehabilitation employment contracts by Pavonia's directors, officers, or persons in fact performing similar functions or having similar powers are statutorily limited to the payment of wages (including any existing fringe benefits, such as health and dental insurance) arising from services they rendered directly to Pavonia that were earned but unpaid prior to the date of this Order.  Accordingly, during the period that Pavonia is in rehabilitation, at no time shall the Rehabilitator pay any claims for severance, post-termination benefits, or other non-wage payments that might otherwise be payable to a Pavonia director or officer upon the termination of his or her employment contract that was entered into prior to the date of this Order.

17.    Pursuant to MCL 500.8113(3), entry of this Order shall not constitute an anticipatory breach of any contracts or relationships between Pavonia and any other persons or entities.  Pursuant to MCL 500.8105(1)(k), during the pendency of this rehabilitation, all persons or entities other than Pavonia Policyholders that have contractual or other relationships with Pavonia as of the date of this Order are

hereby ENJOINED AND RESTRAINED from terminating or attempting to

terminate such contracts or relationships on the basis of the entry of this Order.

18.     Pursuant to MCL 500.8106, all officers, managers, directors, trustees,

owners, employees, or agents of Pavonia, or any other persons or entities having

authority over or in charge of any segment of the affairs of Pavonia, shall fully

cooperate with the Rehabilitator and any Special Deputy Rehabilitator(s) that she

appoints.  Among other things, full cooperation requires a person or entity described

in this paragraph to:

> (a)  Promptly reply to any inquiry by the Rehabilitator, including a written
> reply when requested;
>
> (b)  Provide the Rehabilitator with immediate, full, and complete possession,
> control, access to, and use of all books, accounts, documents, and other
> records, information, or property of or pertaining to Pavonia in his, her, or its
> possession, custody, or control as may be necessary to enable the
> Rehabilitator and Special Deputy Rehabilitator(s) to operate the business
> and to maintain the continuity of insurance coverage for all Policyholders;
>
> (c)  Provide the Rehabilitator with full and complete access to and control of
> all assets, documents, data, computer systems, security systems, buildings,
> leaseholds, and property of or pertaining to Pavonia; and
>
> (d)  Provide the Rehabilitator with full and complete access to all legal
> opinions, memoranda, letters, documents, information, correspondence, legal
> advice, and any other attorney-client privileged and/or attorney work product
> materials relating to Pavonia or the operation of Pavonia and its business,
> provided to or from Pavonia's in-house or outside counsel by or to Pavonia, its
> officers, managers, directors, trustees, owners, employees, or agents.

In addition, pursuant to MCL 500.8105(1)(c), no person shall obstruct or interfere

with the Rehabilitator or Special Deputy Rehabilitator(s) in the conduct of this

rehabilitation proceeding.

16

19.    As provided by MCL 500.8106(4), any failure to cooperate with the

Rehabilitator or Special Deputy Rehabilitator(s), any obstruction or interference

with the Rehabilitator or Special Deputy Rehabilitator(s) in the conduct of this

rehabilitation proceeding, or any violation of an order of the Director validly entered

under Chapter 81, may result in:

(a) A sentence requiring the payment of a fine not exceeding $10,000.00, or
imprisonment for a term of not more than one year, or both; and

(b) After a hearing, the imposition by the Director of a civil penalty not to
exceed $10,000.00, or the revocation or suspension of any insurance licenses
issued by the Director, or both.

20.    Any person or entity with possession, custody, or control of assets,

documents, data, accounts, moneys, books, records, information, or property of or

pertaining to Pavonia shall immediately take all necessary steps to safeguard,

preserve, and retain such assets, documents, data, accounts, moneys, books,

records, information, or property.  In addition, at the Rehabilitator's or Special

Deputy Rehabilitator(s)' request, any person or entity with possession, custody, or

control of assets, documents, data, accounts, moneys, books, records, information, or

property of or pertaining to Pavonia, shall:

(a) Provide the Rehabilitator with notice that such assets, documents, data,
accounts, moneys, books, records, information, or property are in his, her, or
its possession, custody, or control, together with a description of the assets,
documents, data, accounts, moneys, books, records, information, or property
in his, her, or its possession, custody, or control.

(b) Tender possession, custody, and control of such assets, documents, data,
accounts, moneys, books, records, information, or property to the
Rehabilitator.

17

21.    Pursuant to MCL 500.8105(1) and MCL 500.8114(2), and except as specifically provided in paragraphs 5, 15, 23, and 25 of this Order, all Creditors of Pavonia are ENJOINED from:

(a) Instituting or continuing to prosecute any actions or proceedings to determine, enforce, collect, or assert any claims against Pavonia, its assets, Policyholders, officers, directors, or employees;

(b) Instituting or continuing to prosecute any actions or proceedings to determine, enforce, collect, or assert any claims against the Rehabilitator or Special Deputy Rehabilitator(s), their agents, attorneys, employees, or representatives, or the State of Michigan and its officers, agencies, or departments for claims or causes of action arising out of or relating to Pavonia or any proceedings under Chapter 81;

(c) Obtaining preferences, judgments, attachments, garnishments, or liens against Pavonia, its assets, Policyholders, officers, directors, or employees;

(d) Levying of execution against Pavonia, its assets, Policyholders, officers, directors, or employees; and

(e) Threatening or taking any other action that may lessen the value of Pavonia's assets or prejudice the rights of Pavonia's Creditors as a whole, its Policyholders, or the administration of this rehabilitation proceeding.

22.    Any person who violates an injunction issued in this matter shall be liable to the Rehabilitator, the Policyholder, or both, for the reasonable costs and attorney fees incurred in enforcing the injunction or any court orders related thereto and any reasonably foreseeable damages.

23.    All Creditor claims against Pavonia are within the exclusive jurisdiction of this Court and will be determined, resolved, paid, and/or discharged, in whole or in part, according to the terms and conditions approved by the Court.

24.    Because this rehabilitation of Pavonia includes the Claim Procedure for Unscheduled Liabilities, the rights and liabilities of all Creditors holding claims

18

for Unscheduled Liabilities, and of Pavonia and ServiceCo with respect to such claims, are fixed as of the date of entry of this Order pursuant to MCL 500.8118(2).

25.     Any and all claims by Creditors against Pavonia must be raised or asserted within the rehabilitation proceeding before this Court and are subject to this Court's orders regarding the submission and determination of claims.

26.     Pursuant to MCL 500.8114(1), the Rehabilitator appoints James Gerber, the Director of Receiverships at DIFS, as Special Deputy Rehabilitator for Pavonia.  The Rehabilitator further appoints Janice Sylvertooth and Julieanne Gulliver as Special Deputy Rehabilitators, who shall report to Mr. Gerber.  Mr. Gerber, Ms. Sylvertooth, and Ms. Gulliver shall serve at the pleasure of the Rehabilitator, who reserves the right to appoint other Special Deputy Rehabilitator(s) to replace and/or serve with them in the future as the need arises. Subject to the supervision and direction of the Rehabilitator and this Court (and with respect to Ms. Sylvertooth and Ms. Gulliver, subject also to the supervision and direction of Mr. Gerber), Mr. Gerber, Ms. Sylvertooth, and Ms. Gulliver shall have all the powers and responsibilities of the Rehabilitator granted under MCL 500.8114.

27.     Pursuant to MCL 500.8114(1), the Rehabilitator has fixed the compensation of Mr. Gerber, Ms. Sylvertooth, and Ms. Gulliver as follows, which this Court approves: Mr. Gerber shall be compensated as a salaried employee of DIFS and shall not receive any additional salary in his capacity as Special Deputy Rehabilitator for Pavonia.  Ms. Sylvertooth and Ms. Gulliver shall be compensated

19

at a fixed hourly rate as retained independent contractors of Pavonia. Mr. Gerber's, Ms. Sylvertooth's, and Ms. Gulliver's expenses for travel, lodging, meals, and other expenses incurred in connection with their appointment as Special Deputy Rehabilitators shall be paid out of the funds or assets of Pavonia as administrative expenses due in the ordinary course of business pursuant to paragraph 15(c) of this Order. Mr. Gerber, Ms. Sylvertooth, and Ms. Gulliver will separately invoice and submit these expenses, which shall be reimbursed subject to State of Michigan reimbursement rates. The Rehabilitator will also allocate to Pavonia the pro-rata portion of Mr. Gerber's salary at the rate of $91 an hour, and the fixed hourly rate of Ms. Sylvertooth and Ms. Gulliver as independent contractors at $85 an hour each, for services attributable to the performance of their duties as Special Deputy Rehabilitators, which compensation shall be paid out of the funds or assets of Pavonia as administrative expenses due in the ordinary course of business pursuant to paragraph 15(c) of this Order and MCL 500.8114(1). In the event that Pavonia does not possess sufficient cash or liquid assets to pay the costs and expenses attributable to Mr. Gerber's, Ms. Sylvertooth's, and Ms. Gulliver's services as Special Deputy Rehabilitators, the Rehabilitator may advance the necessary funds, which shall be repaid out of the first available money of Pavonia pursuant to MCL 500.8114(1).

28.    If Pavonia remains in rehabilitation, the Rehabilitator and Special Deputy Rehabilitator(s) shall make an initial accounting to the Court of Pavonia's financial condition and progress towards rehabilitation on or before January 15,

2020. Thereafter, the Rehabilitator and Special Deputy Rehabilitator(s) shall make a similar accounting to the Court each succeeding one-year period from the date of this Order during which Pavonia remains in rehabilitation.

29.    None of the provisions contained in this Order shall be construed to limit the Rehabilitator's authority to conduct receivership proceedings in accordance with the powers granted to her under Chapter 81.

30.    The Court reserves jurisdiction to amend this Order or issue such further orders as it deems just, necessary, and appropriate.

Ingham County
Circuit Court Judge    7/9/19

[The remainder of this page is left intentionally blank;
Stipulation signatures follow]

CERTIFIED COPY
30TH CIRCUIT COURT

JUL – 9 2019

I hereby certify that this document is a true and correct copy of the original on file with this court.
, Deputy Clerk

21

Stipulated and Agreed:

Christopher L. Kerr (P57131)
Attorney for Petitioner

7/9/19

Dated

**PAVONIA LIFE INSURANCE
COMPANY OF MICHIGAN**

By: Lou Hensley    by consent via
          Lou Hensley    PDF signature --
                                    see attached

7/9/19

Dated

Its:  Chief Executive Officer

22

Stipulated and Agreed:


_____          _____
Christopher L. Kerr (P57131)              Dated
Attorney for Petitioner


**PAVONIA LIFE INSURANCE
COMPANY OF MICHIGAN**

By: _____            ___7/9/19___
        Lou Hensley                      Dated

Its:  Chief Executive Officer

# EXHIBIT B

STATE OF MICHIGAN
CIRCUIT COURT FOR THE 30TH JUDICIAL CIRCUIT
INGHAM COUNTY

ANITA G. FOX, DIRECTOR OF THE
MICHIGAN DEPARTMENT OF
INSURANCE AND FINANCIAL SERVICES,

       Petitioner,

v

PAVONIA LIFE INSURANCE
COMPANY OF MICHIGAN,

       Respondent.

Case No. 19-504-CR

HON. WANDA M. STOKES

[IN REHABILITATION]

---

_____/

### STIPULATED ORDER
### APPROVING SALE OF SUBSIDIARY ENTITY
### AND ENTRY INTO RELATED SERVICES AGREEMENT

At a session of said Court held in the Circuit Courtrooms
for the County of Ingham, State, of Michigan on the
24 day of June 2021.

PRESENT: HONORABLE WANDA M. STOKES, CIRCUIT COURT JUDGE

WHEREAS, Anita G. Fox, Director (the "**Director**"[1]) of the Michigan

Department of Insurance and Financial Services ("**DIFS**") and Court-appointed and

statutory Rehabilitator (the "**Rehabilitator**") of Pavonia Life Insurance Company

of Michigan ("**Pavonia Life**"), and its wholly-owned subsidiary Global Bankers

Insurance Group, LLC ("**ServiceCo**" or the "**Company**," and collectively with

---

[1] All initially capitalized terms shall have the meaning(s) ascribed to them in this
Order or the Court's Order of June 25, 2020.

Pavonia Life, the "**Pavonia Entities**"), Aspida Holdco LLC ("**Aspida**"), and GBIG

Holdings, Inc. ("**GBIG Holdings**") (each of the Rehabilitator, Aspida and GBIG

Holdings is a "**ISA Party**" and are collectively the "**ISA Parties**"), by and through

their respective attorneys, have stipulated to the entry of this Order Approving Sale

(the "**Sale**") of Subsidiary Entity ServiceCo from the rehabilitation estate as

contemplated by and pursuant to this Court's Order (i) Approving Plan of

Rehabilitation and Related Closing of Stock Purchase Agreement; (ii) Approving

Actions of the Rehabilitator; and Upon Closing of Stock Purchase Agreement (iii)

Terminating Rehabilitation; and (iv) Discharging the Rehabilitator and Granting

Related Relief (the "**June 25 Order**"); provided that GBIG Holdings does not

stipulate to paragraphs 15 and 21 hereof;

WHEREAS, the Court has reviewed this order ("**Order**");

WHEREAS, the Court being otherwise fully advised; and

WHEREAS, if any of the following Findings constitute Conclusions, the Court

deems them as such, and *vice versa*.

## FINDINGS & CONCLUSIONS

1.    The Rehabilitator prepared a Plan of Rehabilitation ("**Plan**") to

effectuate the reorganization and transformation of the Pavonia Entities for the

protection and benefit of the companies, their policyholders, and creditors. The Plan

proposed the sale of the Pavonia Entities by GBIG Holdings, Inc. ("**GBIG

Holdings**"), as seller, to non-affiliated third party, Aspida, a Delaware holding

company that is an affiliate of Ares Management Corporation, as buyer.

2

2.      The Plan intended to effect a change in ownership, management, and control of the Pavonia Entities, and implemented a process for resolving claims for "**Unscheduled Liabilities**" as defined in the Plan.

3.      The Plan was undertaken as part of and pursuant to the State of Michigan's regulation of the business of insurance, in order to protect the interests of policyholders and to secure their contractual coverage.

4.      Following entry of this Court's June 25, 2020 Order and subsequent orders entered on July 9, 2020, and July 14, 2020, Seller sought and was granted leave to appeal the July 9 and 14 orders to the Michigan Court of Appeals, which subsequently issued a stay of all proceedings herein ("**Stay**") and later vacated this Court's July 9 and 14 orders.

5.      The Rehabilitator, Aspida and GBIG Holdings have reached a partial resolution of certain disputes between them ("**Interim Settlement**") and entered into an Interim Settlement Agreement ("**Interim Settlement Agreement**"), setting forth the terms of that agreement.

6.      Pursuant to MCR 7.215(F), the Stay is of no further force or effect.

7.      Upon the terms and conditions set forth in the Interim Settlement Agreement, the Rehabilitator, GBIG Holdings and Aspida seek to preserve the ongoing operations of ServiceCo, notwithstanding any delays resulting from pending litigation of disputes between them, and without any prejudice to such litigation and any ISA Party's rights or positions as described in the Interim Settlement Agreement.

3

8.    The terms for a sale of ServiceCo to Aspida are set forth in the Interim
Settlement Agreement and have been definitively memorialized in an LLC Unit
Purchase Agreement (the "**Sale Agreement**"). Under such terms, and subject to the
approval of this Court and the Director, the Rehabilitator shall cause Pavonia Life
to sell convey, assign, transfer, and deliver to Aspida, and Aspida shall purchase,
acquire, and accept from the Rehabilitator, all of Pavonia's right, title and interest
in ServiceCo consisting of all of the outstanding membership units of ServiceCo (the
"**Units**"), free and clear of all liens or other encumbrances, and ServiceCo shall
resume its operations subject to the applicable "**Scheduled Liabilities**" as defined
in the Plan and previously determined during these rehabilitation proceedings.

9.    At the closing of the Sale (the "**Closing**"), Aspida shall pay $5.5 million
as the "**Purchase Price**" to the Pavonia Life rehabilitation estate, which the
Parties agree is a fair and reasonable value for ServiceCo. Aspida will also pay
certain long-term incentive agreements to ServiceCo management.

10.    Aspida and the Rehabilitator also have negotiated, and Pavonia Life
and ServiceCo shall enter into, a services agreement ("**Services Agreement**"),
pursuant to which ServiceCo shall provide administrative and operational services
for Pavonia Life reasonably necessary for its continued operation in consideration
for a monthly fee to be paid to ServiceCo totaling $9.11 million per year.

11.    Closing on the Sale will effect the separation of ServiceCo from the
"**NC Insurer Affiliates**" (as defined in the Plan) and Greg Lindberg, and will
restore the operations of ServiceCo. Closing on the Sale will ensure the protection

of Pavonia Life's policyholders, creditors and the public. The separation will be achieved, at least in part: (i) by restoring to ServiceCo its applicable portion of the Scheduled Liabilities (the "**ServiceCo Scheduled Liabilities**") and the ServiceCo Assets (defined below), and (ii) based upon the fact that all Unscheduled Liabilities were adjudicated through the "**Claims Procedure**" as defined in the Plan, regardless whether a "**Claim**" was filed as defined and provided for in the Plan. (ServiceCo's liability or obligation for any Unscheduled Liabilities is "**Unscheduled ServiceCo Liabilities**.")

12.     The restoration of its assets and liabilities, along with control of its business, to ServiceCo are express and integral conditions of, and will facilitate, the Sale. The Sale will facilitate the rehabilitation of the Pavonia Entities.

13.     The terms and conditions of the Interim Settlement Agreement and the Sale Agreement (the "**Interim Settlement and Sale Agreements**") are consistent with the rehabilitation objectives of the Pavonia Entities and do not have a material adverse effect on the Plan or Pavonia Estate.

14.     The Rehabilitator has determined that the Interim Settlement and Sale Agreements will further the purposes of this rehabilitation proceeding. The Rehabilitator has therefore requested that the Court enter this Order approving the Interim Settlement and Sale Agreements and directing that simultaneously with the Closing: (a) the applicable ServiceCo Scheduled Liabilities will be restored to ServiceCo and become the obligations of ServiceCo; (b) no other liabilities will be restored to ServiceCo, except as otherwise provided for herein (*i.e.*, the ServiceCo

5

Permitted Claims, as defined below); and (c) after Closing ServiceCo will not have any obligations for any other Unscheduled Liabilities. The Rehabilitator has further requested that, based on the adjudication of any and all filed claims for Unscheduled Liabilities, unless otherwise specifically addressed herein, the Court bar the assertion of any further Unscheduled Liabilities that could have been filed, but were not, and forever release, discharge, bar, and extinguish any liability for unfiled claims (if any) for Unscheduled ServiceCo Liabilities.

15.    The Rehabilitator has also determined that the Services Agreement will further the purposes of this rehabilitation proceeding. The Rehabilitator has therefore requested that the Court enter this Order approving the Services Agreement.

16.    The Rehabilitator has further requested that this Order provide for the release and discharge from, and extinguishment of, any pre-rehabilitation and pre-Closing liability or responsibility for ServiceCo, GBIG Holdings, Aspida, and their respective past, present and future parents, owners, members, equity holders, subsidiaries, affiliates, directors, officers, managers, employees, successors, agents or assignees in such capacities  (collectively, "**Affiliates**"), and their representatives in the transaction for any Unscheduled ServiceCo Liabilities; and include injunctions issued in favor of ServiceCo, GBIG Holdings, their Affiliates, and their representatives in the transaction precluding the assertion against them of any claims for Unscheduled ServiceCo Liabilities by any and all "**Unscheduled Liabilities Claimants**" and "**Unscheduled Liabilities Potential Claimants**,"

6

except for such Permitted Claims as are described or defined in the Plan and in the Court's June 25 Order <u>and</u> are applicable to ServiceCo (the "**ServiceCo Permitted Claims**").

17.    Aspida has represented that it would not enter into the Interim Settlement or Sale transactions or proceed with the Closing without the restoration provisions, releases, discharges and extinguishment of liability, and injunctive relief that are set forth in this Order. Such restoration provisions, releases, discharges and extinguishment of liability, and injunctions are provided for in MCL 500.8105(1) and 500.8121, are narrowly tailored to effectuate the Sale transaction and further the rehabilitation, and are fair, equitable, and just under the facts and circumstances of this case where a plan of rehabilitation has been approved and a claims procedure effected.

18.    The Sale is proposed in partial achievement of the Plan, and the balance of the Plan remains subject to further ruling by this Court.

19.    Pursuant to MCL 500.8104(3), the Court has the power to enter this Order related to the rehabilitation of Pavonia Life.

20.    Upon Closing, neither Greg Lindberg nor any other "**Global Group**" controlling person (as defined in the Plan) will have, nor may they exercise, any control whatsoever over ServiceCo.

21.    Aspida has represented, and the Rehabilitator believes, that Aspida acted in good faith in the Sale transaction.

7

22. No evidence has been presented to the Rehabilitator or the Director that the Sale will render either of the Pavonia Entities insolvent.

23. The Sale does not involve payments on account of antecedent debt and is not made with intent to hinder, defraud, or delay any creditor of GBIG Holdings, the Pavonia Entities, or the Estate. Upon Closing, ServiceCo will have been acquired in compliance with applicable law.

24. The consideration that Aspida is providing is (a) fair and constitutes reasonably equivalent value for the Units it is acquiring in ServiceCo from the Rehabilitator; and (b) good, valid, and valuable and allows for the transaction to close and protects the Estate which receives the Purchase Price.

25. The release, discharge, and extinguishment of Aspida's liability from all Unscheduled ServiceCo Liabilities, reinforced by injunctive relief, are necessary and appropriate to facilitate and protect the transaction.

26. Restoration of the ServiceCo Assets (as defined below) to ServiceCo effective upon the Closing will not violate any applicable fraudulent transfer, voidable preference, voidable transaction, or other avoidance statute under federal (including title 11 of the United States Code) or state law.

27. The Rehabilitator has requested that the Court declare, order, and decree that upon Closing, Aspida shall be the owner of legal and beneficial title to the acquired Units, and that such Units be free and clear of any liens, claims, interests, charges, and any other encumbrances, including but not limited to Unscheduled ServiceCo Liabilities.

8

28.    The terms and conditions of the Sale Agreement and the relief requested by the Rehabilitator in the Motion are consistent with, further and enforce the terms of this Court's June 25 Order.

29.    The Sale will accomplish the restoration of ServiceCo within the meaning of MCL 500.8116(1).

30.    This rehabilitation, the Interim Settlement, the Sale transaction, and this Order are all undertaken as part of and pursuant to the State of Michigan's regulation of the business of insurance, and thus to protect the interests of policyholders to secure their contractual coverage, and to protect the interests of creditors and the public.

## ORDER

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

A.    The Court ACCEPTS this Stipulation.

B.    The Court approves the Services Agreement as requested by the Rehabilitator in Paragraph 15 above.

C.    The Court authorizes the Parties to enter into and execute the termination of intercompany agreements as described by Section 2.07 of the Interim Settlement Agreement.

D.    Upon Closing, the terms of the Sale Agreement are and forever will be binding on and enforceable against the Estate, the Rehabilitator, Pavonia Life's policyholders, all actual and potential creditors of the Pavonia Entities, GBIG Holdings, Aspida, all other potentially interested persons, and their respective

9

parents, owners, members, equity holders, subsidiaries, affiliates, directors, officers,

managers, employees, successors, agents or assignees in such capacities, even if: (i)

the transaction, the Sale Agreement, the Plan or this rehabilitation proceeding is

later deemed to have affected or impaired any rights or claims of such person; or (ii)

such person makes a later demand for payment of any claim or has made (or

attempted to make) an appearance in this rehabilitation proceeding at any time.

  E. For purposes of Closing and effective prior to Closing, and with this

Court's express approval, ServiceCo liabilities and assets will be restored to the

Company, such that, effective upon Closing:

> ServiceCo's **"Post-Closing Liabilities"** shall include only
> ServiceCo Scheduled Liabilities and ServiceCo Permitted
> Claims, if any.

> ServiceCo shall be restored with, and vested in, and hold
> all right, title and interest in and to its respective
> properties and assets, including, without limitation, all of
> the rights, title, and interest in any and all: (i) owned and
> leased real property; (ii) accounts and notes receivable;
> (iii) all tangible personal property; (iv) contracts to which
> ServiceCo is a party; (v) intellectual property; (vi)
> licenses, permits, franchises, approvals, registrations,
> authorizations, and consents; (vii) books and records,
> ledgers, files, documents, correspondence, and business
> and accounting records of every kind (including all
> financial, business, and marketing plans), all advertising,
> marketing, and promotional materials, all invoices, bills
> of sale, and other instruments and documents; (viii)
> claims (including insurance benefits), causes of action,
> choses in action, rights of recovery, rights of recoupment,
> and rights of set-off; (ix) guarantees, warranties,
> indemnities, and similar rights in favor of ServiceCo; (x)
> goodwill as going concerns and all other intangible
> property; (xi) all prepaid expenses, credits, advance
> payments, security, deposits, charges, sums, and fees; (xii)
> cash, cash equivalents, securities, and investments; (xiii)

10

prepayments, prepaid expenses (including, without
limitation, prepaid insurance premiums), deferred
charges, advance payments, and security deposits; (xiv)
insurance, reserves, and deposits; and (xv) all other
property not referred to above which is either represented
on ServiceCo's balance sheets or acquired by ServiceCo
thereafter (collectively, "**ServiceCo Assets**").

F.      Effective upon Closing, the restoration of the ServiceCo Assets to

ServiceCo and the sale of the Units to Aspida shall be made free and clear of all

Unscheduled Liabilities (including, but not limited to, liens, encumbrances, claims,

charges, and other interests of any nature, type, or kind whatsoever, whether

arising under any contract, common law, statute, law, in equity, or otherwise) that

have or could have been asserted against ServiceCo at any time before or during the

Rehabilitation or when such company and its assets and liabilities were within the

title, possession, or control of the Rehabilitator or were part of the Estate, except for

the ServiceCo Permitted Claims.

G.      Upon Closing, ServiceCo shall be vested with good, valid, and

marketable title in and to all ServiceCo Assets, free of any and all liens, security

interests, or encumbrances of whatever kind or nature, adverse claims, defenses

(including, without limitation, rights of setoff and recoupment), and interests of

third parties of any kind or nature, other than the Scheduled ServiceCo Liabilities

and ServiceCo Permitted Claims, if any.

H.      Effective upon Closing, ServiceCo, GBIG Holdings, Inc., Aspida, their

Affiliates, and their representatives in the transaction shall be fully and

unconditionally released and discharged from, and have absolutely no responsibility

or liability whatsoever for any Unscheduled ServiceCo Liabilities, except as
provided herein in relation to any ServiceCo Permitted Claims, and the assets of the
Pavonia Entities shall not be chargeable for any Unscheduled ServiceCo Liabilities.
No person or entity shall have a valid claim or cause of action against the ServiceCo
Assets, GBIG Holdings, Aspida, their Affiliates, or their representatives in the
transaction for any claim related to, or arising in connection with, directly or
indirectly, any Unscheduled ServiceCo Liabilities, except as provided herein in
relation to any ServiceCo Permitted Claims, and neither ServiceCo, GBIG Holdings,
Aspida, their Affiliates, or their representatives in the transaction shall have any
future responsibility or liability whatsoever for Unscheduled ServiceCo Liabilities,
and are hereby fully released and discharged therefrom, except as provided herein
in relation to any ServiceCo Permitted Claims.

  I.  Effective upon Closing, to protect the transaction and in support of the
rehabilitation of the Pavonia Entities, and consistent with MCL 500.8105(1)(c), (f),
and (k), the Court issues the following injunctions, which complement the
Rehabilitation Order's injunctions and the injunctions in the Court's June 25, 2020
Order entered previously in these proceedings:

> All persons and entities, including, but not limited to,
> Estate creditors, contract counterparties, and other
> interested persons, and without limitation their
> respective parents, owners, members, equity holders,
> subsidiaries, affiliates, directors, officers, managers,
> employees, successors, agents or assignees in such
> capacities, and all persons in active concert or
> participation with any of them, whether in the State of
> Michigan or elsewhere, except as permitted by this Order,
> are permanently restrained and enjoined from: (i)

pursuing in any manner any claim or commencing or continuing in any manner or in any place any suit, action, or other proceeding, whether legal, equitable, administrative, or otherwise, whatsoever relating directly or indirectly to Unscheduled ServiceCo Liabilities (except for any ServiceCo Permitted Claims) as defined or described in the Rehabilitator's Plan, submissions to the Court, and this Court's Orders, against GBIG Holdings, the acquired Units, the Assets of the Pavonia Entities, the Pavonia Entities, Aspida, any of their respective Affiliates, or their respective representatives in the transaction; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against the acquired Units, the Seller, the Assets of the Pavonia Entities, the Pavonia Entities, Aspida, or their respective Affiliates or representatives in the transaction relating directly or indirectly to Unscheduled ServiceCo Liabilities (except for the Permitted Claims) as defined in the Rehabilitator's Plan, submissions to the Court, and this Court's Orders; or (iii) creating, perfecting, or enforcing any lien or encumbrance with respect to the acquired units or the Assets of the Pavonia Entities relating directly or indirectly to Unscheduled ServiceCo Liabilities (except for any Permitted Claims) as defined or described in the Rehabilitator's Plan, submissions to the Court, and this Court's Orders.

All persons and entities are hereby forever prohibited and enjoined from taking any action or omitting to act that would adversely affect or interfere with the ability of the Rehabilitator to effect this Sale transaction or that would interfere with the transaction in any way.

Any person or entity attempting to pursue a claim or commence or continue any action or proceeding in violation of these injunctions in this Order shall cause such persons and/or entities to be subject to contempt proceedings before this Court, applicable fines, and other sanctions.

J.    Effective upon Closing, each of Aspida and GBIG Holdings, for itself

and its respective Affiliates, shall be deemed to have released all claims, rights, or

causes of action that any of them have or could have asserted, or that could in the

13

future be asserted, against GBIG LLC, the Rehabilitator, the Director, the

Department of Insurance and Financial Services ("**DIFS**"), or any of their respective

officers, employees, attorneys, or agents, including Unscheduled Liabilities, to the

extent relating to or arising from GBIG LLC.

K.    Effective upon Closing, Aspida shall hold harmless and indemnify the

Rehabilitator and her officers, employees, attorneys, or agents, from and against all

losses arising from or related to the assertion of any claim that is the subject of the

release provided in the foregoing Paragraph (I).

L.    The Sale Agreement (and each of the instruments or agreements

contemplated by it and delivered pursuant to it) may be modified, amended, or

supplemented in a writing signed by the parties to the Sale Agreement and in

accordance with its terms and with notice to the Director, but without notice to or

order of this Court; provided, however, that any such modification, amendment, or

supplement will not have a material adverse effect on the Plan or the Estate

unless such modification, amendment or supplement is submitted to and

approved by separate order of this Court.

M.    The Court will retain exclusive jurisdiction over this matter for all

purposes necessary to effectuate and enforce its orders, including this Order.

Without limiting the generality of the above, the Court's continuing jurisdiction will

include:

> The right to hear and determine all claims, controversies,
> disputes, and demands arising out of or relating to this
> Order and the Pavonia Entities' rehabilitation
> proceedings; and

14

The taking of any action necessary to ensure the
continued vitality and legality of the Sale Agreement, the
transaction, the Plan, and this Order.

### Authorization of Service

N.    The Court authorizes the Rehabilitator's service of this Order upon:

- GBIG Holdings, Inc., c/o counsel Zachary Larsen
- Aspida Holdco LLC, c/o counsel Stephen Schwab
- Any other potentially interested individuals or entities by posting
  electronic copies on the DIFS website www.michigan.gov/difs, under
  the section "Who We Regulate," the subsection "Receiverships," and
  the sub-subsection "Pavonia Life Insurance."

O.    The Court finds that service in the foregoing manner is reasonably
calculated to give the listed individuals and entities, together with any other
potentially interested individuals or entities, actual notice of the Order and is
otherwise reasonable under the circumstances.

### Additional Provisions

P.    This Order shall be binding on all persons that may have an interest in
the Pavonia Entities and all persons that received actual or constructive notice of
the Motion, and while specifically excepting claims by the U.S. Internal Revenue
Service, include without limitation the United States and its agencies (other than
the U.S. Internal Revenue Service), all parties in interest, all federal, state, and
local governmental entities and fiscal intermediaries thereof, and any other holders
of Unscheduled Liability claims of any kind, whether known or unknown, asserted
or unasserted, disputed or undisputed, matured or unmatured, liquidated or
unliquidated, fixed or contingent, arising in law or equity. This Order and the
foregoing terms hereof shall bind each and every one of the foregoing persons or

15

entities, without limitation, regardless of whether or not: (a) this Order is later deemed to have impaired any rights or claims of such persons or entities; (b) such persons or entities have responded to the Motion or participated in any hearing thereon; and/or (c) such persons or entities make a later demand for payment of any claim or have made (or attempted to make) an appearance in the rehabilitation proceeding at any time.

Q.    This Order is without any prejudice to the ongoing litigation between the parties concerning the disposition of Pavonia and any ISA Party's rights or positions in that litigation as described in the Interim Settlement.

R.    GBIG Holdings, Aspida, and the Rehabilitator have fully participated through counsel in the drafting of this Order and hereby waive any right to appeal this Order once entered.

16

DocuSign Envelope ID: 79D3BF9F-3E31-4056-87CD-3358585C84C6

IT IS SO ORDERED.

This Order does not resolve the last pending claim and does not close this case.

_____
Honorable Wanda M. Stokes
Circuit Court Judge

STIPULATED AND AGREED this 16th day of June 2021, by:

Pavonia Life Insurance Company of Michigan, in Rehabilitation

By: _____
Name: Jim Gerber
Title: Special Deputy Rehabilitator

GBIG Holdings, Inc.

By: _____
Name:
Title:

Aspida Holdco, LLC

By: _____
Name:
Title:

IT IS SO ORDERED.

This Order does not resolve the last pending
claim and does not close this case.

_____

Honorable Wanda M. Stokes
Circuit Court Judge

STIPULATED AND AGREED this 16th day of June 2021, by:

Pavonia Life Insurance Company of Michigan, in Rehabilitation

By: */s/ Jim Gerber*
Name:  Jim Gerber
Title:  Special Deputy Rehabilitator

GBIG Holdings, Inc.

Peter R. Kupelian (P31812)
Clark Hill PLC
151 S. Old Woodward Avenue, Suite 200
Birmingham, MI 48009
(248) 530-6336
pkupelian@clarkhill.com

Ronald A. King (P45088)
Zachary C. Larsen (P72189)
Clark Hill PLC
212 E. Cesar E. Chavez Ave.
Lansing, MI 48906
(517) 318-3015
rking@clarkhill.com
zlarsen@clarkhill.com
*Counsel for GBIG Holdings, Inc.*

17

DocuSign Envelope ID: A699322E-B351-49AF-8CB3-3EF367304597

IT IS SO ORDERED.

This Order does not resolve the last pending
claim and does not close this case.

_____

Honorable Wanda M. Stokes
Circuit Court Judge

**STIPULATED AND AGREED** this $\underline{16^{th}}$ day of June 2021, by:

Pavonia Life Insurance Company of Michigan, in Rehabilitation

By:_____
Name:
Title:

GBIG Holdings, Inc.

By:_____
Name:
Title:

Aspida Holdco, LLC

By:_____
Name:    Anton Feingold
Title:    Authorized Signatory

17

# EXHIBIT C

STATE OF MICHIGAN
CIRCUIT COURT FOR THE 30TH JUDICIAL CIRCUIT
INGHAM COUNTY

ANITA G. FOX, DIRECTOR OF THE
MICHIGAN DEPARTMENT OF
INSURANCE AND FINANCIAL SERVICES,

          Petitioner,

v

PAVONIA LIFE INSURANCE
COMPANY OF MICHIGAN,

          Respondent.

Case No. 19-504-CR

HON. WANDA M. STOKES

**[IN REHABILITATION]**

_____/

## PLAN OF REHABILITATION

### I.    BACKGROUND

The Court placed Pavonia Life Insurance Company of Michigan ("**Pavonia**"

or the "**Company**") into rehabilitation on July 9, 2019, pursuant to the *Stipulated*

*Order Placing Pavonia into Rehabilitation, Approving Compensation of Special*

*Deputy Rehabilitators, and Providing Injunctive Relief* (the "**Rehabilitation**

**Order**"). As required by Section 8113(1) [MCL 500.8113(1)] of the Insurance Code

of 1956 ("**Insurance Code**"), MCL 500.100 *et seq.*, the Rehabilitation Order

appointed the Director ("**Director**") of the Michigan Department of Insurance and

Financial Services ("**DIFS**") as the Rehabilitator of Pavonia (the "**Rehabilitator**").

The Rehabilitator further appointed James Gerber, Janice Sylvertooth, and

Julieanne Gulliver as Special Deputy Rehabilitators (collectively, the "**Special**

1

**Deputy Rehabilitators**"), whose compensation the Court approved under MCL

500.8114(1).[1]

In accordance with MCL 500.8113(1), the Rehabilitation Order directed the

Rehabilitator to take immediate possession of all the assets of Pavonia and to

administer those assets under the Court's general supervision, thereby creating the

Pavonia rehabilitation estate (the "**Estate**").  Pursuant to MCL 500.8113(1), the

Rehabilitation Order further vested legal title to all assets, accounts, and moneys of

Pavonia in the Rehabilitator by operation of law.  Among the Estate assets that the

Rehabilitator controls and administers is Global Bankers Insurance Group, LLC

("**ServiceCo**"), a wholly-owned subsidiary of Pavonia that provides all executive

management, regulatory oversight review, and administrative services for Pavonia's

operations.  Because ServiceCo is included as an asset of Pavonia, all references

hereafter to "Pavonia" shall include ServiceCo as Pavonia's wholly-owned

subsidiary.

The Rehabilitation Order and MCL 500.8114(2) authorize the Rehabilitator

to take such action as she considers necessary or appropriate to reform and

revitalize Pavonia.  Under MCL 500.8114(4), if the Rehabilitator determines that

reorganization, consolidation, conversion, reinsurance, merger or other

transformation of Pavonia is appropriate, she must prepare a plan to effect those

---

[1] All policyholders, creditors, and other interested parties of Pavonia are strongly
encouraged to review the complete Rehabilitation Order, the Director's Stipulated Petition
requesting entry of the Rehabilitation Order, and the separate order containing detailed
procedures governing the bar date, claim process, and other aspects of the rehabilitation
plan (the **Procedural Order**"), which are incorporated into this *Plan of Rehabilitation* by
reference and are available on the DIFS website at www.michigan.gov/difs, then click on
"Who We Regulate," then "Receiverships," then "Pavonia Life Insurance."

changes.  Upon the Rehabilitator's application for approval of the plan, and after

notice and hearings as the Court may prescribe, the Court may either approve or

disapprove the plan proposed or may modify it and approve it as modified.  (*Id.*)

The standard for Court approval of a rehabilitation plan is whether, in the Court's

judgment, the plan is fair and equitable to all parties concerned.  (*Id.*)  When the

Court approves the Rehabilitator's plan, the Rehabilitation must then implement

the plan.  (*Id.*)

Here, this *Plan of Rehabilitation* document explains and submits for the

Court's approval the Rehabilitator's proposed plan to effect Pavonia's reorganization

and transformation (the "**Plan**") for the benefit of the Company, its policyholders,

and creditors.  Generally speaking, the Plan proposes Pavonia's sale by its current

owner, GBIG Holdings, Inc. ("**GBIG Holdings**"), to a non-affiliated third party,

Aspida Holdco LLC ("**Aspida**"), a Delaware holding company that is an affiliate of

ARES Management Corporation.

## II.    ADDITIONAL DEFINITIONS

As used hereafter in this Plan, the following definitions apply:

"**Buyer**" means Aspida and "**Seller**" means GBIG Holdings, which

collectively are referred to as the "**Transaction Parties**."

"**Chapter 81**" means Chapter 81 of the Insurance Code, MCL 500.8101 –

500.8159.

"**Creditor**" means a person having a claim against Pavonia, whether matured or unmatured, liquidated or unliquidated, secured or unsecured, absolute, fixed, or contingent.

"**Effective Date**" means the date on which this Plan is approved by the Court.

"**Policies**" means insurance policies, annuities, and other insurance contracts of Pavonia, including insurance liabilities and obligations arising under policies, annuities, and contracts assumed or otherwise reinsured by Pavonia.

"**Policyholders**" means the owners, holders, and beneficiaries of Policies.

The rights of Policyholders in or to Policies that are: (1) currently recorded on the books and records of Pavonia or ServiceCo on behalf of Pavonia; or (2) identified or scheduled in: (a) Pavonia's 2018 annual and first quarter 2019 financial statements prepared according to statutory accounting principles ("**Pavonia's SAP Statements**"); and (b) ServiceCo's 2018 annual and first quarter 2019 financial statements prepared according to generally accepted accounting principles ("**ServiceCo's GAAP Statements**," and collectively with Pavonia's SAP Statements, the "**Financial Statements**"), are referred to as the "**Policyholder Liabilities**."

The rights of, and the liabilities or obligations owed to, non-Policyholder Creditors that Pavonia has not formally disputed and that: (1) are identified or scheduled in the Financial Statements; or (2) Pavonia agrees are due and payable by Pavonia or ServiceCo in the ordinary course of their respective business

4

operations, are referred to as the "**Non-Policyholder Liabilities**," and collectively with the Policyholder Liabilities, the "**Scheduled Liabilities**."

All other Creditor claims against Pavonia or ServiceCo not included within the definition of "Scheduled Liabilities" above (regardless whether matured or unmatured, liquidated or unliquidated, secured or unsecured, absolute, fixed, or contingent, asserted or unasserted, known or unknown) are collectively referred to as the "**Unscheduled Liabilities**."

"**Stock Purchase Agreement**" means that agreement entered into between and executed by Seller and Buyer on July 9, 2019, subject to DIFS' Form A regulatory approval and the Court's approval of this Plan, which is attached hereto as Exhibit A and is fully incorporated into this Plan with all of its recitals, terms, conditions, representations, warranties, covenants, indemnities, and exhibits, under which Buyer will acquire all of the issued and outstanding capital stock of Pavonia.

All other defined terms used in this Plan that are not specifically defined herein shall have the meanings ascribed to them in the Stock Purchase Agreement. In the event of a conflict between a term defined in both this Plan and the Stock Purchase Agreement, the definition contained in this Plan shall control.

## III.    APPLICABLE LAW

Pursuant to Section 8114(2) of the Insurance Code, MCL 500.8114(2), the Director in her capacity as Rehabilitator is authorized, subject to the Court's supervision, to "take such action as [she] considers necessary or appropriate to

reform and revitalize the insurer including, but not limited to, the powers in section

8121(1)(f), (l), (m), (r), and (u) . . . [and] has full power to direct and manage, to hire

and discharge employees subject to any contract rights they may have, and to deal

with the property and business of the insurer."

Section 8121 of Insurance Code, MCL 500.8121, also includes, and therefore

when appropriate the Rehabilitator may exercise, the power, among others:

> (g) To conduct public and private sales of the insurer's property.

> * * *

> (i) To acquire, hypothecate, encumber, lease, improve, sell, transfer, abandon, or otherwise dispose of, or deal with, insurer property at its market value or upon terms and conditions as are fair and reasonable. He or she shall also have power to execute, acknowledge, and deliver any and all deeds, assignments, releases, and other instruments necessary or proper to effectuate the sale of property or other transaction in connection with the liquidation except that for trusteed assets, any instruments necessary or proper shall be executed only pursuant to court order.

> * * *

> (k) To enter into contracts necessary to carry out the order to liquidate, and to affirm or disavow any contracts to which the insurer is a party.

> * * *

> (r) To assert all defenses available to the insurer as against third persons, including statutes of limitation, statutes of frauds, and the defense of usury. . . .

> (s) To exercise and enforce all the rights, remedies, and powers of a creditor, shareholder, policyholder, or member, including the power to avoid a transfer or lien that may be given by the general law and that is not included in sections 8126 to 8128.

As summarized in the Background section above, Section 8114(4) of the

Insurance Code, MCL 500.8114(4), states in pertinent part:

> (4) If the rehabilitator determines that reorganization,
> consolidation, conversion, reinsurance, merger, or other
> transformation of the insurer is appropriate, [she] shall prepare a
> plan to effect those changes.  Upon application of the rehabilitator
> for approval of the plan, and after notice and hearings as the court
> may prescribe, the court may either approve or disapprove the plan
> proposed, or may modify it and approve it as modified.  A plan
> approved under this section shall be, in the court's judgment, fair
> and equitable to all parties concerned.  If the plan is approved, the
> rehabilitator shall implement the plan. . . .

Section 8116(2) of the Insurance Code, MCL 500.8116(2), provides for the

termination of a pending rehabilitation:

> (2) The rehabilitator may petition at any time the circuit court for
> Ingham county for an order terminating rehabilitation of an
> insurer.  The court shall also permit the insurer's directors to
> petition the court for an order terminating rehabilitation of the
> insurer and may order payment from the insurer's estate for costs
> and other expenses of the petition as justice may require.  If the
> court finds that rehabilitation has been accomplished and that
> grounds for rehabilitation under section 8112 no longer exist, it
> shall order that the insurer be restored to possession of its property
> and the control of the business.  The court may also make that
> finding and issue that order at any time upon its own motion.

The cited sections empower the Rehabilitator to propose, and the Court to

approve, this Plan, which is founded upon Aspida's acquisition of Pavonia pursuant

to the Stock Purchase Agreement attached as Exhibit A.

## IV.    PLAN DETAILS SUBMITTED FOR THE COURT'S APPROVAL

General.  This Plan is designed to protect Pavonia, its Policyholders, and

Creditors by means of a change in ownership and management of the Company,

which will be achieved through the implementation of a process for resolving claims

for Unscheduled Liabilities and the sale of the Company to Aspida, a non-affiliated

third party.

Toward this end, on July 9, 2019, the Seller and Buyer, or Transaction Parties, entered into the Stock Purchase Agreement attached as Exhibit A. The Transaction Parties negotiated the Stock Purchase Agreement at arms' length and in good faith over the course of several months before finally executing the document, which addresses all material terms of Seller's sale of Pavonia to Buyer. The Transaction Parties executed the Stock Purchase Agreement prior to the Company being placed into rehabilitation on July 9, 2019, thus, the Rehabilitator assumed control of the Company with the agreement already in place. As defined in Section II, the Stock Purchase Agreement is subject to DIFS' Form A regulatory approval and the Court's approval of this Plan.

The Rehabilitator's Plan for Pavonia, subject to this Court's approval in a final order approving the Plan, is to consummate the Company's sale from Seller to Buyer pursuant to the terms of the Stock Purchase Agreement, together with the additional procedures and conditions contained in this Section IV. In general terms, the Buyer will acquire all of the issued and outstanding capital stock of Pavonia (the "**Shares**") from Seller for Seventy Five Million Dollars ($75,000,000), which amount will be adjusted at the closing of the transaction for certain indebtedness of Seller, costs associated with the settlement of intercompany loans, notes and advances of the Acquired Companies, expenses of Pavonia, and transactional expenses. The Stock Purchase Agreement contains various representations and warranties as well as covenants by each of the Transaction Parties, and each of the Transaction Parties will indemnify the other party with respect to certain losses

8

arising out of or resulting from breaches of such representations, warranties, and covenants, among other things.  In order to incent the Transaction Parties to complete the transaction, the Stock Purchase Agreement provides for a termination fee, which would be payable by Seller to Buyer, and a "reverse" termination fee, which would be payable by Buyer to Seller, if the Stock Purchase Agreement is terminated in certain circumstances.

The closing of the transaction contemplated by the Stock Purchase Agreement ("**Closing**") is subject to certain conditions, including, among others, applicable DIFS regulatory approvals, the completion of the Claim Procedure (defined below), the Court's entry of an order approving this Plan, achievement of a minimum ratio related to and level of capital and surplus, and the Court's entry of an order terminating the rehabilitation of Pavonia.  It is a further condition to Buyer's obligation to close that the regulatory conditions to closing can be satisfied without the imposition of a "Burdensome Condition," as that term is defined in the Stock Purchase Agreement, which is generally defined as any requirement by any governmental entity that Buyer, Pavonia, or any of their affiliates take or refrain from taking actions that result in certain consequences.

The Stock Purchase Agreement envisions, consistent with the Procedural Order entered by the Court entitled the *Order Preliminarily Approving Plan of Rehabilitation to: (i) Set Bar Date and Establish Mandatory Procedures for Claims for Unscheduled Liabilities; (ii) Establish Procedures for Notice, Comment and Hearing Concerning Final Approval of Plan of Rehabilitation; and (iii) Authorize*

9

*Combined Notice*, a 90-day proof of claim filing process with a bar date ("**Claim Procedure**") applicable to Creditors holding claims for Unscheduled Liabilities, as discussed below.  The Stock Purchase Agreement further envisions, consistent with the Rehabilitation Order, the payment of all Policyholder Liabilities and Non-Policyholder Liabilities in the ordinary course of business, which ensures the continuity of insurance coverage to Pavonia's Policyholders and minimizes disruptions to Pavonia's business operations.

Employment Matters.  The Rehabilitation Order provides that Pavonia's officers, managers, and employees remain employed during the rehabilitation unless discharged.  Officer, manager, and employee wages (including any associated fringe benefits, such as health and dental insurance) will continue to be paid in the ordinary course of business.  Any non-wage benefits payable to officers, managers, and employees under existing or replacement employment agreements, except for benefits under replacement retention bonus and post-termination agreements for specified employees that the Rehabilitator or Special Deputy Rehabilitators expressly approved, will be paid from non-Estate assets.

Fixing of Unscheduled Liabilities and Related Rights.  As provided by the Rehabilitation Order, because the rehabilitation of Pavonia includes the Claim Procedure for Unscheduled Liabilities, the rights and liabilities of all Creditors holding claims for Unscheduled Liabilities, and of Pavonia and ServiceCo with respect to such claims, are fixed as of the date of entry of the Rehabilitation Order pursuant to MCL 500.8118(2).

Capacity of the Rehabilitator and Objections to Plan.  The Rehabilitator was appointed by the Court pursuant to statute given her position as the chief insurance regulator of the State of Michigan.  In this capacity, the Rehabilitator supports a change in control of Pavonia through its sale to Buyer, subject to DIFS' Form A regulatory approval and the Court's approval of this Plan, according to the terms of the Stock Purchase Agreement.  Further, in her fiduciary capacity as the statutory and Court-appointed Rehabilitator of Pavonia, the Rehabilitator recommends that the Court approve this Plan because under the circumstances described herein, she believes that it fully protects the Company, its Policyholders, and Creditors.  However, it is incumbent on any interested person or party of any kind, including Policyholders, Creditors, or other persons or entities, to exercise their right to appear and object in the event they do not agree with this Plan.  Any interested person not objecting pursuant to the process set forth herein, and for which notice will be provided pursuant to the Procedural Order entered by this Court, will be deemed to have waived any objection to the Plan.

90-Day Claim Filing Procedure.  At the request of the Rehabilitator, the Court initiated the Claim Procedure that provides for a 90-day period to file a proof of claim applicable to Creditors holding claims for Unscheduled Liabilities, as more specifically described in and governed by the Procedural Order.  The Rehabilitator will provide notice of this 90-day proof of claim filing process as required by the Procedural Order.  The Rehabilitator requested this Claim Procedure in

11

rehabilitation as the most effective mechanism under the circumstances to protect
the interests of Pavonia, its Insureds, and Creditors.

Claims to be resolved through the Claim Procedure are limited to those of
any Creditors holding claims for Unscheduled Liabilities, which includes any
Creditors holding claims for otherwise Scheduled Liabilities that Pavonia has
formally disputed.  Conversely, pursuant to the Rehabilitation Order, the
Rehabilitator will pay: (a) all Creditor claims for Policyholder Liabilities arising
from benefits payable and/or losses covered under Pavonia Policies, whether
incurred or accrued before, on, or after the date of the Rehabilitation Order,
according to the Company's normal claim processing procedures; (b) all Creditor
claims for Non-Policyholder Liabilities incurred or accrued before the date of the
Rehabilitation Order as they become due in the ordinary course of business; and (c)
all Creditor claims for Non-Policyholder Liabilities incurred or accrued on or after
the date of the Rehabilitation Order that are necessary for the continued operation
and/or rehabilitation of Pavonia as they become due in the ordinary course of
business.  Thus, Creditors holding claims for these Scheduled Liabilities (provided
the claim has not been formally disputed) are not subject to the Claim Procedure.
The sale Closing will not occur until after the Claim Procedure concludes.

Bar Date.  On or before the Claim Procedure's 90-day bar date for filing
proofs of claim ("**Bar Date**"), as set forth in the Procedural Order, any Creditors
holding claims for Unscheduled Liabilities are required to file their proofs of claim
with the Rehabilitator (each, a "**Proof of Claim**" and collectively, the "**Proofs of**

**Claim"**).  Proofs of Claim must contain all information required by MCL 500.8136 and use the Rehabilitator's approved proof of claim form, which is available on the DIFS website and through other means specified in the Procedural Order.

As stated, Creditors holding claims for Scheduled Liabilities that have not been formally disputed are not subject to the Claim Procedure or impacted by the Bar Date.

Proofs of Claim.  Pursuant to the Procedural Order, Creditors holding claims for Unscheduled Liabilities who are required to file a claim can acquire a Proof of Claim form and instructions by various means specified in such Order.  The Rehabilitator will not consider or allow any Creditor's claim for an Unscheduled Liability unless that Creditor files a timely Proof of Claim (i.e., on or before the Bar Date) containing substantially all of the information required by MCL 500.8136 and the Rehabilitator's approved Proof of Claim form.  Under MCL 500.8136(3), at any time the Rehabilitator may request that the claimant present information or evidence supplementary to that required on the Proof of Claim form and may take testimony under oath, require the production of documents, filing of affidavits, or taking of depositions, or otherwise obtain additional information or evidence.

Proof of Claim Resolution.  Pursuant to MCL 500.8143, the Rehabilitator will review all Proofs of Claim that are timely and duly filed and will make such further investigation as she deems necessary or advisable to determine which such claims should be allowed and in what amount.  She may compound, compromise, or in any

other manner negotiate the amount for which claims will be allowed and
recommended to the Court.

Pursuant to MCL 500.8139(1), if a claim is denied in whole or in part by the
Rehabilitator, written notice of the determination will be given to the claimant by
first class mail on the address shown on the Proof of Claim. Within 30 days from
the mailing of the notice (which is expedited from the 60-day period provided in the
statute), the claimant may file with the Rehabilitator a written objection to the
claim determination. If no written objection is timely filed, the Rehabilitator's
determination will be a final determination as to the validity, distribution priority,
and allowed amount of the claim, and the claimant shall not further object to the
Rehabilitator's determination.

Pursuant to MCL 500.8139(2), if the claimant files a timely, written objection
with the Rehabilitator and the Rehabilitator does not alter her denial of the claim
as a result of the objection, or an agreement cannot be reached to resolve the
claimant's claim, then the Rehabilitator will ask the Court for a hearing as soon as
practicable. Upon receipt of the Rehabilitator's request for hearing, the Court will
set a date and time for such hearing and provide the Rehabilitator with a notice of
the hearing date. The Rehabilitator will then give notice of the hearing by first-
class mail to the claimant or his or her attorney and to any other persons directly
affected, not less than 10 nor more than 30 days before the date of the hearing. If a
hearing is necessary, the Court will determine the validity, distribution priority,

14

and/or allowed amount of the Claim, as applicable.  The Court's decision will be a final and appealable order.

Rehabilitator's Report and Recommendation on Timely Filed Claims.  As provided by MCL 500.8143(1), as soon as practicable after the Bar Date elapses, the Rehabilitator will present to the Court her report of all timely and duly filed Proofs of Claim received in the Pavonia rehabilitation and will further submit to the Court her recommendations on the handling of such Proofs of Claim (the "**Claim Report and Recommendations**").  The report will include the name and address of each claimant and the amount of the claim finally recommended, if any.  The Rehabilitator will recommend that the distribution priority for payment of all allowed Proofs of Claim be made in accordance with MCL 500.8142.  Pursuant to MCL 500.8143(2), the Court may then approve, disapprove, or modify the Rehabilitator's Claim Report and Recommendations.  Following the Court's entry of a final order on the Rehabilitator's Claim Report and Recommendations, the Rehabilitator will take any action necessary to effectuate the Court's order, including by making any recommended, Court-approved payments on allowed Proofs of Claim.

The Stock Purchase Agreement.  As stated, the Rehabilitator's Plan for Pavonia, subject to this Court's approval in a final order approving the Plan, is to consummate the Company's sale from Seller to Buyer pursuant to the terms of the Stock Purchase Agreement attached as Exhibit A.  The Stock Purchase Agreement is therefore central to this Plan, and the Rehabilitator finds that it is consistent

15

with the Plan's objectives and the principles, circumstances, findings, and conclusions set forth herein.  Accordingly, the Rehabilitator hereby confirms to the Court that: (a) she or her representatives have reviewed the final version of the Stock Purchase Agreement; (b) the Stock Purchase Agreement and Buyer's acquisition of Pavonia are subject to DIFS' Form A regulatory approval and the Court's approval of this Plan; (c) she has determined that the rehabilitation process and submission of this Plan for Court approval fully protects Pavonia, its Policyholders, and Creditors; (d) the Transaction Parties have represented that they are ready and willing to perform or cause the performance of the obligations under the Stock Purchase Agreement; and (e) she recommends that the Court approve this Plan which incorporates the Stock Purchase Agreement.

The Rehabilitator has further determined that assuming DIFS' Form A regulatory approval, the rights of Policyholders to coverage under their Policies will be completely secured as a result of the Stock Purchase Agreement and Buyer's acquisition of Pavonia.

Conducting Pavonia's Business in the Ordinary Course and Consistent with Chapter 81 and this Plan.  During the rehabilitation, the Rehabilitator will cause the Company to conduct its business in the ordinary course and in accordance with Chapter 81 and this Plan, as may be amended under the *Modification, Amendments, and Disputes* sub-section below.

In addition, the Rehabilitator will endeavor to have regular (weekly or biweekly) meetings and/or teleconference calls with the Buyer and Seller to discuss

16

the status of the rehabilitation, the transaction, progress toward consummating the

closing conditions in the Stock Purchase Agreement, and achieving restoration to

Pavonia of possession of its assets and the control of its business consistent with

MCL 500.8116(2).

Restoration of Pavonia.  The restoration of Pavonia (post-Closing, as a then

wholly-owned subsidiary of Aspida) to possession of its property and the control of

its business is consistent with the goals of rehabilitation under Chapter 81, and will

be accomplished as and when appropriate under MCL 500.8116(2).  The

Rehabilitator will rely on this statute to authorize restoration in a manner that

protects the interests of Pavonia, its Policyholders, and Creditors.

Conveyance of Shares Free and Clear; Releases; Injunctions.  Upon the

successful completion of this rehabilitation and the Court's approval of this Plan,

and if authorized by and consistent with Chapter 81, the Rehabilitator will include

in a proposed order terminating the rehabilitation of Pavonia the following:

- A provision stating that as a result of the transaction, upon Closing,
  the Court orders and decrees Buyer the owner of legal and beneficial
  title to the Shares free and clear of any liens, claims, interests,
  charges, and any other encumbrances (including but not limited to
  Unscheduled Liabilities).

- A provision releasing the Rehabilitator, Buyer, and Seller from any
  and all claims and liabilities relating to or arising from, at a minimum,
  the rehabilitation, the transaction, and the Unscheduled Liabilities.

17

- A provision enjoining all persons and entities from pursuing any claims, actions, or proceedings relating to or arising from, at a minimum, the rehabilitation, the transaction, and the Unscheduled Liabilities.

Notice.  Notice will be provided in compliance with all notice procedures contained in the Procedural Order entered by this Court.

Plan Enforcement.  The Court will retain exclusive jurisdiction to enforce the provisions of this Plan and to ensure that the intent and purposes of the Plan are carried out and given effect.  The Court will further retain jurisdiction as set forth in its order approving this Plan and in the Stock Purchase Agreement.

Modification, Amendments, and Disputes.  In addition, and without limitation by reason of specification, the Court will retain exclusive jurisdiction of the rehabilitation proceeding to consider any modification or amendment of this Plan and to hear and determine:

(i)    all disputes, if any, as may arise concerning the classification, subordination, allowance, or disallowance of Creditor Proofs of Claim involving Unscheduled Liabilities, and any objections thereto, to the extent consistent with this Plan;

(ii)    all controversies, suits, and disputes, if any, as may arise in connection with the interpretation or enforcement of this Plan;

18

(iii)    all Creditor claims, causes of action, controversies, suits, and disputes against Pavonia, if any, as may arise prior to the Effective Date, whether or not the subject of an action that was pending as of the Effective Date;

(iv)    applications for the allowance of compensation to and the expenses of professional persons;

(v)    any and all applications, motions, or litigated matters arising out of or relating to the rehabilitation that were pending before this Court on the Effective Date; and

(vi)    all proceedings to enforce performance of this Plan against any person or entity, including without limitation, proceedings to enforce any injunction and stay provided for in the Rehabilitation Order, the Procedural Order, the proposed order terminating the rehabilitation of Pavonia, and any other order duly entered by the Court.

Reservation of Rights. Neither the filing of this Plan, any statement or provision contained herein, nor the taking of any action by the Rehabilitator or any of her employees or agents with respect to this Plan will be or be deemed to be an admission or a waiver of any rights of Pavonia, the Rehabilitator, Buyer, or Seller prior to the Effective Date.  In the event the Effective Date does not occur, no statement contained herein may be used or relied upon in any manner in any suit, action, proceeding, or controversy within or outside of this proceeding.

# EXHIBIT D

 **Clark Hill**

| | |
|---|---|
| Zachary C. Larsen | Clark Hill |
| T (517) 318-3053 | 215 South Washington Square |
| F (517) 318-3066 | Suite 200 |
| Email:zlarsen@clarkhill.com | Lansing, MI 48933 |
| | T (517) 318-3100 |
| | F (517) 318-3099 |

September 20, 2022

**VIA EMAIL & HAND DELIVERY**
Ingham County Circuit Court
Attn:  Clerk of The Court
315 S. Jefferson Street
Mason, MI 48854

> **Re:    *Anita G. Fox v Pavonia Life Insurance Company of Michigan***
> **Ingham County Circuit Court Case No. 19-504-CR**

Dear Clerk:

Enclosed please find a Joint Notice Regarding Closing of Sale of Pavonia Under Stock Purchase Agreement, along with a Proof of Service, for filing in the above-referenced matter.

If you should have any questions, please do not hesitate to contact me. Thank you for your assistance in this matter.

Sincerely,

CLARK HILL

*/s/ Zachary C. Larsen*

Zachary C. Larsen

ZCL:pm
Enclosures

cc w/Encl.: Counsel of Record

clarkhill.com

**STATE OF MICHIGAN**
**IN THE 30TH CIRCUIT COURT FOR THE COUNTY OF INGHAM**

ANITA G. FOX, Director of the Michigan
Department of Insurance and Financial
Services,

      Petitioner,

v.

PAVONIA LIFE INSURANCE COMPANY
OF MICHIGAN,

      Respondent.

Case No. 19-504-CR

Hon. Wanda M. Stokes

_____/

| | |
|---|---|
| Christopher L. Kerr (P57131)<br>Assistant Attorneys General<br>Corporate Oversight Division<br>P. O. Box 30736<br>Lansing, MI 48909<br>(517) 335-7632<br>KerrC2@michigan.gov<br>*Counsel for Petitioner* | Peter B. Kupelian (P31812)<br>Clark Hill PLC<br>151 S. Old Woodward Ave., Ste. 200<br>Birmingham, MI 48009<br>(248) 530-6336<br>pkupelian@clarkhill.com |
| Lori McAllister (P39501)<br>Dykema Gossett PLLC<br>201 Townsend St., Ste. 900<br>Lansing, MI 48933<br>(517) 374-9100<br>lmcallister@dykema.com<br>*Counsel for Axar Capital, LLC* | Ronald A. King (P45088)<br>Zachary C. Larsen (P72189)<br>Clark Hill PLC<br>215 South Washington Square, Ste. 200<br>Lansing, MI 48933<br>(517) 318-3015<br>rking@clarkhill.com<br>zlarsen@clarkhill.com<br>*Counsel for GBIG Holdings, Inc.* |

_____/

**JOINT NOTICE REGARDING CLOSING OF SALE OF PAVONIA**
**UNDER STOCK PURCHASE AGREEMENT**

GBIG Holdings, Inc. ("GBIG") and Axar Capital, LLC ("Axar"), through their attorneys,

hereby give notice to this Court and to the Rehabilitator Anita G. Fox that the parties closed on the

sale of Pavonia on Thursday, September 15, 2022, consistent with the terms of this Court's

September 14, 2022 Order: (1) Approving Second Amended Plan of Rehabilitation and Related

Closing of Stock Purchase Agreement; (2) Approving Actions of the Rehabilitator; and Upon

Closing of Stock Purchase Agreement (3) Terminating Rehabilitation; and (4) Discharging the

Rehabilitator, Closing the Case, and Granting Related Relief, as well as consistent with the terms

of the parties' Stock Purchase Agreement.

Respectfully Submitted,

_/s/ Lori McAllister_
Lori McAllister (P39501)
Attorney for Axar Capital, LLC

_/s/ Zachary C. Larsen_
Ronald A. King (P45088)
Zachary C. Larsen (P72189)
Attorneys for GBIG Holdings, LLC

Dated: September 20, 2022

Dated: September 20, 2022

**STATE OF MICHIGAN**
**IN THE 30ᵀᴴ CIRCUIT COURT FOR THE COUNTY OF INGHAM**

ANITA G. FOX, Director of the Michigan
Department of Insurance and Financial
Services,

      Petitioner,

v.

PAVONIA LIFE INSURANCE COMPANY
OF MICHIGAN,

      Respondent.

Case No. 19-504-CR-C30

Hon. Wanda M. Stokes

_____/

Christopher L. Kerr (P57131)
Aaron W. Levin (P81310)
Assistant Attorneys General
Corporate Oversight Division
P. O. Box 30736
Lansing, MI 48909
(517) 335-7632
KerrC2@michigan.gov
*Counsel for Petitioner*

Peter B. Kupelian (P31812)
Clark Hill PLC
151 S. Old Woodward Ave., Ste. 200
Birmingham, MI 48009
(248) 530-6336
pkupelian@clarkhill.com

Ronald A. King (P45088)
Zachary C. Larsen (P72189)
Clark Hill PLC
215 South Washington Square, Ste. 200
Lansing, MI 48933
(517) 318-3015
rking@clarkhill.com
zlarsen@clarkhill.com
*Counsel for GBIG Holdings, Inc.*

_____/

**PROOF OF SERVICE**

I hereby certify that on September 20, 2022, a copy of a **Joint Notice Regarding Closing of Sale of Pavonia Under Stock Purchase Agreement**, along with this Proof of Service, was served upon the following:

*By email & first-class mail*
AAG Christopher L. Kerr
*Counsel for Rehabilitator*
Michigan Department of Attorney General
Corporate Oversight Division
P.O. Box 30736
Lansing, MI 48909
kerrc2@michigan.gov

*By email & first-class mail*
Teresa A. Bingman
*Counsel for Independent Insurance, LLC*
Law Offices of Teresa Bingman
120 N Washington Square, Suite 300
Lansing, MI 48933
tbingman@tbingmanlaw.com

*By email*
Lori McAllister
*Counsel for Axar Capital, LLC*
LMcAllister@dykema.com

*By email*
Robert D. Heitmeyer
*Counsel for U.S. Internal Revenue Service*
Robert.d.heitmeyer@irscounsel.treas.gov

*By email*
Nicholas Otis
*Counsel for DelRio Litigation*
ntotis@nlkj.com

*By email*
Timothy W. Volpe
*Counsel for Independent Insurance, LLC*
Tim.volpe@arlaw.com

*By email*
Steve Ferguson
*Counsel for Sharp Litigation*
fergatty@aol.com

*By email*
C. Christopher Muth
*Counsel for Copelin Litigation*
Chris@ccmuth.com

*By email*
Mike Dinius
Deputy Rehabilitator
NC Insurer Affiliates
MDinius@noblecon.net

*By email*
Thomas Mitchell
MitchellT5@michigan.gov

In addition, electronic copies of the foregoing documents will be provided to the Department of Insurance and Financial Services, which will provide courtesy notice to other potentially interested individuals/entities by posting the documents on its website, www.michigan.gov/difs, under the section "Regulatory & Legal," the subsection "Receiverships," and the sub-subsection "Pavonia Life Insurance."

Paula K. Mertins

# EXHIBIT E

EXECUTION VERSION

## SUBORDINATION AGREEMENT

This SUBORDINATION AGREEMENT (as amended, restated, supplemented or otherwise modified in accordance with the terms hereof, this "Agreement"), dated as of July 9, 2019, is entered into among the parties listed under the "Agent" on Part A of Schedule I hereto (each a "Subordinated Agent" and, collectively, "Subordinated Agents"), the parties listed under the heading "Lender" on Part A and Part B of Schedule I hereto (each such Lender, each Subordinated Agent and Successor Agent (as defined below), a "Subordinated Creditor" and, collectively, "Subordinated Creditors"), Colorado Bankers Life Insurance Company ("CBLIC"), a life insurance company organized under the Laws of North Carolina, as Successor Agent, and Aspida Holdco, LLC, as lender under the Senior Loan Agreement referred to below (together with its successors and assigns, "Senior Creditor"), with reference to the following facts:

A.    GBIG Holdings, Inc., a Delaware corporation (the "Borrower"), has incurred the obligations listed under the heading "Part A: Junior Loan Obligations" on Schedule I hereto, pursuant to the applicable agreements set forth under the column with the heading "Junior Loan Agreement" (collectively, each as amended, restated, supplemented or otherwise modified from time to time, the "Junior Loan Agreements"), to certain Subordinated Creditors as set forth therein. The loan documents, financing documents, promissory notes and other instruments or agreements entered into by the Borrower with or for the benefit of the applicable Subordinated Creditors under the Junior Loan Agreements, as applicable, together with the Junior Loan Agreements, are collectively referred to as the "Junior Loan Documents", and all obligations of the Borrower thereunder under are collectively referred to as the "Junior Loan Obligations".

B.    The Borrower has incurred the obligations listed under the heading "Part B: Junior Book Entry Obligations" on Schedule I hereto in book entry form to certain Subordinated Creditors, as set forth therein (the "Junior Book Entry Obligations"). Any loan documents, financing documents, promissory notes and other instruments or agreements entered into by the Borrower with or for the benefit of the applicable Subordinated Creditors with respect to the Junior Book Entry Obligations from time to time, as applicable, are collectively referred to as the "Junior Book Entry Documents".

C.    The Borrower desires to enter into (i) that certain Loan Agreement, as borrower, to be dated on or about the date hereof (as amended, restated, supplemented or otherwise modified from time to time, the "Senior Loan Agreement") by and between the Borrower, as borrower, and Senior Creditor, as lender, pursuant to which the Borrower will incur Obligations and liabilities in accordance with the terms and conditions thereof to Senior Creditor, and (ii) the related other Loan Documents (as defined therein) for the benefit of Senior Creditor each as amended, restated, supplemented, renewed refinanced, replaced or otherwise modified form time to time, and collectively (together with the Senior Loan Agreement, the "Senior Loan Documents").

D.    In connection with the Senior Loan Agreement, the Borrower, Subordinated Agents, certain Subordinated Creditors party thereto will enter into the Amendment, Consent, and Release to be dated on or about the date hereof (the "Consent"), pursuant to which the parties thereto agree, among other things, to (i) consent to the Senior Loan Agreement, the

Senior Loan Documents and all of the transactions contemplated thereby, (ii) (x) terminate, release and discharge any Lien and security interest granted under the applicable Junior Loan Agreement (subject to reinstatement as provided therein), and (y) amend the applicable Junior Loan Agreement pursuant to the terms of the Consent and (iii) to assign all of SNIC's (as defined below) right, title and interest in, to and under the applicable Junior Loan Documents as "Agent" (as defined in the applicable Junior Loan Agreement) to CBLIC, as successor agent (CBLIC, in such capacity, the "Successor Agent").

E.      As a condition to entering into the Senior Loan Documents and advancing funds to the Borrower pursuant to the Senior Loan Documents, Senior Creditor has required that the Junior Loan Obligations and the Junior Book Entry Obligations will be subordinated to the Senior Debt (as defined below) and any Senior Liens (as defined below).

F.      Each Subordinated Creditor has agreed to subordinate all of the payment, performance and priority of the Borrower's Obligations owed to such Subordinated Creditor with respect to the Junior Loan Obligations or the Junior Book Entry Obligations, under the Junior Loan Documents and any Junior Book Entry Documents, and any other Obligations thereunder or related thereto, to the prior payment, performance and priority of the Senior Debt (as defined below) all as set forth in the succeeding provisions of this Agreement (which shall control over any conflicting or inconsistent recitals above).

**NOW, THEREFORE,** Senior Creditor and Subordinated Creditors hereby agree as follows:

1.      Certain Definitions Capitalized terms used in this Agreement and not otherwise defined herein shall have the meaning given to such terms in the Senior Loan Agreement.

(a)      The term "Bankruptcy Code" means Title 11 of the United States Code, as amended, or any similar federal or state law for the relief of debtors, including any Insurance Law (as defined in the Senior Loan Agreement) with respect to any supervision, rehabilitation, liquidation, conservation or similar insurance receivership proceeding.

(b)      The term "Bankruptcy Event" means, with respect to any Person (as defined in the Senior Loan Agreement), the commencement by such Person of a voluntary case or other proceeding involving its liquidation, rehabilitation, winding up, bankruptcy or sequestration or otherwise seeking reorganization or other relief with respect to itself or its debts under any Debtor Relief Law (as defined in the Senior Loan Agreement) or seeking the appointment of a trustee, receiver, liquidator, conservator, rehabilitator, custodian or other similar official of it or any substantial part of its property, or such Person shall consent to any such relief or to the appointment of or taking possession by any such official in any involuntary case or other proceeding commenced against it, or shall make a general assignment for the benefit of creditors, or shall fail generally, or admit in writing its inability, to pay its debts as they become due, or shall take any corporate action to authorize any of the foregoing; or any involuntary case or other proceeding shall be commenced against such Person involving its liquidation, rehabilitation, winding up, bankruptcy or sequestration or otherwise seeking reorganization or other relief with respect to it or its debts under any Debtor Relief Law that is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; or an order for

2

relief is entered in any such proceeding or such Person becomes the subject of the appointment of a trustee, receiver, rehabilitator, conservator, liquidator, custodian, or other similar official with respect to a substantial part of its property.

(c)    The term "Lien" means any mortgage, deed of trust, pledge, hypothecation, security interest, option, claim, encroachment, restriction, exclusive license of Intellectual Property or other similar encumbrance, lien or adverse right.

(d)    The term "Obligations" is used in this Agreement in its broadest and most comprehensive sense and shall mean all present and future indebtedness of Borrower which is or may be, from time to time, directly or indirectly incurred by Borrower, including any negotiable instruments evidencing the same, and all guaranties, debts, demands, monies, indebtedness, liabilities, and obligations owed or to become owing, including interest, principal, costs, and other charges, and all claims, rights, causes of action, judgments, decrees, remedies, security interests, or other obligations of any kind whatsoever and howsoever arising, whether voluntary, involuntary, absolute, contingent, or by operation of law.

(e)    The term "Paid in Full" or "Payment in Full" means the expiration of the 91-day period commencing upon the payment in full in cash of all Senior Debt.

(f)    The term "Pledge Agreement" means the Pledge Agreement as defined in the Senior Loan Agreement.

(g)    The term "Secured Obligations" means the Obligations as defined in the Senior Loan Agreement.

(h)    The term "Senior Liens" means any Lien securing Senior Debt.

(i)    The term "Senior Debt" means, subject to Section 6, all Secured Obligations now existing or hereafter created of Borrower to Senior Creditor, under or incurred pursuant to the Senior Loan Agreement and any other Senior Loan Document, as any of the foregoing may be amended, restated, renewed, refinanced, replaced, or otherwise modified from time to time, whether direct or indirect, primary or secondary, joint or several, fixed or contingent, and whether evidenced by note, application for or agreement for reimbursement of advance under letter of credit, open account, overdraft, indorsement, surety agreement, indemnitee, guaranty or otherwise. The Senior Debt includes amounts accruing before or after the filing of any bankruptcy, receivership, insolvency or like petition, whether or not an allowed or allowable claim in any Bankruptcy Event. Without limiting the generality of the foregoing, Senior Debt includes all obligations for fees, to indemnify, to reimburse for expenses and to reimburse for advances (whether for the payment of taxes, insurance premiums, the preservation or protection of property or the title thereto or for any other reason) arising under any Senior Loan Documents, and all other Secured Obligations.

Unless otherwise stated or the context clearly requires otherwise: (a) references to Subordinated Agent will refer to Subordinated Agent acting on behalf of itself and on behalf of all other applicable Subordinated Creditors, (b) definitions of terms apply equally to the singular and plural forms; pronouns will include the corresponding masculine, feminine, and neuter forms; (c) "will" and "shall" have the same meaning; (d) in computing periods from a specified

3

date to a later specified date, (i) the words "from" and "commencing on" (and the like) mean "from and including," (ii) the words "to," "until" and "ending on" (and the like) mean "to but excluding" and (iii) the word "through" means "to and including"; (e) except as otherwise provided in this Agreement, any action permitted under this Agreement may be taken at any time and from time to time; (f) "including" means "including, but not limited to"; (g) "A or B" means "A or B or both"; (h) references to a statute refer to the statute and all regulations promulgated under or implementing the statute as in effect at the relevant time, references to a specific provision of a statute or regulation include successor provisions; (i) references to a section of the Bankruptcy Code also refer to any similar provision of other Bankruptcy Law; (j) references to an agreement (including this Agreement) refer to the agreement as the same may be amended, supplemented or modified at the relevant time; and (k) references to a governmental authority include any successor governmental authority.  Unless otherwise expressly stated, if a party may not take an action under this Agreement, then it may not take that action indirectly, or take any action assisting or supporting any other person in taking that action directly or indirectly.  "Taking an action indirectly" means taking an action that is not expressly prohibited for the party but is intended to have substantially the same effects as the prohibited action.

2.    <u>Subordination of Creditor Obligations</u>.    Any and all Obligations owed to Subordinated Creditors (i) under or with respect to the Junior Loan Obligations or otherwise with respect to the Junior Loan Documents and (ii) under or with respect to the Junior Book Entry Obligations or otherwise with respect to any Junior Book Entry Documents (together, in each case, with any extensions, amendments, replacements, refinancings, exchanges or substitutions therefor) ("<u>Creditor Obligations</u>"), are hereby subordinated to any and all Senior Debt.  Other than as provided in Section 4(b) below, no payment shall be made by Borrower on the Creditor Obligations until all Senior Debt has been Paid in Full.

3.    <u>Insolvency</u>.  In the event of any Bankruptcy Event, the officers of the Borrower and any assignee, trustee in such Bankruptcy Event, receiver, and other person or persons in charge, are hereby directed to cause the Senior Debt to be Paid in Full (including all interest accruing, and all interest which, but for the application of the Bankruptcy Code, would have accrued, after the commencement of any such Bankruptcy Event, whether or not an allowed or allowable claim in such Bankruptcy Event), before making any payments or distributions of any kind to any Subordinated Creditor.  Each Subordinated Creditor hereby irrevocably authorizes, empowers and appoints Senior Creditor as its agent and attorney-in-fact to execute, verify, deliver and file and vote such proofs of claim in any Bankruptcy Event; provided (x) Senior Creditor shall have no obligation to exercise any such authority with respect to any Subordinated Creditor's claim, and (y) if any Subordinated Creditor votes its claim, such Subordinated Creditor shall not, without the prior written consent of Senior Creditor, vote to accept a plan of liquidation, reorganization, arrangement, composition or extension that does not provide for the Payment in Full of all of the Senior Debt prior to the payment of any Creditor Obligations.

4.    <u>Limitations on Creditor's Actions</u>.  (a) At any time prior to the Payment in Full of all Senior Debt, each Subordinated Creditor agrees not to: (i) accelerate (except for any automatic acceleration upon bankruptcy of the Borrower pursuant to the terms of any Junior Loan Document or Junior Book Entry Document) or collect or receive payment upon, by setoff or in any other manner, any portion of the Creditor Obligations; (ii) sell, assign, exchange, redeem, transfer, pledge, or give a security interest in the Creditor Obligations (other than to any

4

person that is or agrees to be bound hereby as a Subordinated Creditor with respect to such Creditor Obligations); (iii) enforce, collect, realize upon, or apply any Lien now or hereafter existing for the Creditor Obligations; (iv) commence, prosecute, or participate in any administrative, legal, or equitable action that might adversely affect the Borrower or any Senior Creditor or either of their interests; (v) join in any Bankruptcy Event (other than to file a proof of claim with respect to the Creditor Obligations); (vi) take any Lien on or in any of Borrower's real or personal property; (vii) except as permitted under clause (b) below, incur any obligation to, or receive any loans, advances, or gifts from Borrower; (viii) modify any of the terms and conditions of the Creditor Obligations in a manner that makes the terms thereof more onerous to the Borrower; or (ix) exercise any other rights or remedies thereof under the Junior Loan Documents or the Junior Book Entry Documents.

(b)    Notwithstanding anything to the contrary contained in this Agreement, Subordinated Creditors shall be entitled to (i) accrue interest on the outstanding principal balance owed under the Junior Loan Agreements at the applicable rate per annum set forth therein, and (ii) accrue interest on the outstanding principal balance owed with respect to the Junior Book Entry Obligations, and, in each case, add such interest to principal thereof from time to time, so long as no portion thereof shall be paid in cash prior to the Payment in Full of the Senior Debt.

5.    <u>Legending Instruments</u>.  Each Subordinated Creditor agrees that if any part or all of the Creditor Obligations shall be evidenced by one or more promissory notes or other instruments, such Subordinated Creditor shall, at the request of the Senior Creditor, place or cause to be placed on the face of each such note and instrument a legend stating that the payment thereof is subject to the terms of this Agreement and is subordinate to the prior Payment in Full of all of the Senior Debt and shall, within the later of seven (7) days after the execution of any such promissory note or instrument or seven (7) days after the date of this Agreement, deliver a copy of the original of such legended promissory note or legended instrument to Senior Creditor. Each Subordinated Creditor agrees to mark all books of account in such manner as to indicate that payment of the applicable Creditor Obligations are subordinated pursuant to the terms of this Agreement.

6.    <u>Modification of Senior Debt</u>.  Each Subordinated Creditor agrees that Senior Creditor shall have absolute power and discretion, without notice to such Subordinated Creditor or any other Subordinated Creditor, to deal in any manner with the Senior Debt, including, the power and discretion to do any of the following: (a) any demand for payment of any Senior Debt may be rescinded in whole or in part, and any Senior Debt and the Senior Debt or the liability of Borrower or any other party upon or for any part thereof, or any collateral security or guaranty therefor, or right of offset with respect thereto, may, from time to time, in whole or in part, be continued, extended, renewed, modified, refinanced, replaced accelerated, compromised, waived, surrendered, or released; and (b) the Senior Debt, any Senior Loan Documents and any other document or instrument evidencing or governing the terms thereof or any collateral security documents or guaranties or documents in connection with the Senior Debt may be amended, restated, otherwise modified, supplemented, or terminated, in whole or in part, as Senior Creditor may deem advisable from time to time, and any collateral security at any time held by Senior Creditor for the payment of any of the Senior Debt may be sold, exchanged, waived, surrendered, or released. Each Subordinated Creditor will remain bound under this Agreement, and the subordination provided for herein shall not be impaired, abridged, released, or otherwise

5

affected notwithstanding any such continuation, extension, modification, renewal, refinancing, replacement, acceleration, compromise, amendment, waiver, surrender, supplement, termination, sale, exchange, or release. The Senior Debt shall conclusively be deemed to have been created, contracted, or incurred in reliance upon this Agreement, and all dealings between Borrower and Senior Creditor shall be deemed to have been consummated in reliance upon this Agreement. Notwithstanding the foregoing, the terms of the Senior Loan Documents shall not be amended, and Senior Debt shall not be amended, restated, otherwise modified, supplemented or refinanced in a manner that causes the principal amount of the indebtedness thereunder to be increased (excluding, for the avoidance of doubt, any principal resulting from the capitalization of interest in accordance with the terms thereof as in effect on the date hereof) without the express prior written consent of each of SNIC and CBLIC.

7.    <u>Subordinated Creditors' Waivers and Agreements</u>.  Each Subordinated Creditor however waives: (a) any and all notice of the creation, modification, renewal, extension, replacement, refinancing or accrual of any of the Senior Debt and notice of or proof of reliance by Senior Creditor upon this Agreement; (b) the right, if any, to require Senior Creditor to marshal or otherwise require Senior Creditor to proceed to dispose of or foreclose upon collateral in any manner or order; and (c), until the Senior Debt is Paid in Full, any right of subrogation, contribution, reimbursement, or indemnity which it may have against Borrower arising directly or indirectly out of this Agreement. Each Subordinated Creditor agrees not to assert against Senior Creditor any rights which a guarantor or surety could exercise; but nothing in this Agreement shall constitute such Subordinated Creditor a guarantor or surety.

8.    <u>Continuing Nature of This Agreement</u>.  Notwithstanding any action or inaction by Senior Creditor with respect to the Senior Debt or with respect to any collateral therefor or any guaranties thereof, this Agreement, the obligations of each Subordinated Creditor owing to Senior Creditor, and Senior Creditor's rights and privileges hereunder, shall continue until Payment in Full, in cash, of all of the Senior Debt and termination of any obligation of Senior Creditor to make loans or advances to, or guarantee letters of credit for the account of, Borrower. All rights, power, and remedies hereunder shall apply to all past, present, and future Senior Debt, including those arising out of successive transactions which may continue renew, increase, decrease, or from time to time create new Senior Debt. The subordinations, agreements, and priorities set forth herein shall remain in full force and effect, regardless of whether any party hereto in the future seeks to rescind, amend, terminate, or reform, by litigation or otherwise, its respective agreements with Borrower.

9.    <u>Liens</u>.

(a)    Until the Senior Debt have been Paid in Full, no Subordinated Creditor shall accept, take or hold a Lien in any real or personal property of Borrower as security for the Creditor Obligations or otherwise. Each Subordinated Creditor further agrees that in case such Subordinated Creditor shall, in contravention of the terms of this Agreement, take or receive any Lien by way of attachment, execution, or otherwise, on any of the real or personal property of Borrower, or should take or join in any other measure or advantage contrary to this Agreement at any time prior to the Payment in Full of any and all Senior Debt, Senior Creditor shall be entitled to have the same vacated, dissolved, and set aside by such proceedings at law or otherwise as Senior Creditor may deem proper, and this Agreement shall constitute full and sufficient grounds

6

therefor and shall entitle Senior Creditor to become a party to any proceedings at law or otherwise initiated by Senior Creditor or by any other party, in or by which Senior Creditor may deem it proper to protect Senior Creditor's interest hereunder. Each Subordinated Creditor agrees that it will not, and will not encourage or support any other person to, at any time, contest the validity, perfection, priority or enforceability of the Senior Debt or the Liens in any collateral securing the Secured Obligations.

(b)    No Subordinated Creditor shall enforce any Liens, if any, at any time prior to the Payment in Full of any and all Senior Debt. All amounts, whether in the form of cash, proceeds, checks, drafts, orders or other instruments for the payment of money, recovered or received with respect to any property of Borrower shall immediately upon receipt thereof by any Subordinated Creditor be paid over and delivered in the form received, but with any necessary endorsements or instruments required for payment to Senior Creditor, and, until so delivered shall not be commingled with any other funds or property but shall be held by Subordinated Creditor in trust for the benefit of Senior Creditor.

10.    <u>Subordinated Creditors To Receive Payments, etc. in Trust</u>.  If any Subordinated Creditor shall receive any payments, collateral security, or other rights in any property of Borrower in violation of this Agreement, such payment or property shall be received by such Subordinated Creditor in trust for Senior Creditor and shall immediately be delivered and transferred to Senior Creditor in the same form received together with any necessary endorsement.

11.    <u>No Other Subordinations</u>.  Each Subordinated Creditor represents and warrants to Senior Creditor that no currently effective subordinations of the Creditor Obligations have previously been executed by such Subordinated Creditor for the benefit of any other person, and any such subordinations hereafter executed will be, and shall be expressed to be, subject and subordinate to the terms of this Agreement and the rights of Senior Creditor hereunder.

12.    <u>Financial Condition of Borrower</u>.  Each Subordinated Creditor represents and warrants to Senior Creditor that (a) such Subordinated Creditor is currently informed of the financial condition of Borrower and of all other circumstances which a diligent inquiry would reveal and which bear upon the risk of nonpayment of the Senior Debt, and (b) such Subordinated Creditor has read and understands the terms and conditions of the Senior Loan Agreement any other Senior Loan Documents and all other documents executed in connection therewith.

13.    <u>Subordinated Creditors Representations</u>.  Each Subordinated Creditor hereby represents and warrants to Senior Creditor as follows: (a) such Subordinated Creditor is duly organized, validly existing and in good standing under the laws of the state of its incorporation, organization or formation, as applicable; (b) such Subordinated Creditor has the power and authority to execute, deliver and perform its obligations under this Agreement, all of which have been duly authorized by all proper and necessary action; (c) this Agreement constitutes the legal, valid and binding obligation of such Subordinated Creditor, enforceable against such Subordinated Creditor in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, or similar laws affecting the enforcement of creditors' rights generally and by equitable principles; (d) the execution, delivery and performance of this

7

Agreement by such Subordinated Creditor does not (i) contravene the terms of such Subordinated Creditor's organization documents or (ii) conflict with or result in any breach or contravention of, or result in the creation of any Lien under, any material contract or agreement to which such Subordinated Creditor is a party or to which its property is subject or any order, injunction, writ or decree of any governmental authority to which such Person or its property is subject or (iii) violate any law, rule or regulation binding upon such Person or its property that could, in the case of this clause (iii), reasonably be expected to have a material adverse effect on the rights and remedies of Senior Creditor; (e) on the date hereof, such Subordinated Creditor together with the other Subordinated Creditors parties hereto are the collective owners and holders of the obligations under the Junior Loan Agreements, Junior Book Entry Obligations and all other Creditor Obligations; and (f) upon the execution thereof, no default will exist under or with respect to the Junior Loan Documents, the Junior Book Entry Obligations or any other Creditor Obligation.

14.     <u>Assignees, etc</u>.  This Agreement shall be binding upon the heirs, administrators, personal representatives, successors, and assigns of each Subordinated Creditor, and shall inure to the benefit of Senior Creditor's successors and assigns.  No Subordinated Creditor shall sell, assign, pledge or otherwise transfer all or any portion of its Junior Loan Agreement or any Junior Book Entry Obligation or any of its interests in respect thereof, unless the assignee or transferee thereof executes and delivers to Senior Creditor a joinder to this Agreement in the form of <u>Exhibit A</u> hereto or is otherwise bound hereby with respect to the interests so assigned.  In the event of any assignment or other such action in violation of the terms of this Agreement, the subordination effected hereby shall survive any sale, assignment, pledge or other transfer of all or any portion of any Junior Loan Agreement or any Junior Book Entry Obligation, and the terms of this Agreement shall be binding upon the successors and assigns of such Subordinated Creditor, as provided herein.

15.     <u>Additional Documents</u>.  Each Subordinated Creditor agrees to execute and deliver, upon the request of any Senior Creditor, such documents and instruments (appropriate for filing or recording, if requested) as may be necessary or appropriate to fully implement or to fully evidence the understanding and agreements contained in this Agreement.

16.     <u>Severability</u>.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced under any Law or as a matter of public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated by this Agreement is not affected in any manner materially adverse to any party.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties to this Agreement shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner so that the transactions contemplated by this Agreement be consummated as originally contemplated to the greatest extent possible.

17.     <u>Choice of Law; Venue</u>.  The validity of this Agreement, its construction, interpretation, and enforcement, and the rights of the parties hereunder, shall be determined under, governed by, and construed in accordance with the laws of the State of New York, except as set forth below. Each party irrevocably and unconditionally submits for itself and its property in any legal action or proceeding arising out of or relating to this Agreement, the transactions

8

contemplated hereby or thereby, the formation, breach, termination or validity of this Agreement or the recognition and enforcement of any judgment in respect of this Agreement to the exclusive jurisdiction of the courts of the State of New York sitting in the County of New York, the federal courts for the Southern District of New York, and appellate courts having jurisdiction of appeals from any of the foregoing, and all claims in respect of any such action shall be heard and determined in such New York courts or, to the extent permitted by Law, in such federal court, except as set forth below. The parties hereto hereby irrevocably waive any objection, including any objection to the laying of venue or based on the grounds of forum non conveniens, that any of them may now or hereafter have to the bringing of any such action or proceeding in such jurisdictions, except as set forth below. Notwithstanding anything to the contrary in this Agreement, any dispute or action of any kind arising out of, or relating to, this Agreement that involves SNIC or CBLIC shall be brought exclusively in the rehabilitation proceeding pending in the General Court of Justice, Superior Court Division, of Wake County, North Carolina, File No. 19CV008664, subject to the terms of the Order of Rehabilitation, Order Appointing Receiver, and Order Granting Injunctive Relief entered in that proceeding on or about June 27, 2019, and shall be governed exclusively by North Carolina law.

18.    <u>Collection Costs; Attorneys' Fees</u>.  In the event it becomes necessary for either party to commence any proceedings or actions to enforce the provisions of this Agreement, the court or body before which the same shall be tried shall award to the prevailing party all costs and expenses thereof, including reasonable attorneys' fees, the usual and customary and lawfully recoverable court costs, and all other expenses in connection therewith.

19.    <u>Counterparts; Heading</u>.  This Agreement may be executed in two (2) or more counterparts, and by the different parties to this Agreement in separate counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement.  Delivery of an executed counterpart of a signature page to this Agreement by facsimile or electronic mail shall be as effective as delivery of a manually executed counterpart.  The captions and headings of this Agreement are for convenience of reference only and shall not affect the interpretation of this Agreement.

20.    <u>Waiver, Amendments, Etc</u>.  The subordination provisions contained herein are for the benefit of Senior Creditor and their successors and assigns and may not be rescinded, cancelled, or modified in any way, nor, unless otherwise expressly provided for herein, may any provision of this Agreement be waived or changed, without the prior written consent thereto of all the Subordinated Creditors and Senior Creditor. Notwithstanding the foregoing, any amendment or modification of this Agreement that modifies the rights or imposes additional duties or obligations on the Borrower shall be subject to the prior written consent of the Borrower.

21.    <u>Waiver of Jury Trial</u>.   EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY ACTION (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR ITS PERFORMANCE HEREUNDER OR THEREUNDER OR THE ENFORCEMENT OF THIS AGREEMENT.  ANY PARTY HERETO MAY FILE A COPY OF THIS PARAGRAPH WITH ANY COURT AS WRITTEN EVIDENCE OF THE KNOWING, VOLUNTARY AND

BARGAINED-FOR AGREEMENT BY AND AMONG THE PARTIES TO WAIVE IRREVOCABLY THEIR RIGHT TO TRIAL BY JURY IN ANY SUCH ACTION. EACH PARTY HERETO CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE OF ANY OTHER PARTY HERETO HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF ANY ACTION, SEEK TO ENFORCE THE FOREGOING WAIVER, (B) EACH PARTY HERETO UNDERSTANDS AND HAS CONSIDERED THE IMPLICATION OF THIS WAIVER, (C) EACH PARTY HERETO MAKES THIS WAIVER VOLUNTARILY, AND (D) EACH PARTY HERETO HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS PARAGRAPH 21.

22.    <u>Avoidance Issues; Termination; Reinstatement</u>.    If a holder of Senior Debt receives payment or property on account of Senior Debt and the payment is subsequently invalidated, avoided, declared to be fraudulent or preferential, set aside, or otherwise required to be transferred to a trustee, receiver, or Borrower or an estate of Borrower (a "<u>Recovery</u>"), then, to the extent of the Recovery, the Senior Debt intended to have been satisfied by the payment will be reinstated as Senior Debt on the date of the Recovery and the Senior Debt will be deemed not to be Paid in Full for all purposes hereunder. If this Agreement is purported to be terminated prior to a Recovery, this Agreement will be reinstated in full force and effect, and such prior termination will not diminish, release, discharge, impair, or otherwise affect the obligations of the parties hereunder from the date of reinstatement. Upon any such Recovery, each Subordinated Creditor will deliver to Senior Creditor any payments in respect of the Junior Loan Documents, the Junior Book Entry Obligations or other Creditor Obligations received between (x) the date that the Senior Debt were previously purported to be Paid in Full and (y) the date of such Recovery that would not have been permitted under the terms of this Agreement had this Agreement remained effective during that period. Each Subordinated Creditor may not benefit from a Recovery, and any distribution made to any Subordinated Creditor as a result of a Recovery will be paid over to Senior Creditor.

23.    <u>Entire Agreement; Conflicts</u>.    This Agreement embodies the entire agreement of Senior Creditor and Subordinated Creditors with respect to the subject matter hereof and supersede all prior agreements and understandings relating to the subject matter hereof and thereof and any draft agreements, negotiations or discussions involving Borrower and any of Senior Creditor and/or Subordinated Creditors relating to the subject matter hereof. In the event of any conflict between any term, covenant or condition of this Agreement and any term, covenant or condition of the Junior Loan Documents or Junior Book Entry Documents, the provisions of this Agreement shall control and govern.

24.    <u>Termination</u>.    This Agreement shall terminate upon the Payment in Full of the Senior Debt, subject to Section 22.

25.    <u>Effect on Junior Loan Documents</u>.    Notwithstanding anything contained in the Junior Loan Documents, each of the Borrower and each Subordinated Creditor hereby agrees that (i) the execution and delivery of this Agreement by the Borrower and the Subordinated Creditors and (ii) performance of Borrower's and Subordinated Creditor's obligations hereunder does not, and will not, breach or result in a default under the Junior Loan Documents.

10

*[remainder of this page intentionally left blank]*

11

**SUBORDINATED AGENTS:**

SOUTHLAND NATIONAL INSURANCE CORPORATION

By: John Murphy, in his capacity as Special Deputy
Rehabilitator acting on behalf of the Commissioner of Insurance
of North Carolina in his role as court appointed Rehabilitator


By:_____
Name:  John Murphy
Title:    Special Deputy Rehabilitator

ACADEMY ASSOCIATION, INC.


By:_____
Name: Greg E. Lindberg
Title: President

[Signature Page to Subordination Agreement]

**SUBORDINATED AGENTS:**

SOUTHLAND NATIONAL INSURANCE CORPORATION

By: John Murphy, in his capacity as Special Deputy
Rehabilitator acting on behalf of the Commissioner of Insurance
of North Carolina in his role as court appointed Rehabilitator

By:_____

Name:   John Murphy

Title:    Special Deputy Rehabilitator

ACADEMY ASSOCIATION, INC.

By:_____

Name: Greg E. Lindberg

Title: President

[Signature Page to Subordination Agreement]

This Agreement has been executed and delivered as of the date set forth in the first paragraph hereof.

**<u>SUBORDINATED CREDITORS:</u>**

**SOUTHLAND NATIONAL INSURANCE CORPORATION**

By: John Murphy, in his capacity as Special Deputy Rehabilitator acting on behalf of the Commissioner of Insurance of North Carolina in his role as court appointed Rehabilitator"

By: _____

        Name: John Murphy
        Title:   Special Deputy Rehabilitator

**BALDWIN ASSET MANAGEMENT, LLC**

By: _____

        Name:
        Title:

**CANAAN, LLC**

By: _____

        Name:
        Title:

**CAPITAL ASSETS FUND I, LLC**

By: _____

        Name:
        Title:

This Agreement has been executed and delivered as of the date set forth in the first paragraph hereof.

**SUBORDINATED CREDITORS:**

**SOUTHLAND NATIONAL INSURANCE CORPORATION**

By: John Murphy, in his capacity as Special Deputy Rehabilitator acting on behalf of the Commissioner of Insurance of North Carolina in his role as court appointed Rehabilitator

By: _____

        Name: John Murphy

        Title:   Special Deputy Rehabilitator

**BALDWIN ASSET MANAGEMENT, LLC**

By: _____

        Name:  Christa Miller

        Title:   Manager

**CANAAN, LLC**

By: _____

        Name: Chris Herwig

        Title:   Manager

**CAPITAL ASSETS FUND I, LLC**

By: _____

        Name:  Christa Miller

        Title:   Manager

**CAPITAL ASSETS FUND V, LLC**

By: _____
Name:  Christa Miller
Title:    Chief Financial Officer

**CHATSWORTH ASSET MANAGEMENT, LLC**

By: _____
Name:  Christa Miller
Title:    Manager

**DUNBARTON, LLC**

By: _____
Name:  Chris Herwig
Title:    Manager

**EPHESUS ASSET MANAGEMENT, LLC**

By: _____
Name:  Christa Miller
Title:    Manager

**HENNIKER, LLC**

By: _____
Name:  Chris Herwig
Title:    Manager

[Signature Page to Subordination Agreement]

**JACKSON ASSET MANAGEMENT, LLC**

By: _____
    Name:  Christa Miller
    Title:    Chief Financial Officer


**NASHUA, LLC**

By: _____
    Name:  Chris Herwig
    Title:    Manager


**STANDARD MALTA LIMITED**

By: _____
    Name:  Chris Herwig
    Title:    Director


**ACADEMY FINANCIAL ASSETS, LLC**

By: _____
    Name:  Christa  Miller
    Title:    Manager


[Signature Page to Subordination Agreement]

**<u>SUCCESSOR AGENT:</u>**


COLORADO BANKERS LIFE INSURANCE COMPANY

By: John Murphy, in his capacity as Special Deputy
Rehabilitator acting on behalf of the Commissioner of Insurance
of North Carolina in his role as court appointed Rehabilitator



By:_____
Name:  John Murphy
Title:    Special Deputy Rehabilitator

[Signature Page to Subordination Agreement]

**SENIOR CREDITOR:**

ASPIDA HOLDCO, LLC

By: _____

Name:    MICHAEL D. WEINER

Title:    AUTHORIZED SIGNATORY

GBIG Holdings, Inc., a Delaware corporation, hereby accept and consent thereto and agree to be bound by all of the provisions thereof and to recognize all priorities and other rights granted thereby to Senior Creditor and to pay Senior Creditor in accordance therewith.

Dated: _____, 2019.

GBIG HOLDINGS, INC.,

By: _____

Name:

Title:

[Signature Page to Subordination Agreement]

**SENIOR CREDITOR:**                    **ASPIDA HOLDCO, LLC**

By: _____

Name: _____

Title: _____

 

GBIG Holdings, Inc., a Delaware corporation, hereby accept and consent thereto and agree to be bound by all of the provisions thereof and to recognize all priorities and other rights granted thereby to Senior Creditor and to pay Senior Creditor in accordance therewith.

Dated: _____July 9_____, 2019.

**GBIG HOLDINGS, INC.,**

By: _____

Name: Greg E. Lindberg

Title:  Chairman

[Signature Page to Subordination Agreement]

## **SCHEDULE I**

### **Junior Indebtedness**:

Part A: Junior Loan Obligations

| | **Borrower** | **Agent** | **Lender(s)** | **Principal Amount (as of Closing Date)** | **Junior Loan Agreement** |
|---|---|---|---|---|---|
| 1. | GBIG Holdings, Inc. | Southland National Insurance Corporation ("SNIC") | SNIC<br><br>Baldwin Asset Management, LLC<br><br>Canaan, LLC<br><br>Capital Assets Fund V, LLC<br><br>Chatsworth Asset Management, LLC<br><br>Dunbarton, LLC<br><br>Ephesus Asset Management, LLC<br><br>Henniker, LLC<br><br>Jackson Asset Management, LLC<br><br>Nashua, LLC<br><br>Standard Malta Limited | $35,000,000 | Loan and Security Agreement, dated as of January 28, 2016 |
| 2. | GBIG Holdings, Inc. | Academy Association, Inc. | Capital Assets Fund I, LLC | $1,191,385 | Loan Agreement, dated as of January 29, 2016 |
| 3. | GBIG Holdings, Inc. | N/A | Capital Assets Fund I, LLC | $10,705,454 | Promissory Note, dated as of June 21, 2017 |
| 4. | GBIG Holdings, Inc. | N/A | Capital Assets Fund I, LLC | $4,081,000 | Promissory Note, dated as of November 6, 2017 |

Part B: Junior Book Entry Obligations

|  | **Obligor** | **Original Date** | **Lender** | **Principal Amount (as of Closing Date)** |
|---|---|---|---|---|
| 1. | GBIG Holdings, Inc. | 11/28/2016 | Academy Financial Assets, LLC ("AFA") | $449,440 |
| 2. | GBIG Holdings, Inc. | 1/20/2017 | AFA | $990,000 |
| 3. | GBIG Holdings, Inc. | 2/6/2017 | AFA | $810,000 |
| 4. | GBIG Holdings, Inc. | 2/17/2017 | AFA | $400,000 |
| 5. | GBIG Holdings, Inc. | 2/21/2017 | AFA | $200,000 |

2

## <u>EXHIBIT A</u>

**Form of Joinder to Subordination Agreement
for Subordinated Creditor Transferee**

To:    Aspida Holdco, LLC

From:  [TRANSFEREE OF JUNIOR LOAN AGREEMENT/JUNIOR BOOK ENTRY OBLIGATION]

Re:    <u>Joinder to Subordination Agreement</u>

Date:  [●]

This joinder to subordination agreement, dated as of [●] (this "<u>Joinder</u>"), is delivered by the undersigned ("<u>Subordinated Creditor Transferee</u>") in connection with the Subordination Agreement, dated as of July 9, 2019 (as amended, restated, supplemented, renewed, refinanced, replaced, or otherwise modified from time to time, the "<u>Subordination Agreement</u>"), by and among the parties listed on Schedule I thereto (each a "<u>Subordinated Creditor</u>" and together with Subordinated Creditor Transferee, collectively, the "<u>Subordinated Creditors</u>") and Aspida Holdco, LLC, as Senior Creditor under the Subordination Agreement. Capitalized terms used but not defined herein have the meanings ascribed to such terms in the Subordination Agreement.

Whereas, it is a condition to the assignment or other transfer to Subordinated Creditor Transferee of all or any portion of a Subordinated Creditor's Junior Loan Agreement or Junior Book Entry Obligation or any of such Subordinated Creditor's interests in respect thereof that Subordinated Creditor Transferee execute and deliver this Joinder to Senior Creditor.

**NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, Subordinated Creditor Transferee hereby agrees as follows:

1.    Subordinated Creditor Transferee has received and reviewed a copy of the Subordination Agreement. Subordinated Creditor Transferee is and shall be a "Subordinated Creditor" under the Subordination Agreement and agrees to be bound by the terms and provisions thereof as a "Subordinated Creditor." All references in the Subordination Agreement to the terms "Subordinated Creditor" and/or "Subordinated Creditors" shall be deemed to include Subordinated Creditor Transferee.

2.    Subordinated Creditor Transferee hereby (a) certifies that all representations and warranties set forth in Sections 11, 12 and 13 of the Subordination Agreement are true in all respects with respect to such Subordinated Creditor Transferee and (b) represents and warrants that the assignment or other transfer to it of all or any portion of the Junior Loan Agreement or Junior Book Entry Obligation or any interest in respect thereof is not prohibited by the terms of the Subordination Agreement.

3.    Except as specifically modified hereby, all of the terms and conditions of the Subordination Agreement remain unchanged and are in full force and effect.

4.      This Joinder may be executed in two (2) or more counterparts, and by the different parties to this Joinder in separate counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement.  Delivery of an executed counterpart of a signature page to this Joinder by facsimile or electronic mail shall be as effective as delivery of a manually executed counterpart.

5.      The laws of the State of New York shall govern all matters arising out of, in connection with or relating to this Joinder, including, without limitation, its validity, interpretation, construction, performance and enforcement.

*[Signature page follows]*

WEST\286624134.4

IN WITNESS WHEREOF, this Joinder has been duly executed and delivered as of the date first written above.

[INSERT NAME OF SUBORDINATED CREDITOR TRANSFEREE]

By: _____
    Name:
    Title:

Address:

# EXHIBIT F

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re:

PB LIFE AND ANNUITY CO., LTD., *et al.*,

        Debtors in Foreign Proceedings

UNIVERSAL LIFE INSURANCE COMPANY,

                Plaintiff-Appellant,

          -against-

GREG E. LINDBERG, individually, CHRIS HERWIG,
individually, AAPC HOLDINGS, LLC, ACADEMY
FINANCIAL ASSETS, LLC, AGH PARENT, LLC,
ALPINE CAPITAL, LLC, ASIM HOLDINGS, LLC,
ASL HOLDINGS, LLC, ATKINSON, LLC,
ATLANTIC COAST LIFE INSURANCE COMPANY,
ATLAS FINANCIAL INVESTMENTS, LLC,
AUGUSTA ASSET MANAGEMENT, INC.,
BEGONIA EIGHT, LLC, BLH CAPITAL, LLC, BLUE
DAFFODIL, LLC, BLUE VIOLET, LLC, CAPITAL
ASSETS FUND I, LLC, CAPITAL ASSETS FUND II,
LLC, CAPITAL ASSET MANAGEMENT I, LLC,
CAPITAL ASSETS MANAGEMENT II, LLC,
CAPITAL ASSETS MANAGEMENT III, LLC,
CARNATION THREE, LLC, CHATSWORTH ASSET
MANAGEMENT, LLC, CHRYSANTHEMUM TWO,
LLC, CSI INTERCO, LLC, DAHLIA TEN, LLC,
DAISY SEVEN, LLC, DRUMMOND GROUP, LLC,
DUNHILL HOLDINGS, LLC, ELI GLOBAL, LLC,
ENGLERT HOLDINGS, LLC, EPPING, LLC, ERIE
PROPERTIES, LLC, FLAGSHIP HOLDINGS, LLC,
FLEET ASSIST INTERCO LIMITED, FLOWERY
BRANCH, LLC, FORSYTH, LLC, FORTREX, LLC,
GBIG CAPITAL, LLC, GBIG HOLDINGS, INC., GBI
GROUP, LLC, GERANIUM TWO, LLC, GILFORD
ASSET MANAGEMENT, LLC, GLOBAL BANKERS
INSURANCE GROUP, LLC, GLOBAL GROWTH
HOLDINGS, INC., GLOBAL INSURANCE CAPITAL,
LLC, GREENFIELD CAPITAL, LLC, HAMPTON
ASSET MANAGEMENT, INC., HANSEN
AEROSPACE, LLC, HEALTHLINK HOLDINGS,
LLC, HOOKSETT, LLC, HUTCHISON LAW GROUP,
PLLC, INTEGRITY EMR HOLDINGS, LLC,

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _7/31/2022_

22 Civ. 5122 (AT)

**ORDER**

INTEGRITY EMR, LLC, IRON CITY ASSET
MANAGEMENT, INC., ITECH FUNDING, LLC,
JACKSON ASSET MANAGEMENT, INC., KITE
ASSET MANAGEMENT, INC., LILAC SIX, LLC,
MACON, LLC, MORNING MOUNTAIN HOLDINGS,
LLC, NETHERLANDS INSURANCE HOLDINGS,
INC., NEW ENGLAND CAPITAL, LLC, NIH
CAPITAL, LLC, NOM GB 2018 I, LLC, PARADIGM
PARK HOLDINGS, LLC, PARALLEL CAPITAL
ASSETS, LLC, PERSHING, LLC, RED BEGONIA,
LLC, REVOLVERCAP PARTNERS FUND, LP,
SATORI WATERS, LLC, SEDWICK, LLC,
SENTINEL SECURITY LIFE INSURANCE
COMPANY, SOMERSWORTH, LLC, STANDARD
ADVISORY SERVICES, LTD, STANDARD
FINANCIAL LIMITED, STANDARD INVESTMENT
CAPITAL, LTD, TREATMENT RESOURCES OF
MARGATE, INC., TRITON FINANCIAL LIMITED,
TUX HOLDINGS, LLC, TYBEE ISLAND ASSET
MANAGEMENT, LLC, UKAT HOLDINGS, LLC,
UKAT INVESTMENT LIMITED, VERDESIAN LIFE
SCIENCES, LLC, WEARE, LLC, YELLOW LOTUS,
LLC, YELLOW SUNFLOWER, LLC, UBS
FINANCIAL SERVICES, INC., GOLDMAN SACHS
LENDING PARTNERS, LLC, CREDIT SUISSE AG
CAYMAN ISLANDS BRANCH, GOLDMAN SACHS
BANK USA, MORGAN STANLEY SENIOR
FUNDING, INC., THE BRYN MAWR TRUST
COMPANY, and DOES 1 through 10, inclusive,

                              Defendants-Appellees.

ANALISA TORRES, District Judge:

Plaintiff-Appellant, Universal Life Insurance Company ("ULICO"), appeals a final judgment

of the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy

Court").  *See* ECF No. 1.  The Bankruptcy Court dismissed ULICO's action against the

Defendants-Appellees ("Defendants") for lack of subject matter jurisdiction on April 15, 2022, and

denied ULICO's request to alter or amend the judgment of dismissal on June 1, 2022.  *Id.* at 8–15.

For the reasons stated below, the Bankruptcy Court's orders are REVERSED, and the case is

REMANDED to the Bankruptcy Court for further proceedings.

# BACKGROUND[1]

### I.    Factual Background

ULICO, a Puerto Rican insurance company, sells annuities and life insurance policies to individuals.  App. at A-3, A-6 ¶¶ 1, 17, ECF No. 31-1.  In June 2017, ULICO and Private Bankers Life & Annuity Co., Ltd. ("PBLA"), a Bermudan insurance company, entered into a reinsurance agreement, which provided that PBLA would reinsure certain policies issued by ULICO.  *Id.* at A-3, A-23 ¶¶ 2, 119; *see PB Life & Annuity Co. Ltd. v. Universal Life Ins. Co.*, No. 20 Civ 2284, ECF No. 1 ¶¶ 1, 8–9 (S.D.N.Y.) (LJL).  The reinsurance agreement required PBLA to fund a trust account as security for the insurance liabilities covered by the agreement.  App. at A-3, A-23 ¶¶ 3, 120.  Under the agreement, PBLA was permitted to invest the assets held in the trust consistent with certain investment guidelines, provided that the trust had, at all times, at least 105% of ULICO's necessary statutory reserves.  *Id.* at A-3, A-23 ¶¶ 3, 122.  If PBLA made investment decisions that resulted in a higher value in the trust than required, PBLA was permitted to withdraw the surplus under certain circumstances.  *Id.*

In June 2017, when ULICO and PBLA entered into the agreement, PBLA was ultimately owned and controlled by Defendant Greg E. Lindberg.  App. at A-3 ¶ 2.  At that time, Lindberg was also the ultimate owner of many other corporations and limited liability companies, including many of the Defendant companies.  *Id.* at A-4 ¶ 7.  Under Lindberg's direction, PBLA transferred funds out of the trust to Lindberg's various affiliates and corporate entities.  *Id.* at A-4–A-5, A-24 ¶¶ 5, 7, 123.  Those companies, in turn, loaned the funds to other entities affiliated with Lindberg.  *Id.*  In total, PBLA siphoned more than $500 million from the trust to Lindberg's corporate entities.  *Id.* at A-24 ¶ 124.

---

[1] The following facts are taken from the amended complaint.  *See* App. at A-1, ECF No. 31-1.  "When jurisdictional facts are in dispute, the district court may consider materials outside the pleadings, including affidavits and other written materials."  *Pickett v. Migos Touring, Inc.*, 420 F. Supp. 3d 197, 202 (S.D.N.Y. 2019).

II.   Procedural History

A.  Related Proceedings

On February 24, 2020, pursuant to the terms of the reinsurance agreement, ULICO initiated arbitration against PBLA, claiming that PBLA had breached the agreement by making unauthorized investments.  *See PB Life & Annuity Co.*, No. 20 Civ. 2284, ECF No. 36-1 at 2.  On June 2, 2020, the arbitration panel found in ULICO's favor and entered an award of over $524 million.  *See id.* at 6–7.  Thereafter, pursuant to the Federal Arbitration Act, 9 U.S.C. § 207, ULICO moved to confirm the arbitration award in district court.  *PB Life & Annuity Co.*, No. 20 Civ. 2284, ECF No. 34.  The Honorable Lewis J. Liman granted the petition on July 30, 2020, and entered judgment on August 11, 2020.  *PB Life & Annuity Co.*, No. 20 Civ. 2284, ECF Nos. 47, 52.

On September 18, 2020, the Bermuda Monetary Authority petitioned the Bermuda Supreme Court to, *inter alia*, wind up PBLA and appoint joint provisional liquidators ("JPLs") to take control of PBLA from Lindberg.[2]  *See* App. at A-5 ¶ 11.  A week later, the Bermuda court appointed the JPLs as PBLA's authorized foreign representatives.  *Id.*  On December 3, 2020, the JPLs filed a Chapter 15 bankruptcy case in the Bankruptcy Court seeking recognition of the PBLA Bermuda case as a foreign main proceeding under Chapter 15 of the Bankruptcy Code.[3]  *In re: PB Life & Annuity Co.*, No. 20-12791, ECF No. 1 (Bankr. S.D.N.Y.); *see* App. at A-5 ¶ 12.  The next month, the Bankruptcy Court granted the request and entered a recognition order, which enjoined litigation against PBLA and directed the turnover of PBLA's assets.  *In re: PB Life & Annuity Co.*, No. 20-12791, ECF No. 33; *see* App. at A-6 ¶¶ 13–14.  To date, ULICO is PBLA's largest creditor and has a

---

[2] In March 2019, Lindberg was criminally charged with attempted honest services fraud and federal funds bribery in the United States District Court for the Western District of North Carolina in relation to a conspiracy to bribe the North Carolina Insurance Commissioner.  *See United States v. Lindberg*, 39 F.4th 151, 157 (4th Cir. 2022); App. at A-4 ¶ 6.  A jury convicted Lindberg on both counts.  *Lindberg*, 39 F.4th at 157.  The Fourth Circuit subsequently reversed that conviction based on an erroneous jury instruction, and Lindberg awaits retrial on those charges.  *See id.* at 175–76.
[3] The purpose of Chapter 15 is "to provide effective mechanisms for dealing with cases of cross-border insolvency" by, among other things, fostering cooperation between United States courts and foreign courts.  11 U.S.C. § 1501.

4

final, unsatisfied judgment in the amount of over $524 million, plus interest. *See* App. at A-5 ¶¶ 8–9; *see also* Appellant Reply at 6, ECF No. 44.

### B.  Adversary Proceeding

On July 6, 2021, ULICO commenced an action (the "Adversary Proceeding") against Defendants, alleging that Defendants were recipients of fraudulent conveyances from PBLA. *See Universal Life Ins. Co. v. Global Growth Holdings, Inc.*, No. 20-12791, ECF No. 1 (Bankr. S.D.N.Y.); App. at A-25–A-27 ¶¶ 135–49.[4]  ULICO also asserted causes of action for, *inter alia*, unjust enrichment, breach of fiduciary duty, and fraud. *See* App. at A-28–A-31 ¶¶ 150–75.  In the complaint, ULICO pleaded that federal jurisdiction was provided by (1) "related to" jurisdiction under 28 U.S.C. § 1334, and (2) diversity jurisdiction under 28 U.S.C. § 1332. *See id.* at A-22 ¶¶ 114–15.  As to § 1334, ULICO alleged that the Adversary Proceeding was "related to" the PBLA Bermuda case recognized as a foreign main proceeding under Chapter 15. *See id.* at A-22 ¶ 114. Because § 1334 was one of the jurisdictional statutes invoked, the Adversary Proceeding was referred to the Bankruptcy Court under this District's standing order of reference. *See* Am. Standing Order of Reference ("Order of Reference"), No. 12 Misc. 32 (S.D.N.Y. Feb. 1, 2012).

After Defendants filed several, separate motions to dismiss, ULICO moved to file a second amended complaint. *See* App. at A-397–A-413.  At a hearing on the motion to amend, the Bankruptcy Court denied the motion on the ground that it lacked subject matter jurisdiction over the Adversary Proceeding.  App. at A-675–A-676, 66:19–67:6.  The Bankruptcy Court found that ULICO's claims were not sufficiently "related to" PBLA's insolvency case as "[r]esolution of ULICO's claims . . . would have no direct effect on PBLA foreign assets because PBLA is not a party to [the Adversary Proceeding] [and] PBLA's property is not the subject of th[e] [A]dversary

---

[4] On July 30, 2021, ULICO filed an amended complaint, which added additional Defendants. *See* App. at A-1; *see also id.* at A-6 ¶ 16.

[P]roceeding." *Id.* at A-670, 61:13-16. The Bankruptcy Court did not address whether diversity jurisdiction was present because it concluded that it could not exercise diversity jurisdiction under the Order of Reference. *Id.* at A-676–A-677, 67:13–68:16. On April 28, 2022, ULICO moved to alter or amend the Bankruptcy Court's dismissal, and on June 1, 2022, the Bankruptcy Court denied that motion. *See id.* at A-591–A-609; A-688–A-689. ULICO timely appealed the Bankruptcy Court's final judgment. *See* ECF No. 1.

## DISCUSSION

I.    <u>Legal Standard</u>

A.  Standard of Review

District courts exercise appellate jurisdiction over final bankruptcy court orders. *See* 28 U.S.C. §§ 158(a)(1), 1334. In its review of bankruptcy court decisions, the district court "sits as an appellate court." *In re Fairfield Sentry Ltd. Litig.*, 458 B.R. 665, 674 (S.D.N.Y. 2011). A district court reviews a bankruptcy court's factual findings for clear error and its conclusions of law *de novo*. *See In re Overbaugh*, 559 F.3d 125, 129 (2d Cir. 2009). "Questions about [a] [b]ankruptcy [c]ourt's subject matter jurisdiction and questions of statutory interpretation are legal questions that are reviewed *de novo*." *In re Fairfield*, 458 B.R. at 674. Appellate courts review the denial of a motion for leave to amend for abuse of discretion. *See Jones v. N.Y. State Div. of Mil. & Naval Affs.*, 166 F.3d 45, 49 (2d Cir. 1999). But, "[i]f that denial was based on an interpretation of law, [the court] review[s] that legal conclusion *de novo*." *Id.*

B.  "Related to" Jurisdiction

Under 28 U.S.C. § 1334(b), "the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or *related to* cases under title 11" (emphasis added). "Related to" jurisdiction exists when the outcome of the cause of action "might have any conceivable effect on the bankrupt estate." *SPV Osus Ltd. v. UBS AG*, 882 F.3d

333, 339–40 (2d Cir. 2018) (*quoting Parmalat Cap. Fin. Ltd. v. Bank of Am. Corp.*, 639 F.3d 572,

579 (2d Cir. 2011)).  "While related to jurisdiction is not limitless, it is fairly capacious, and includes

suits between third parties which have an effect on the bankruptcy estate." *Id.* (cleaned up); *see*

*Celotex Corp. v. Edwards*, 514 U.S. 300, 308 (1995) ("Congress intended to grant comprehensive

jurisdiction to the bankruptcy courts so that they might deal efficiently and expeditiously with all

matters connected with the bankruptcy estate.").

II.    Analysis

The Bankruptcy Court erroneously concluded that it did not have subject matter jurisdiction

over ULICO's claims.  App. at A-670, 61:13-14.  The Bankruptcy Court reasoned that "no outcome

of [the Adversary Proceeding] will likely have a direct [e]ffect on PBLA's foreign estate" because

"PBLA is not a party to [the Adversary Proceeding], and the property sought is that of the trust"

"[a]nd therefore, the [e]ffect of a judgment would alter the liabilities of and relationship between

ULICO and [D]efendants rather than between ULICO and PBLA."  *Id.* at A-671, 62:4-10.

As an initial matter, the legal test is whether resolution of ULICO's claims "might have any

conceivable effect" on the bankruptcy case.  *SPV Osus*, 882 F.3d at 339–40.  "Related to" jurisdiction

does not depend on whether the debtor is a party to the action or whether the property sought is

identical to that sought in the bankruptcy case.  *See, e.g.*, *id.* ("'[R]elated to' jurisdiction . . . includes

'suits between third parties which have an effect on the bankruptcy estate.'" (quoting *Celotex*, 514

U.S. at 307 n.5)).  Applying the "conceivable effects" test, courts in this Circuit have found that

"related to" jurisdiction exists where "the cause of action will directly impact the amount of any

distribution payable to creditors, as for example when the bankruptcy trustee or representative sues to

recover damages on behalf of the bankruptcy estate."  *Worldview Ent. Holdings Inc. v. Woodrow*, 611

B.R. 10, 16 (S.D.N.Y. 2019); *see Parmalat*, 639 F.3d at 579.

Here, resolution of ULICO's claims might have a "conceivable effect" on the PBLA Bermuda case because if ULICO succeeds on its claims, that "will directly impact the amount of any distribution payable to [PBLA's] creditors." *Worldview Ent. Holdings Inc.*, 611 B.R. at 16. ULICO secured an unpaid judgment in this District against PBLA for over $524 million and remains PBLA's largest creditor. Any sums that ULICO recovers against Defendants in the Adversary Proceeding will necessarily reduce its claim as a creditor of PBLA because ULICO may not receive double recovery for the same damages, *see Conway v. Icahn & Co.*, 16 F.3d 504, 511 (2d Cir. 1994), thus allowing greater distributions to PBLA's other creditors.[5]

For example, on July 7, 2017, PBLA loaned Defendant Flowery Branch, LLC an amount of over $10 million from the trust. App. at A-26 ¶ 137(c). If ULICO succeeds in voiding that loan as a fraudulent transfer in the Adversary Proceeding, the $10 million would pass through PBLA and return to the trust. There would also be a corresponding decrease of $10 million to ULICO's claim against PBLA in the Bermuda insolvency proceeding. Therefore, the outcome of the Adversary Proceeding could "liquidate significant claims of the debtor[, PBLA,]" and "could augment the recoveries of creditors of the debtor." *In re Brit. Am. Ins. Co.,* 488 B.R. 205, 223–24 (S.D. Fla. 2013).[6]

---

[5] The Bankruptcy Court rejected ULICO's argument that "if it were to recover funds from [D]efendants in [the Adversary Proceeding], then PBLA will not have to pay ULICO as much on its claims and will have more money to distribute to the other creditors." App. at A-671, 62:11-14; *see generally id.* at A-671–A-673, 62:11–64:7. In doing so, the Bankruptcy Court relied on *In re Lehman Brothers, Inc.*, 458 B.R. 134 (Bankr. S.D.N.Y. 2011), and found that "there are no grounds for ULICO to setoff amounts recovered from [D]efendants against its claim against PBLA in Bermuda's insolvency proceeding." *Id.* at A-673, 64:5-7. But, *In re Lehman* is inapposite. There are no setoffs at issue in the Adversary Proceeding, and ULICO does not advance any argument that it has a setoff against a claim brought by PBLA against ULICO. *See* Appellant Reply at 12.

[6] The settlement agreement between ULICO and PBLA, which was executed after the Adversary Proceeding was filed, further confirms that "any recovery ULICO receives [from Defendants in the Adversary Proceeding] will reduce the $524 million judgment ULICO has against PBLA dollar-for-dollar." Appellant Reply at 8. The settlement agreement does not create any new rights but merely memorializes basic legal principles of double recovery. *See Conway*, 16 F.3d at 511.

8

## CONCLUSION

Accordingly, for the reasons stated above, the Bankruptcy Court's orders dismissing the Adversary Proceeding and denying ULICO's request to alter or amend the judgment of dismissal are REVERSED,[7] and this action is REMANDED to the Bankruptcy Court for further proceedings.[8]

The Court does not address Defendants' remaining arguments, such as Defendants' arguments that ULICO fails to state a claim under Federal Rule of Civil Procedure 12(b)(6), Defendant Aspida Financial Services, LLC (f/k/a Global Bankers Insurance Group, LLC)'s argument as to *Burford* abstention, *see* ECF No. 38 at 14–24, and Defendant Morgan Stanley Senior Funding, Inc.'s argument as to the automatic stay, *see* ECF No. 41 at 18–19, because the Bankruptcy Court did not address those arguments in its underlying decisions.  On remand, the Bankruptcy Court shall consider those arguments in the first instance.

The Clerk of Court is directed to remand the matter to the Bankruptcy Court and close the case.

SO ORDERED.

Dated: July 31, 2023
New York, New York

_____
ANALISA TORRES
United States District Judge

---

[7] The stipulated order of dismissal between ULICO and Defendant AAPC Holdings, LLC, ECF No. 35-1, is a final order that is not affected by the Court's reversal of the Bankruptcy Court's orders.  *See* ECF No. 35; Appellant Reply at 27.

[8] Because the Court concludes that the Bankruptcy Court has "related to" jurisdiction over the Adversary Proceeding, the Court does not address ULICO's arguments as to diversity jurisdiction.

9