Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 20-12791 (LGB)

4    Adv. Case No. 23-01000 (LGB)

5    - - - - - - - - - - - - - - - - - - - - - - - - - - x

6    In the Matter of:

7

8    PB LIFE AND ANNUITY CO., LTD., et al.,

9

10            Debtors in Foreign Proceedings.

11   - - - - - - - - - - - - - - - - - - - - - - - - - - x

12   JOHN JOHNSTON, as Joint Provisional Liquidator on behalf of

13   PB LIFE AND ANNUITY CO., LTD., et al.,

14            Plaintiffs,

15        v.

16   GREGREY EVAN LINDBERG a/k/a GREG EVAN LINDBERG, et al.,

17            Defendants.

18   - - - - - - - - - - - - - - - - - - - - - - - - - - x

19                    United States Bankruptcy Court

20                    One Bowling Green

21                    New York, NY 10004-1408

22

23                    Tuesday, September 24, 2024

24                    10:00 AM

25

Page 2

1    B E F O R E :

2    HON LISA G. BECKERMAN

3    U.S. BANKRUPTCY JUDGE

4

5    ECRO: K.S.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1      HEARING re Oral Argument on Motions to Dismiss

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25      Transcribed by:   Sonya Ledanski Hyde

Page 4

1    A P P E A R A N C E S :

2

3    CONDON TOBIN SLADEK THORNTON

4          Attorneys for Defendants

5          8080 Park Lane, Suite 700

6          Dallas, TX 75231

7

8    BY:  JARED PACE

9          AARON TOBIN

10

11   EVERETT GASKINS HANCOCK TUTTLE HASH LLP

12         Attorneys for Defendant

13         Edwards Mill Asset Management LLC

14         P.O. Box 911

15         Raleigh, NC 27602

16

17   BY:  MICHAEL BYRNE

18         JAMES M. HASH

19

20

21

22

23

24

25

1    STEVENS & LEE LLP

2         Attorneys for the JPLs, John Johnston and Edward

3         Willmott

4         485 Madison Avenue, 20th Floor

5         New York, NY 10022

6

7    BY:  NICHOLAS F. KAJON

8         CONSTANTINE D. POURAKIS

9         WADE D. KOENECKE

10

11   BEST & FLANAGAN LLP

12        Attorneys for Pavonia Life Insurance Company of

13        Michigan and Axar Capital Management LP

14        60 South Sixth Street, Suite 2700

15        Minneapolis, MN 55402

16

17   BY:  BRIAN J. LINNEROOTH

18        JOHN A. SULLIVAN

19

20

21

22

23

24

25

Page 6

1                    P R O C E E D I N G S

2              THE COURT:  You may be seated.  For the record,

3     Case Number 23-01000, Johnston, et al. v. Lindberg, et al.

4     May I have appearances of counsel in the courtroom, please?

5              MR. PACE:  Good morning, Your Honor.  My name is

6     Jared Pace.  I'm at the law firm of Condon Tobin in Dallas.

7     My law partner, Aaron Tobin, is with me as well.

8              We represent 763 defendants who are identified at

9     exhibit -- I'm sorry, ECF 151.  There's two exceptions to

10    that.  ECF 259, there were some parties in our group that

11    have been dismissed.  Those are the Eye Care Leader parties

12    who are in bankruptcy.  And then at ECF 314, there's another

13    group of parties, the UCAP parties, that have also been

14    dismissed.  They were previously part of our representation.

15             We also have filed a motion to withdraw as counsel

16    from 572 defendants.  Those are identified on Exhibit 1 at

17    506, and we would stay in for 181 defendants.  Those are

18    identified on Exhibit 2 at 506.  That's not set for today.

19    Mr. Kajon filed a statement saying he, I think, has no

20    opposition to our withdrawal so long as it doesn't delay

21    today's proceedings, and we're okay with that.  I intend to

22    argue for all the defendants we briefed on behalf of.

23             THE COURT:  Okay.  So guess we'll get through --

24    Let me just get through appearances.

25             MR. PACE:  Sure.

Page 7

1              THE COURT:  And then we can talk about that, Mr.

2      Pace.  How about that?

3              MR. PACE:  Sure.  Thank you, Your Honor.

4              THE COURT:  Okay.  All right.

5              MR. HASH:  Good morning, Your Honor.  My name is

6      James Hash and we're with my partner, Michael Byrne.  We're

7      from the Wake County, North Carolina bar.  Unlike Mr. Pace,

8      we only represent one client and that is defendant Edwards

9      Mill Asset Management LLC.

10             THE COURT:  Okay.  Thank you.

11             MR. LINNEROOTH:  Good morning, Your Honor.  Brian

12     Linnerooth and John Sullivan, Best & Flanagan, and we

13     represent Pavonia Life Insurance Company of Michigan and

14     Axar Capital Management Limited Partners.

15             THE COURT:  Okay.  All right.

16             MR. KAJON:  Good morning, Your Honor, and it's a

17     pleasure to appear in person for the first time in a very

18     long time.

19             THE COURT:  I know, after all these years.

20             MR. KAJON:  Yes.

21             THE COURT:  Three and a half years on the bench

22     and never seen you all, either you or Mr. Pace, either, in

23     person.

24             MR. KAJON:  It's a strange world.  Anyway.

25             THE COURT:  It is.

Page 8

```
 1              MR. KAJON:  Nicholas F. Kajon, of Stevens & Lee,
 2      on behalf of the JPLs, John Johnston and Edward Willmott,
 3      who are plaintiffs in this adversary proceeding.  I'm joined
 4      here by my partners, Wade Koenecke to my right, and
 5      Constantine Pourakis on the end, and we also have a client
 6      representative with us in court today, Martinis Dreier, a
 7      director at Deloitte's Bermuda office.
 8              THE COURT:  Okay.  Thank you.
 9              MR. KAJON:  Thank you.
10              THE COURT:  Okay.  I guess I'll ask, is there
11      anybody on the Zoom that wishes to appear?  Okay.  All
12      right.  So, Mr. Pace, going back to your motion for
13      withdrawal.
14              MR. PACE:  (Indiscernible)
15              THE COURT:  Sorry.  No, that's okay.  I was going
16      to deal with it actually last today for the reasons that you
17      just said, that it shouldn't be impacting this hearing.  And
18      I have a couple of questions about it.  But I thought that
19      would do -- we would do that last.
20              If it's all right with you all, I thought we would
21      start first with the, I guess, motion to join in the
22      complaint because whether or not I'm going to allow that or
23      not depends on who you're arguing for a little bit today, I
24      suppose.  In the arguments and the motions to dismiss, there
25      are three parties that you filed this motion to join in and
```

Page 9

1      adopt, and there was opposition to that.

2            So I'm going to deal with that first, and then I'm

3      going to hear, obviously, the motions to dismiss that were

4      filed by both the parties and the arguments on both sides

5      for that, and then we'll get to the motion for withdrawal at

6      the end, if that's -- that's the way I would proceed today.

7      All right.

8            MR. PACE:  Okay.  Makes sense.

9            THE COURT:  All right.  Okay.  So I've read the

10     papers for the request to join in and then the opposition to

11     it, and I'll just say that I generally agree with a lot of

12     what the plaintiffs' papers indicated here, just in terms of

13     the procedure for it.

14           I do think that this is like a Rule 55 proceeding,

15     I believe, where you need to actually challenge them, the

16     default that was entered into it.  But the one thing I don't

17     agree with the plaintiffs on is that that requires leave for

18     me to do.  I've looked at our local rules.  I've looked at

19     the cases that were cited in the papers by the parties, none

20     of which are in our district.  I've looked at our circuit,

21     our district court rules and I don't see anything about that

22     that requires that either in the bankruptcy court or the

23     district court here in the Southern District of New York for

24     someone to do that.  So I don't see why I would require that

25     here.

Page 10

1         So I do think what the appropriate process would

2    be first is I'm not going to allow you to join in and adopt

3    the motion to dismiss because I find that the plaintiffs',

4    right in light of the default having been entered by the

5    court, that that's not appropriate unless the defaults were

6    set aside.  And there may be -- as you know, the standard

7    for setting aside default is not small.  It has to be pled

8    in the motion.  But I don't think you need leave from me to

9    file that motion.  So you may go ahead.

10        And so today, when you're arguing, you're not

11   arguing for in terms of them joining in this pleading for

12   AYC Holdings, LLC, CAF Holdings, LLC and Standard Advisory

13   Services Limited.  So just note that for the record, and you

14   are free to file a motion with respect to the default.  And

15   obviously you'll have an opportunity to oppose it based on

16   whatever you're going to allege the good cause was for the

17   default and proceed from there.  But that's how we're going

18   to proceed today.  All right.

19        MR. PACE:  Thank you, Your Honor.

20        THE COURT:  Okay.  All right.  I guess I will ask

21   the parties, the defendants who filed the motions, Mr. Pace,

22   my inclination would be, for the defendants' counsel, that I

23   would just hear first the argument on behalf of Mr. Pace and

24   all the clients and then let you join in subsequently, make

25   any arguments you wish to subsequent to that if they're not

Page 11

1    covered in his arguments.  You're free to raise your own

2    issues.  And then Mr. Kajon, his side will have their

3    opportunity to oppose both the motions and then we'll have

4    reply, time for somebody to issue -- to argue some response.

5    Okay.

6              All right.  I guess I'll turn the actual podium

7    over to you, Mr. Pace, then.

8              MR. PACE:  Thank you, Your Honor.

9              THE COURT:  Okay.

10             MR. PACE:  I'll do my best to -- I know the court

11   has read everything, probably multiple times and probably

12   more than we have all read.

13             THE COURT:  What's that noise?

14             MR. PACE:  Is it me?  The microphone?

15             THE COURT:  No, I don't know.  That doesn't sound

16   good.  Let's see if that's going to stop.  Okay.  It seems

17   like it stopped for the moment.  If not, we're going to have

18   to call our tech people.  Sorry.  This has happened before,

19   but usually not from that podium or this.  We've had it from

20   that microphone.  We've had witnesses, but I haven't had it

21   this way.  But let's try and see if it doesn't go away.

22             MR. PACE:  Okay.  So we filed our motion to

23   dismiss --

24             THE COURT:  Nope, that doesn't sound good.

25             MR. PACE:  It's got to be me, right?

1              THE COURT:  It's not you, I'm sure.

2              MR. KAJON:  Oh, it's you, Jared.

3              THE COURT:  Okay.  All right.  So we need to reach

4     out to Keith and Brent and have them come in.  Sorry.

5     Sorry, guys.  And Chantel, if you're listening to me --

6     sorry, my courtroom deputy usually is listening.  Bear with

7     me a second.  My courtroom deputy says she's calling Pedro,

8     who's our tech person.

9              MR. PACE:  Sure.

10             THE COURT:  I guess unique ones.  It just won't

11    help recording.  Yeah, see, you can hear when I'm doing it,

12    it's doing it too.  It's not just you.

13             MR. PACE:  Weird, yeah.

14             THE COURT:  Yeah, it's not just you.

15             MR. PACE:  I'm happy to present from here if the

16    court prefers.

17             THE COURT:  Well, I think that would record,

18    right?

19             CLERK:  Yes.

20             THE COURT:  Okay.  So you can do that.  But we're

21    still going to have a problem when they come in.  I'm going

22    to have to probably stop you so that they can fix the mic

23    because it's doing it on mine.  So it's going to mess up the

24    recording.

25             MR. PACE:  Okay.

Page 13

1          THE COURT:  See what I'm saying?

2          MR. PACE:  Should I start trying from here and see

3     what happens?

4          THE COURT:  Yeah.  Sure, go ahead.  It's fine.

5     Don't worry -- I'm not going to say you can't start over if

6     it doesn't work out very well.

7          MR. PACE:  Okay.  Is that okay there?  Is that

8     high enough?

9          CLERK:  It's picking up.

10         MR. PACE:  Okay.  No ringing?  All right.  So,

11    Your Honor, we filed our motion to dismiss on December 15,

12    2023.  That's a really long time ago.  Initially this was

13    supposed to be heard in May, got moved back.  But since

14    then, a lot has changed.  They filed their amended complaint

15    before that.  We filed our motion to dismiss, and then they

16    filed their restated amended complaint after we filed our

17    motion to dismiss in February.

18         Since then, of the 957 original parties that were

19    sued, by my count, 75 parties have been dismissed from the

20    case, and those include the North Carolina insurance

21    companies who, at the time we filed our motion, the case was

22    simply stayed as to the North Carolina insurance companies.

23    They've now been dismissed.  And also relevant to some of

24    the arguments is Axar and Pavonia have also been dismissed.

25    I think the paperwork is pending perhaps on that.  But I

Page 14

1      believe they've been dismissed with prejudice now.  So --

2              MR. KAJON:  I believe that's the case.

3              MR. PACE:  Yes.  So one of our bases for our

4      motion is under 12(b)(7), failure to join necessary parties,

5      and by reference, Rule 19, what is a necessary party and

6      what do you do when it's not feasible to join them.  The

7      North Carolina insurance companies, I'll talk about them

8      first.  They absolutely are necessary parties to at least

9      some of this case.  All right.  So in our briefing, we asked

10     the entire case be dismissed for their lack of joinder.

11     There are 47 total claims, total counts that have been

12     asserted by the plaintiffs.  By my count, there are at least

13     29 of those counts that require North Carolina to be parties

14     to this case.  And I may say North Carolina.  When I say

15     North Carolina, I'm generally referring to the North

16     Carolina insurance companies.

17             So there are actually ten claims out of the 47

18     that are against North Carolina insurance companies

19     exclusively.  No one else.  Let's count: 7, 8, 9, 22, 26,

20     27, 28, 29, 30 and 31.  So ten claims presumably are gone.

21     With those ten claims that are gone, presumably also there

22     are hundreds of allegations and perhaps pages in this

23     complaint that are also gone that relate exclusively to

24     those claims.  There's eight other claims where North

25     Carolina insurance companies are named as parties along with

Page 15

1      other defendants.  Those are Counts 11, 12, 13, 25, 32, 34,

2      35 and 36.  So you had 18 claims alleged directly against

3      North Carolina, exclusively or jointly.  On top of that,

4      there are 11 other claims that seek to enforce, or

5      alternatively, void loan agreements and pref equity

6      agreements to which the North Carolina companies are

7      parties, either as participating lenders or loan agents.

8      Then you've got another set of those 11 claims that seek to

9      void the MOU, the memorandum of understanding and the IALA,

10     the interim amendment to loan agreements, that is part of

11     the memorandum of understanding.  Shall I pause?

12             THE COURT:  Yeah.  Just for a second.  Okay.

13     Okay.  So when Mr. Pace was speaking on that microphone and

14     when I was speaking on this microphone, we were getting like

15     a really --

16             MAN 1:  Feedback?

17             THE COURT:  Yeah, a lot of feedback.  So --

18             MAN 1:  (Indiscernible)

19             THE COURT:  Yeah, so there's problems.  That's why

20     he was doing his argument from that microphone there,

21     because this was not working.  It really was loud feedback,

22     like we had that time on the witness before.  Yeah.  And

23     mine too, my microphone as well.  Yeah, you probably need to

24     stop just at the moment because I don't know if by adjusting

25     it -- okay.

Page 16

1           MR. PACE:  So there are 11 other claims that seek

2     to void those loans or pref equity agreements.  I think I

3     talked about that.  And then also those claims seek to void

4     the MOU and the IALA.  The point there is that the North

5     Carolina insurance companies are parties to those contracts.

6     And then you've got a subset of those same 11 claims that

7     are seeking constructive trusts or recovery of proceeds over

8     assets received by the North Carolina insurance companies.

9           So at minimum, of the 47 claims, 29 require North

10    Carolina insurance companies to be a party to this case.

11    And I'll just address this while I'm here.  Count 42 names

12    Axar and Pavonia and relates to PBLA, just PBLA's interest

13    or noninterest in Pavonia Life Insurance Company.  They are

14    likely a necessary party to that one count as well.  So

15    there are at least 30 claims that should be dismissed under

16    12(b)(7) for failure to join.

17          Now, a lot of the briefing disputes whether or not

18    the North Carolina insurance companies are or are not

19    necessary parties.  They're necessary parties for one of

20    three reasons, and this is all under Rule 19(a)(1).  A party

21    is required to be joined if the court cannot accord complete

22    relief among the existing parties in that party's absence.

23    Our position is the court cannot accord complete relief on

24    the ten direct claims against North Carolina insurance

25    companies, for sure, on the eight claims where they are co-

Page 17

1    defendants, or on the 11 claims where they are parties to

2    contracts seeking to be enforced or voided.

3           They are also necessary parties because under Rule

4    19(a)(1)(B), disposing of the action in the North Carolina's

5    absence may, and this is in the rule, "as a practical

6    matter, impair or impede the person's ability to protect

7    their interests."  So the question has to be asked, if the

8    court grants the JPLs what they're seeking on these 29

9    claims, as a practical matter, is that going to impair or

10   impede North Carolina's interests?  And the answer on all of

11   those is certainly yes, for all the reasons I just said.

12          They're also necessary parties for a third reason

13   under 19(a)(1)(B) and that is the existing parties, the

14   folks who are going to stay in the case, who are not

15   dismissed from the case, my clients, others, are going to be

16   left to double or inconsistent obligations.  And a lot of

17   times, when necessary parties are being analyzed under this

18   one, there's a lot of speculation involved.  Is there going

19   to be other filings?  Are there other cases that are going

20   to subject these existing parties to inconsistent or double

21   recovery?

22          Here, we are in a unique position not to have to

23   speculate on that point.  For example, there are 35 cases

24   right now pending in North Carolina on some of the same loan

25   agreements and pref equity agreements sought to be voided or

1    enforced by the JPLs in this case.  Seven of those 35 cases

2    are set for trial on December 16th.  Twenty-four out of 28

3    of the other cases are in federal court.  They've been

4    consolidated for summary judgment purposes only, and summary

5    judgment has been granted on liability.  Those lawsuits, by

6    the way, assume the enforceability of the IALA in

7    determining amounts owed under those loan agreements.  So

8    it's not hard to speculate how rulings in this case on those

9    particular claims would conflict with what's going on in

10   North Carolina.

11          Same thing for the MOU.  They have sought to void

12   the MOU.  The MOU lawsuit has been going on since October 1,

13   2019.  It is now post judgment.  Part of it remains on

14   appeal, but part of it is proceeding.  The part that's

15   proceeding is the specific performance piece of that

16   judgment, which, as the court may recall, requires

17   contribution of a lot of entities, including defendants in

18   this case, to a new holding company where Mo Meghji, who the

19   court is familiar with, is the chief restructuring officer

20   of that new holding company.  That's proceeding.  That's

21   happening now; again, inconsistency, double recovery if the

22   MoU is in this case.  North Carolina needs to be a part of

23   that.

24          We also have the RICO lawsuit in North Carolina.

25   The court may recall that the JPLs, in a previous filing --

Page 19

1      well, I don't want to say that.  I don't know if it was

2      their filing or ours, but they essentially mirrored their

3      RICO clause in this case off the North Carolina insurance

4      RICO case down in the Eastern District of North Carolina.

5      That case has advanced past the dismissal stage, and the

6      court very recently, in August of this year, issued a ruling

7      on the motion to dismiss as to those RICO claims.  You've

8      got some of the same parties in this case are parties in

9      that case, and you've got the same claims; again, exposes

10     everybody to inconsistent results.

11             There's also ULICO's case, which is pending in

12     this court.  It recently got returned to this court from the

13     Second Circuit.  I believe it went to the Second Circuit and

14     back down.  It seeks similar recovery that the JPLs are

15     seeking in this case, at least with respect to the debtor

16     PBLA.  And we don't talk about this one much because it's

17     been on ice for a long time.  But ULICO filed a very similar

18     complaint to the one that's in this court in North Carolina.

19     That's still there.  So for any one of these three reasons,

20     under Rule 19, the North Carolina insurance companies are

21     necessary parties to this case.

22             But then that takes us to Rule 19(b), which says,

23     what on earth do we do about that?  Okay.  First, you got to

24     -- you know, in an ideal world, if you've identified a

25     necessary party who needs to be part of the case, the

Page 20

1    resolution is to join them to the case, add them to the

2    case.   That's not going to happen here.   It's happened and

3    got unhappened, right?   It was dismissed without prejudice,

4    and there have been courts basically saying, you're not

5    allowed to sue them here.   This isn't the right place for

6    all of this.

7         That means that their joinder in this case is not

8    feasible, and that's what takes us to Rule 19(b).   And Rule

9    19(b) tells us what to do when joinder of a necessary party

10   is not feasible.   And it says, the court must determine

11   whether, in equity and good conscience, the action should

12   proceed among the existing parties or should be dismissed.

13   But the rule also gives the court a lot of discretion to

14   "shape the relief or take other measures."   Basically, Rule

15   19(b) gives the court a blank canvas to be as creative as

16   the court needs to be to do equity and proceed with the case

17   in an orderly and workable manner.

18        What I would ask the court, what that means, I

19   think that, at minimum, every claim that requires North

20   Carolina insurance companies as a necessary party must be

21   dismissed, whether it is ten, which I think is indisputable,

22   18, 29, or perhaps even more, because -- I'll get to this in

23   a second.   But the response, if you look at the response to

24   the argument on this piece, on the JPLs' piece, they do make

25   the argument that North Carolina is not a party or is not a

1    necessary party to this case in general.  But then they go

2    further and say that's especially true as to the RICO

3    claims, which North Carolina insurance companies have

4    nothing to do with.  So even there's a recognition by the

5    JPLs that the North Carolina insurance companies have

6    something to do with most of these claims because the RICO

7    claims make up five out of 47.

8            I anticipate that what they'll say is, Judge, you

9    have to look at Rule 19(b)(4) and look at what the factors

10   are in deciding to dismiss parties.  That's a big deal,

11   dismissing for non-joinder.  Courts don't do it lightly.

12   And one of the things the court's got to consider is whether

13   the plaintiffs, the JPLs here, would have an adequate remedy

14   if the action were dismissed for non-joinder.  I think what

15   they're going to say is we don't have an adequate remedy.

16   What are we supposed to do, Judge, if we can't sue on these

17   loan agreements, these pref equity agreements, the MOU, the

18   IALA, which, to their view, hurt their interests?  What are

19   we supposed to do?  What's our adequate remedy?

20           They preserve their adequate remedy in their

21   stipulation to dismiss.  So ECF 320 is their stipulation of

22   dismissal with the North Carolina insurance companies.  It

23   dismisses claims in this case with prejudice, but it

24   preserves a very important claim, and that is for the JPLs

25   to assert their rights via proof of claims under North

Page 22

1    Carolina law.  And they cite a statute in North Carolina,

2    and the statute relates to rehabilitation and liquidation

3    proceedings of insurance companies.  It's essentially a

4    bankruptcy, three bankruptcies that are going on in North

5    Carolina with these North Carolina insurance companies.

6    Their adequate remedy is to do what they preserved on their

7    stipulation.  They'll file proofs of claims in those

8    proceedings.

9            So that takes care of at least 29, and with Axar

10   and Pavonia, I'd say 30 of the 47 claims asserted in the

11   JPLs' lawsuit.  For the other 17 claims, they should be

12   dismissed for different reasons.  And this is where I will

13   not belabor our briefing because there's so much, but I will

14   just summarize what those reasons are.

15           One, the JPLs do not plead fraud with

16   particularity.  So to the extent any of their fraud-based

17   class claims rely on affirmative misrepresentations, that's

18   what they're pleading, including, by the way, the predicate

19   acts under their RICO claims, 9(b) requires, and I don't

20   think there's any dispute about the standard here, that you

21   have to plead the who, the what, the when, the where, with

22   specificity.  They have not done that.  And we pointed that

23   out in our motion.  There are remarkably few statements

24   identified by speaker of what is alleged to be a

25   misrepresentation.  So few, in fact, that in their response,

Page 23

1    the JPLs backed away from this assertion that their fraud

2    claims are based on affirmative representations.

3            So what they're saying now is that their fraud

4    claims really are based on a concealment theory, on a

5    failure to disclose.  And we brief this in our reply.  Even

6    on a failure to disclose theory, you have to plead a duty to

7    disclose.  The only direct reference to any duty of

8    disclosure is in Paragraph 2156, and that relates to

9    disclosing PBLA's interest in Pavonia.

10           Now, to be sure, they have breach of fiduciary

11   duty claims.  They have other references to concealment.

12   Those claims are not factually supported, not sufficient to

13   be able to draw a line to a duty to disclose what they have

14   said has been fraudulently concealed.

15           They've got veil piercing claims that fell for

16   other reasons.  And I'll talk about these now, and then I'll

17   talk about these when I talk about the parties.  Okay.  The

18   veil piercing claims, there are two counts for those, and we

19   pointed this out.  These claims are both conclusory and

20   contradictory.  So to state a veil piercing claim, even

21   under Rule 8, and there's -- some things get fuzzy in the

22   case law on whether Rule 8 or Rule 9 applies here, I'll

23   admit that.  But even under Rule 8, what they had to plead

24   was a complete domination, not only of finances, but of

25   policy and business practices in respect to the transactions

Page 24

1    attacked.  That's what they had to plead.

2         The only allegation against almost every defendant

3    named in this case is this: "Upon information and belief,

4    defendant so and so is a necessary party and a company owned

5    and controlled directly or indirectly by Greg Evan

6    Lindberg."  That is the only allegation for at least 646 of

7    my 763 clients.  That is not sufficient to prove, to even

8    state a claim under Rule 8(a) for alter ego allegations,

9    veil piercing allegations, as to all 646 of those

10   defendants.

11        They also have a lot of contradictory statements.

12   We pointed those out in our opening brief at ECF 210.  Their

13   response did not address any of those contradicting

14   statements.  So they say, on the one hand, that Lindberg

15   exercised complete domination and control of the debtors,

16   number one, and also of all of the affiliated entities,

17   number two.  But then they also say throughout their

18   complaint that the Greg Lindberg served for like one month

19   on the board of one debtor and that it had a host of board

20   members, officers.  The principal control person for one

21   debtor is actually not Greg Lindberg, according to them.

22   It's Scott Boug.  And same thing on the affiliated side.

23   They say there are operating companies who do their own

24   books and records, they say that there are 50, 50 different

25   people who were part of or facilitated the fraudulent

1    scheme.  That cuts against the complete domination

2    allegation by Lindberg or even the senior decision-makers.

3    Regardless, as pleaded today, as pleaded today, they don't

4    satisfy their veil piercing counts.

5         Same thing on a lot of their Bermuda claims.  We

6    identified a lot of claims that they've asserted under

7    Bermuda law.  I think the folks at EMAM have some arguments

8    on this, that I won't rehash our brief or their arguments.

9    But Rule 44.1 is pretty clear.  We've all got to be shooting

10   at the same target here.  If you're going to assert that

11   Bermuda law, one, applies in this case, you've got to tell

12   us and the court what the law is.  What elements are we

13   attacking?  We could all go do our own research.  The court

14   could do its own research.  That's a recipe for disaster if

15   our research finds different results.  44.1 says, if you're

16   going to apply a foreign law, say what the foreign law is.

17   And we don't have that much information as pleaded right

18   now.

19         Okay.  So that's my argument on the claims, the

20   claims that should be dismissed.  I'll talk briefly about

21   the parties.  As I said, 646 of them aren't mentioned

22   anywhere.  And if we really, really, really want to boil

23   this down, only material allegations against folks related

24   to any of these claims, I think, are Lindberg, the senior

25   decision-makers and the North Carolina insurance companies.

1    Those are -- I'm oversimplifying because it's a 500-page

2    complaint and there's thousands of paragraphs.  But that's

3    the crux of their stories, that those are the bad guys.  And

4    you see that in their response.  Even in their response when

5    they are describing what they pleaded in their lawsuit, they

6    describe allegations against Lindberg and the senior

7    decision-makers.  So outside of those folks, there are no

8    allegations pleaded for anything.  And their only argument

9    to this, I mean, they can't argue that there are allegations

10   against those folks.  I mean, 646 of them aren't mentioned

11   anywhere.  So their only argument is that because they've

12   pleaded a veil piercing claim, it's okay to group all of

13   those other defendants in to one of a dozen subset of

14   counter-defendants or defendants.

15          First, I would say this.  Even if that were true,

16   you haven't pleaded a veil piercing claim, not on this

17   statement.  Second, I'd say this.  That's not the law.  And

18   I will say this, you know, reading all the cases on how to

19   apply veil piercing claim and group pleading and lumping of

20   defendants, how to read those consistently, there are cases

21   that say things that aren't entirely consistent with one

22   another.  And I don't think I have found any controlling law

23   in this court.  I don't think they have cited any

24   controlling law in this court that would tell the court

25   exactly what to do in this situation.

1            But we cite a lot of -- I think, two principles.

2    We cite a lot of cases where, at minimum, you cannot

3    attribute fraud to co-defendants based on alter ego

4    allegations.  That's principle number one.  I think that's a

5    fair statement of what the law is.  If you're going to

6    accuse somebody of fraud, you don't get to lump them

7    together through alter ego allegations.  You have to

8    particularize your allegations against those defendants.

9    The second thing I can say about the authorities is there

10   seems to be no precedent for this case.

11           THE COURT:  Why does that surprise me, Mr. Pace?

12           MR. PACE:  Exactly.

13           THE COURT:  I think that would describe everything

14   that we dealt with just about in this case.

15           MR. PACE:  That's right.

16           THE COURT:  Please continue.

17           MR. PACE:  So, in keeping with our track record in

18   this case, I think this is another issue where there simply

19   is no precedent.  There are a couple cases they have cited

20   where the court allowed some group pleadings and some claim

21   lumping in the context of affiliated entities.  I believe

22   the most defendants in any of those entities were three.

23   And you dealt with a parent company and two subsidiaries.

24   Factually, that's not on all fours with our case.

25           So with respect to the claims, they should be

Page 28

1    dismissed because North Carolina is not here, because

2    pleading standards aren't satisfied, because Bermuda law is

3    not pled well.  And with respect to the parties, there are

4    simply no allegations against almost any of them.  They've

5    got to go.

6             So I will sum up in what I'm asking the court to

7    do.  I would ask the court to dismiss the case and, to the

8    extent any of the case survives dismissal -- and I would say

9    this, even if the court disagrees with me on every argument

10   and denies my motion to dismiss entirely, there has to be,

11   at minimum, a more definite statement, and they've asked for

12   this in their motion alternatively.  We have to have a more

13   definite statement even if the court does not expand

14   dismissal to claims that have not already been dismissed.

15            So the reason for that is ten claims certainly are

16   gone against the North Carolina insurance companies.  Their

17   current pleading doesn't read that way.  The 11th claim

18   against Axar and Pavonia are probably are gone too.  It

19   doesn't read that way.  At minimum, those things have to be

20   removed along with every allegation in the 500 pages that

21   relate exclusively to those claims.

22            But I would argue, and I have argued that the

23   dismissal should reach much further than that and carve out

24   a lot more claims.  And I think, honestly, that is the only

25   workable way forward if this case survives, in any part, the

1    motion to dismiss, and I'll stop.

2           THE COURT:  Okay.  I do have questions.  I'm sure

3    you expect that.  So first, you know, there is case law that

4    exists, and it is limited, at least from our review of it,

5    my review of it, to fraud-related claims where the type of

6    pleading that you referenced before, on information and

7    belief type of pleading, is permissible when someone has a

8    role of a trustee, or, in this case, joint provisional

9    liquidators type of role, where they don't necessarily have

10   access to all the records necessarily.  I realize we've had

11   a lot of discovery in this case, so that's not exactly the

12   same facts as sometimes that is.  But there is a case law

13   that seems to allow that.  And so that would involve, I

14   think, actual fraud, actual fraudulent conveyance type cases

15   and fraudulent allegations in RICO.

16           So how do you -- you know, it seems like that

17   would allow, you know, from my reading of it, in those

18   limited circumstances, perhaps some sort of, you know, lower

19   pleading standard than 9(b) would be required for that.

20           MR. PACE:  The way I remember reading those cases

21   is that there is a relaxed standard for bankruptcy trustees

22   with respect to actual fraudulent conveyance claims.  So

23   actual fraudulent transfer claims where you can just allege

24   the badges of fraud and infer the fraud from there, and that

25   they don't have to -- there's a particular element of those

Page 30

1    fraudulent transfer claims that requires you generally to

2    identify the transfers, identify what's been transferred.

3    And as I remember those cases, it relaxes that portion of

4    the pleading standard for the bankruptcy trustee for the

5    same reason you identified.  The bankruptcy trustees are

6    third parties coming in and don't have the ability to

7    necessarily trace those things and identify those transfers

8    at the pleading stage.

9            THE COURT:  Okay.

10            MR. PACE:  But I would say on that point, all of

11    those fraudulent transfer claims under my argument should go

12    away because North Carolina insurance companies have to be a

13    party to this case for those things.

14            THE COURT:  We're going to get to that in a second

15    because I'm not sure that's right.  I think that argument

16    makes sense to me, you know, possibly in the context of --

17    possibly in the context of the MOU, IALA issue where

18    someone's a party to the agreement.  I get that argument.

19    But I don't have think you can extrapolate that to loan

20    agreements and preparation of pref equity agreements where

21    the only role someone's having as an agent or maybe happens

22    to hold the loans just similarly.

23            I think that's perhaps moving that argument too

24    far as to being a necessary party because the actual

25    underlying nature of determining these loans and setting

1    them up and deciding that they were going to exist and

2    creating the documents was, you know, I think here largely

3    alleged that it was done in ways where the North Carolina

4    insurance companies weren't involved at that point.  They

5    may have become involved because they acquired them just

6    like everybody else, the other parties.

7            But I'm not sure that they're indispensable

8    parties for those documents in the same way that maybe

9    there's an argument with the MOU and the IALA where I don't

10   think you'd have a contract, but for they're participating,

11   too, in those parts, in those transactions, potentially.

12           MR. PACE:  So on that point, one of their counts

13   against North Carolina insurance companies exclusively is a

14   suit against those entities as agents on the loan.

15           THE COURT:  Right.  But as you point out, that's

16   dead.

17           MR. PACE:  It is.

18           THE COURT:  I really -- I take those counts as

19   dead also.  And I agree with you that if this hadn't gone in

20   this timeframe and for the reasons that that occurred and

21   the timing where that occurred, I think you would have seen

22   a complaint that would have had to be amended and those

23   counts withdrawn because there's no basis for those counts,

24   those ten counts anyway, where they don't involve anybody

25   else.  I get that.  I just have them in red on my chart so

1       that I know to ignore them.  Sorry to put it that way,

2       because to me, when they were just -- when they were

3       dismissed with prejudice, they're gone.

4                   MR. PACE:  Right.

5                   THE COURT:  So I just take a look at that as gone.

6       Same thing, right or wrong, with Pavonia and Axar, gone.  So

7       really where I focus on is the cases where they were in --

8       the counts where they were involved in the counts, but the

9       other parties are still there.  So those weren't counts that

10      were limited to North Carolina.

11                  MR. PACE:  Right.

12                  THE COURT:  And those is where your argument, I

13      think, is where your argument has to sit to determine

14      whether or not those counts can be dismissed or not because

15      those are the only ones relevant anymore.  Sorry.  You could

16      get a cleaned up complaint, but you get my point.

17                  MR. PACE:  Sure.

18                  THE COURT:  So I look at it as for those, and I

19      think those break down into a couple of different groups

20      myself.  You know, some of them, I think the arguments are

21      where -- and, you know, I'll just say this.  North Carolina

22      insurance companies were added into this, but the nature of

23      the count doesn't appear to be, and the allegations under

24      the law doesn't appear to be something where you would fall

25      into your argument under 19 that you have to have these

1    parties.

2            Where I have the hardest issue, and I'm struggling

3    a little bit myself, is on the voidability of the overall

4    contract itself, because they are a party to that contract,

5    and that would, to me, potentially have impacts on parties.

6    And that's where I am having a little trouble myself.  I get

7    your argument there.  I just am having a harder time seeing

8    it where that argument is significant other types of counts

9    that they're involved in.

10           So let me just see if I can find one where I could

11   point out why I'm not thinking that's the most important

12   thing here.  Maybe where -- here, where they were -- let's

13   see.  Yeah.  I'm not sure.  For example, and I realize this

14   is a Bermuda claim, so that makes it even more fun, but more

15   fun for us, too, and the Second Circuit librarian, who loves

16   us.  But how about, you know, okay, the unjust enrichment

17   claim.  I'll pick that.  This is not a Bermuda one -- under

18   North Carolina law.  I'm not sure they're an essential party

19   to asserting an unjust enrichment claim by eliminating them

20   unless there's some argument about there not being any

21   unjust enrichment except for the benefit of NCIC, and I

22   don't think that's true.

23           I think there was -- if there an allegation --

24   again, these are just allegations.  That doesn't mean I

25   believe they're true.  Just make sure I'm saying this for

1    the record so no one thinks that's what I'm saying.

2              MR. PACE:  Right.

3              THE COURT:  But I'm saying if someone is alleging

4    that there was a non-contractual remedy and there was an

5    unjust enrichment, despite the fact, you know, there was a

6    contract, or perhaps there wasn't a contract and things were

7    transferred anyway, and there was an unjust benefit somehow

8    through the transaction, where there was enrichment, I don't

9    think that -- unless that particular transaction was

10   enriching the NCIC, I don't think that that doesn't mean

11   that you can't have unjust enrichment claims against all

12   these other parties.

13             And so I just -- for example, that's an example

14   where I don't see that they'd have to be essential.  Maybe

15   they're -- when maybe there's a -- if it was a transaction

16   where only they were the ones being enriched, then I would

17   think that's right.  And then your argument on what remedies

18   I could apply when there's trial, ultimately, I could see

19   where that could be an issue as well at the time.

20             But for a motion to dismiss, it's just, can you

21   state a claim that, you know, is at least, you know, beyond

22   the speculative realm here, you know, doesn't state a clear

23   enough statement of claim that it can proceed on.  I mean,

24   that's really my standard here.  It's not, can I ultimately

25   -- you know, unless I cannot ultimately ever do a remedy, I

Page 35

1      don't see that that would be a motion to dismiss issue here.

2      And that's just an example where I don't think every time

3      they're named, and that would be true, for example, of

4      unjust enrichment pursuant to Bermuda law, which, of course,

5      I'm not saying the elements are exact, but you understand my

6      points, the facts are the same that we're talking about,

7      that it could be something like that.

8                  MR. PACE:  Right.

9                  THE COURT:  So I don't think every one of the

10     claims where NCIC was named originally means that they

11     couldn't proceed just because you could never do that.

12     Again, where I'm having trouble -- where I find your

13     argument resonates the most to me is in the MOU, IALA.  And

14     even there, the, you know, the issue is really whether or

15     not PBLA could have actually, or could actually have

16     properly entered into that and had the authorization to do

17     that.  And that really goes to both what the organizational

18     documents say, whether there was any change in the

19     regulatory law that required something else from Bermuda,

20     either their approval, as has been alleged, whether or not

21     that, you know, the fact that that wasn't obtained before

22     the documents were executed, whether that, in essence, means

23     that that's void because of failure to comply with

24     applicable law.

25                  I'm not sure -- you know, the impact on that will

1        certainly impact parties.  I'm not sure what my remedy --

2        you know, my remedy would be exactly because the remedy

3        could impact other parties.  And I get to that.  But I'm not

4        sure, on the face of the claim itself, that that's

5        necessarily something that couldn't be a claim that was

6        relatively limited against the parties that were actually

7        involved in the governance and should have known that this

8        wasn't done -- being properly done.  So I'm not even sure

9        there, for example, that NCIC is a necessary party for that

10       argument.  You understand what I'm saying to you, because

11       NCIC wasn't the governing party for the PBLA entity.  Other

12       parties were.

13               But the point you're making about my remedy

14       availability or what I could do if I allow that to proceed

15       in terms of what the result might be, you know, does seem

16       like it has some -- you know, there are some concerning

17       aspects to that.  I understand what you're saying.

18               So let me ask you a question then, about group

19       pleading in the context of RICO claimants.  That was -- that

20       has been interesting to me to look at, you know, what courts

21       have done with that.  It certainly seems to me that the case

22       law that exists requires predicate acts.  The question is

23       whether, you know, you think that the case law requires two

24       predicate acts on the behalf of every single party in the

25       RICO complaint.  And that's what I was going to ask you

Page 37

1   about.

2           MR. PACE:  Yes.

3           THE COURT:  What's your view on the case law?

4           MR. PACE:  Yes.  I do think that's right.  And I

5   think a good source of that to kind of summarize that is the

6   Eastern District of North Carolina's opinion on the exact

7   same RICO claims that were brought down there.

8           So what the court did on that is allowed certain

9   claims to go forward against the particular individuals

10  where there were particularized allegations being part of

11  the enterprise and the racketeering activity and the

12  predicate -- what's the word I'm looking for -- the

13  predicate criminal acts, you know, the wire fraud, the mail

14  fraud, the laundering.  But it dismissed those claims, all

15  the RICO claims, with respect to everyone else, where there

16  were no particularized allegations.

17          THE COURT:  Like your 646 people, for example?

18          MR. PACE:  Exactly.  The only one it allowed those

19  defendants to stay in on was under 1962(a) and that's

20  because it doesn't require pleading of the fraudulent acts

21  or the enterprise or the racketeering.

22          THE COURT:  Right.

23          MR. PACE:  It requires pleading that you received

24  funds from the fraudulent enterprise.

25          THE COURT:  Okay.  that's helpful.  Yeah, I will

1      say both where the group pleading issues, I think, are --

2      maybe where the best argument that the other side has, maybe

3      on the group leading arguments other than in the context of

4      possibly fraud, to me, seem to be in the context the RICO

5      claims because of trying to argue that they're all part of

6      the same enterprise.

7              But I looked at the case law, and I also have been

8      struggling with the predicate act requirements when I've

9      been looking at it because clearly there aren't predicate

10     acts asserted for 646 parties, because there's no acts for

11     646 parties.  So it's a question of, you know, is it part of

12     the enterprise?  You know, what's the assumption -- you

13     know, is that valid use of a pleading if it's -- I guess if

14     it's fraud and if it's not fraud in those contexts.

15             MR. PACE:  The way I read it --

16             THE COURT:  And then we've got the overlay.

17     Sorry, just to go there.

18             MR. PACE:  Yeah.  Sorry.

19             THE COURT:  I do think that there are one or two

20     cases that have extended this in the context of trustees

21     beyond just the argument of fraudulent transfer, actual

22     fraudulent transfer, because this is a fraud claim, fraud in

23     the RICO context of fraud.  And so I think there is some

24     basis to argue or to -- there is some support for the

25     argument that the trustee's -- the leniency granted the

1    trustee in actual fraudulent conveyance cases does carry

2    over to other types of fraud claims, including this, and so

3    -- in terms of pleading, in group pleading.  But it's

4    helpful to understand what the court did in that case

5    because, you know, obviously we have a unique overlay with

6    the trustee here that wasn't in the North Carolina case.

7              MR. PACE:  Correct.  And I think the way I read

8    their RICO claims, and I could be reading them wrong, but

9    the way I read their RICO claims, is that they are not

10   actually relying on their veil piercing claims to reach a

11   bunch of defendants for the RICO action.  And that instead,

12   I think what they've tried to do is identify concretely who

13   the RICO defendants are, which is a much, much smaller

14   subset of the 763 or even the 646.

15             THE COURT:  Yeah.  No, because there are specific

16   allegations in the complaint against different parties, and

17   I think those -- and different entities where there's actual

18   transactions that are flagged in the complaint itself.  And

19   so I certainly think with respect to those parties, they've

20   established, especially where there was transactions that

21   went from Party A to Party B, C, D, and then on to E, F, G,

22   there's enough of evidence of the connectedness that's in

23   the complaint for those parties, for those transactions.

24             So I think the argument in terms of predicate acts

25   or being part of the organization, I'll just use that, or

Page 40

1    enterprise, I guess, is the right word, I think those

2    allegations that are made not just for that purpose, also to

3    deal with transfers and other things, but they do show the

4    interconnectedness.  So I think the interconnectedness is

5    definitely shown in those parts of the pleading.  I think

6    for those parties that are mentioned in those transactions,

7    and especially where they're mentioned in, you know,

8    sometimes where more than one transfer took place involving

9    the parties, I think there's certainly enough information to

10   show that they were connected, you know, into the whole

11   group process.

12          So I think there, when you add onto it, you

13   certainly have enough information to have specificity of

14   those parties.  I think that they are part of the enterprise

15   and with acts that they will participate in of some kind.

16   But I think when you get into the parties that just aren't

17   mentioned, as you know, with your 646, that's where the hard

18   part comes because that's where I see that there's not

19   specific predicate acts, and then I have to rely on

20   something else and I'm trying to figure out, okay, what's

21   that something else.  Is the something else -- to the extent

22   it's fraud, it's a fraud argument.  Is it the trustee's

23   leniency case law or, your point, is it veil piercing

24   arguments, but where they don't discuss how they were all

25   related and dominated and controlled?  Is it somehow a

Page 41

1    combination where you get the leniency and an assumption of

2    somehow that they're all together because they were

3    ultimately, you know, controlled, owned by parties?  I don't

4    know.  That's where I have a hard time with this, a little

5    bit with those types of claims myself.

6              MR. PACE:  Me too.

7              THE COURT:  So all right, just give me one second.

8    I want to look at my notes and then I will hear argument.

9    Oh, when you mentioned some other alternative litigation

10   that was going on, I note you didn't mention the severed

11   action before the North Carolina court on the MOU.

12             MR. PACE:  That is the MOU case I was talking

13   about.

14             THE COURT:  Right.  But the JPLs were severed,

15   right?

16             MR. PACE:  That's true.

17             THE COURT:  Okay.

18             MR. PACE:  They were severed.  I don't know that

19   that had a separate proceeding or cause.  Has that actually

20   ever been set up?

21             THE COURT:  Well, okay, so my understanding again,

22   and I will admit I'm not a North Carolina lawyer, so I'm

23   sure I'm going to butcher this from my understanding of, but

24   my understanding, having looked at this before in other

25   contexts, was that the action was filed with all the

Page 42

1    parties.  There was an agreement to sever that.  The rest of

2    it went to trial without including them as per the agreement

3    of, I guess, the severance.  That doesn't mean if the

4    parties decided that they were going to proceed with the

5    action, that it couldn't occur now.  I think in North

6    Carolina, I think that's just -- that's up to the joint

7    provisional liquidators as to when, if they ever want to

8    proceed with that action because that will require obviously

9    their consent to do that, or in order for me -- lifting the

10   stay to allow it, I guess.

11            MR. PACE:  Right.

12            THE COURT:  But that's it.

13            MR. PACE:  No, that's -- the court's correct.

14   That case that I was talking about, the MOU case, is the

15   case where PBLA only was a party to that case and was

16   severed.

17            THE COURT:  Right.  But I think the issues that

18   they raised in that, in connection with that litigation,

19   haven't been litigated somewhere else.

20            MR. PACE:  Correct.

21            THE COURT:  They could be, in theory, litigated

22   before the North Carolina court.  But that's part of why, as

23   part of their argument here, and I don't think that has been

24   adjudicated previously.  I mean, the North Carolina court

25   didn't consider whether or not, and specifically their

Page 43

1   ruling -- we had a lot of litigation over this, about the

2   extent of their ruling in other contexts, but in that case,

3   they obviously didn't rule on -- the North Carolina court on

4   that issue, on whether or not, as per PBLA, that agreement

5   is enforceable or not enforceable as to them.

6           MR. PACE:  That's correct.  That's correct.

7           THE COURT:  So that's still an open issue?

8           MR. PACE:  It is.  And that's also an issue in the

9   ULICO case in North Carolina before the same judge.

10  Different case, but in front of the same judge.

11          THE COURT:  Okay.  Did not know that, but I knew

12  ULICO by the case, but I didn't know what was in it.  So

13  that's helpful.  Okay.  Let's see.  What else did I have for

14  you?  Anything?  No, I think that's it for the moment.

15  Thank you.

16          MR. PACE:  Thank you, Your Honor.

17          THE COURT:  All right.

18          MR. HASH:  May it please the court.  Good morning

19  again.  My name is James Hash from Wake County, North

20  Carolina, and I'm here on behalf of defendant Edwards Mill

21  Asset Management, LLC, which referred to, Your Honor, as

22  EMAM, as you've seen throughout the briefing.  There's a lot

23  of pages, a lot of paragraphs, a lot of acronyms here.

24          I will try to be brief because, as compared to Mr.

25  Pace, who represents hundreds of clients on, I think,

Page 44

1    40-some-odd claims, we represent one client on defending 20

2    claims.

3            So, Your Honor, initially, the plaintiffs asserted

4    21 claims against EMAM.  Of those claims, there were three

5    that were alleged directly against EMAM, and then there were

6    18 others that lumped EMAM in with the Lindberg affiliate

7    group.  EMAM, as a bigger picture matter, vigorously

8    contests it should be considered a Lindberg affiliate.  But

9    we also understand, Your Honor, for the purposes of today,

10   we're considered a Lindberg affiliate because the plaintiffs

11   pled us as a Lindberg affiliate.  So we have to respond as

12   such.

13           So with that in mind, Your Honor, we adopt,

14   essentially in its entirety, Mr. Pace's arguments.  I will

15   try not to repeat them because, frankly, they were very

16   articulate, and I don't want to undo any good that he may

17   have accomplished with Your Honor.  But I will, though,

18   necessarily touch on a few things, but if I'm repetitive, I

19   will apologize in advance.

20           So, Your Honor, of these, there were 21 counts,

21   three against Edwards Mill, which we were named, actually,

22   under the count as an actual direct defendant.  The other 18

23   were Lindberg affiliate claims, as we call them.  Again,

24   I'll note the so-called Lindberg affiliates.  But as a

25   matter of housekeeping, one of those claims against EMAM was

1    one of the -- was the claim that was removed when the RAC

2    was filed.  So now, Your Honor, there are 20 claims against

3    Edwards Mill.

4              We filed our motion to dismiss.  We moved to

5    dismiss 18 claims, 16 for failure to state a claim under

6    Rule 12(b)(6) and then two others, the declaratory judgment

7    claims based on 12(b)(1) for lack of subject matter

8    jurisdiction.

9              I think it's important to note -- I won't dwell

10   too much on Mr. Pace's indispensable party argument, because

11   I think, frankly, he explained it very nicely.  But I do

12   want to just talk about it as it relates directly to Edwards

13   Mill.  Of the two claims that Edwards Mill did not move in

14   our December 2023 motion to dismiss, those claims were what

15   are now the RAC Counts 12 and 13.

16             THE COURT:  Okay.

17             MR. HASH:  And since we filed our motion, of

18   course, the RAC was filed.  And these are the claims Your

19   Honor was talking about earlier.  These are the declaratory

20   judgments with respect to the MOU and the interim amendment

21   to the agreement.  And, Your Honor, EMAM is party to those

22   as well.  We think, for the reason -- we believe -- we join

23   Mr. Pace's arguments in general about Rule 19.  But I want

24   to hone in specifically, and note for Your Honor, that we

25   think these claims in particular, because they deal with

1    specific contracts to which the NCICs are parties, we think

2    that they are clearly indispensable parties, and that these

3    claims should be dismissed.

4          Now, this leads to an important housekeeping point

5    we don't want to fail to touch, because we did not move to

6    dismiss those claims in our December motion.  However, Your

7    Honor, there is authority in this district that Your Honor

8    may dismiss claims as to EMAM, even though we did not so

9    move.  And the rationale for that is -- referring to

10   Shtofmakher v. David, I will just cite this because it

11   wasn't in our brief, Your Honor.  Shtofmakher v. David,

12   which is a 2017 Southern District of New York case, 2015 WL

13   5148832.

14         In this case, Your Honor, the Southern District of

15   New York determined that a court may dismiss claims against

16   a non-moving defendant if the rationale is the same as

17   moving defendants' claims and the plaintiffs are on notice

18   with an opportunity to respond.  So, Your Honor, obviously

19   the plaintiffs are on notice of Mr. Pace's argument.  And so

20   we would respectfully submit that if the court is inclined

21   to adopt Mr. Pace's argument, that also be applied in equal

22   force to EMAM so the two cases we did not include in our

23   December 2023 motion would also be dismissed.

24         In a similar vein, Your Honor, and it's already

25   been discussed, Count 42 is case that involves Pavonia and

Page 47

1    Axar.  In light of the NCICs' dismissal with prejudice and

2    what we understand is the soon to be finalized dismissal of

3    Pavonia and Axar, we believe, for those same reasons, that

4    Count 42 should be dismissed, certainly as to EMAM.  And

5    again, we think that this logic holds true, as Mr. Pace has

6    already explained, but in particular, with these three

7    declaratory judgment claims that directly involve EMAM.

8           The other claims, Your Honor, this brings us into

9    this notion of Lindberg affiliates and group pleading.  My

10   perspective on this is obviously somewhat different than Mr.

11   Pace's because he has hundreds of defendants, some of whom,

12   as you've heard, aren't talked about at all.  Here, Your

13   Honor, we have one defendant that at least is named

14   somewhere in the complaint.  So because we're named, at

15   least we know that they know who we are, which means we can

16   expect them to talk about us.  So in the course of this

17   morning, we will look at what they've actually said about us

18   in their complaint.

19          So the three principal reasons that the claims

20   against EMAM as a so-called Lindberg affiliate should be

21   dismissed are, first, and Your Honors heard this and read

22   this, there's general and conclusory allegations that simply

23   aren't well pled allegations that demonstrate it is

24   plausible.  And Your Honor spoke a little bit about the

25   standard that you're supposed to apply here.  Again, the

Page 48

1    standard is not possible.  Is it not?  Could we conjure some

2    notion of how it's possible that there could be relief?  Is

3    it actually plausible based on well pled allegations?

4              Now, we talk about the contradictory nature of

5    some of these things, Your Honor.  The case law is very

6    clear that we can have alternative legal theories.  Well,

7    from time to time, if you read this complaint closely, you

8    get some alternative factual theories, and I don't think you

9    get to do that.  I don't think that's a well pled complaint,

10   Your Honor.  So certainly we don't think that they satisfy

11   Rule 8.  And as we get into these complaints themselves, we

12   don't believe that they come close to satisfying Rule 9.

13   Many of these allegations are claims, as we'll get into

14   later today, we'll see they do, they involve fraudulent

15   transfers.  I don't think there's any dispute that Rule 9

16   applies to those claims.

17             Secondly, Your Honor, this notion of group

18   pleading, we represent one client that's been lumped in with

19   -- I lose count.  Sometimes it seems to be 700 or 600 or

20   900, but a lot.  And the law is that we're entitled to know

21   what it is that the plaintiffs say we did.  And as we look

22   at this, we'll see it's just not there.  It seems from the

23   plaintiffs' briefing that they are bootstrapping their alter

24   ego theories.  It's almost, and I suspect counsel will

25   correct me if I've misapprehended their allegations, but it

1     seems to be their saying, because we're alter egos, we're

2     responsible, and that, we'll talk about the interplay

3     between these elements and these claims and alter ego, but

4     it's not an automatic thing.  Even if, hypothetically,

5     Edwards Mill was an alter ego of another defendant who

6     committed fraud, that's a far cry from saying EMAM committed

7     fraud.  There's a distinction between being responsible for

8     the liabilities owed by an alter ego and actually having

9     committed the predicate tort.  And we think that's

10    incredibly important for Your Honor as you look at how to

11    parse through these claims and figure out what goes away

12    here today, Your Honor.

13          And then third, and finally, these declaratory

14    judgment claims.  We talked about how they're disposed of on

15    other grounds, but there's no justiciable issue.  There's no

16    dispute as to EMAM.  I perhaps shouldn't say the EMAM

17    doesn't care.  I certainly shouldn't be on the record and

18    say that.  But there's no actual dispute alleged that pits

19    the rights of EMAM versus the rights of the plaintiff.  So

20    we're not entirely sure what we should even respond to with

21    respect to those claims.  So we don't think they're properly

22    before the court.  There's not subject matter jurisdiction

23    at this time.

24          Before moving to specific elements of claims, and

25    if Your Honor doesn't want to get too much into specific

Page 50

1    elements, I think that the side parties have all expended a

2    lot of ink and -- well, years ago, it would have been a lot

3    of trees, but we've spent a lot of time briefing here.  So I

4    don't want to repeat what's there, but I think there are

5    some things that need to be highlighted.

6             And the threshold thing to consider is this

7    attempt to consolidate Mr. Lindberg and all of these so-

8    called Lindberg defendants -- excuse me, Lindberg

9    affiliates, as if they're somehow the same defendants.

10   Plaintiffs' briefing actually says that we misapprehend

11   their argument, and that we don't understand that they're

12   saying that all these 900 and some odd parties are one

13   defendant.  Well, we do understand that's what they're

14   saying.  We frankly just disagree that that's allowed.

15            And the reason for that really comes from North

16   Carolina law.  We could get into choice of law discussions.

17   The plaintiffs have said they've pled North Carolina law for

18   their fraud claims and other claims, which, frankly, is

19   appropriate.  And so that's what we're basing this

20   discussion on today.  And they say that they have submitted

21   specific and overwhelming allegations that these parties are

22   the same defendants, and it's essentially an effort to

23   backdoor establish joint and several liability.

24            But that's not what they've pled.  The plaintiff

25   is the master of his complaint.  I think there's case law,

Page 51

1    or there are statements of that in every jurisdiction.  The

2    plaintiff is the master of his complaint, and that's not

3    what they pled, Your Honor.  There is a clear legal

4    distinction between alter ego and an alleged underlying

5    wrong.  And the reason for this is because, in North

6    Carolina, the concept of piercing the corporate veil and

7    alter ego or the instrumentality rule, as it's called in

8    North Carolina, and I suspect other places, it's not itself

9    a theory of direct liability.  There must be an underlying

10   claim as to which that liability can attach.

11          To that point, the North Carolina Supreme Court

12   has stated, and I'm quoting, "The doctrine of piercing the

13   corporate veil is not a theory of liability.  Rather, it

14   provides an avenue to pursue legal claims against corporate

15   officers or directors who would otherwise be shielded by the

16   corporate form.  Without the agency claims serving as the

17   underlying wrongs that proximately caused plaintiff's harm,

18   evidence of domination and control is insufficient to

19   establish liability.  In other words, if the trial court

20   properly dismissed plaintiff's agency claims, it is

21   irrelevant whether the defendants exercised domination

22   control over the defendant companies."  And, Your Honor,

23   that is Green v Freeman, 367 N.C. 136.  And that is a 2013

24   North Carolina Supreme Court case, I believe, offered by

25   Justice Martin, who was later chief justice.

Page 52

1          I said I wasn't going to focus too much on those

2     specifics of case law, but that is so fundamental to

3     understand what we're about here today.  This distinction

4     makes crystal clear that plaintiffs cannot bootstrap group

5     allegations on direct claims simply because they have

6     attempted -- the reason I say attempted is because we're

7     going to come back in a few minutes and argue to Your Honor

8     that they haven't pled alter ego successfully as to our

9     clients.

10          But the point for now is even if they had

11     established alter ego, that's still a distinction from

12     having saying that we've committed fraud or fraudulent

13     conveyance.  Each count alleged must be directly and

14     specifically analyzed separately as to each defendant.  For

15     our purposes, that means EMAM shouldn't be lumped in with

16     this amorphous group of defendants.  And for Mr. Pace's

17     purpose, same thing.  He had -- he's entitled to -- if he

18     has 900 clients, he's entitled to 900 separate explanations

19     of what his clients did.  That's our understanding of law.

20     So these veil piercing claims become relevant if and only to

21     the extent that plaintiffs are able to independently

22     establish their underlying claim.  Thus, they can't rely on

23     the assertion that they're all one and the same.  And these

24     claims fail under Rule 8 and certainly under Rule 9.

25          With respect to the standard, Your Honor, I think

Page 53

1    it's well settled.  As Your Honor knows, after Iqbal and

2    Twombly, the standard is higher.  I know the court is well

3    aware of that, so we won't belabor that.  I do agree with

4    Mr. Pace my understanding of the law.  And I don't want to

5    say there's not a case out there in which a trustee hasn't

6    been afforded the more lenient standard.  But my reading is

7    -- my scope of knowledge is the same as Mr. Pace's, that my

8    recollection is it was in the context of the fraudulent

9    conveyance claims.

10            Having said that, Your Honor, I would like to talk

11   briefly about fraud.  And I promise I will be brief.  I

12   shouldn't talk longer than Mr. Pace, given we don't let the

13   tail wag the dog here.  But I do think it's important to

14   look at fraud.  And specifically, fraud's a big deal, as

15   Your Honor knows, for all sorts of reasons, has all sorts of

16   ramifications that come from it.  So fraud shouldn't be pled

17   lightly.

18            The allegation is that the defendants jointly

19   concealed material facts from each of the debtors concerning

20   the use of the debtors' assets to improperly fund the

21   operations of the Lindberg affiliates, and then as a result,

22   they suffered economic injury and damages.  I believe that

23   is -- that's in the RAC.  I believe that's 1800-1804.  And

24   it's become clear in the course of the briefing that the

25   plaintiffs are not asserting an affirmative

1    misrepresentation.  Instead, we're talking about a

2    fraudulent concealment or a failure to disclose.

3         So to have that, though, Your Honor, there has to

4    be a duty to disclose.  There has to -- this doesn't -- you

5    don't get inferences here, Your Honor.  This has to be pled

6    specifically, and this rack does not explain -- it doesn't

7    allege that Edwards Mill had a duty to disclose.  Even if it

8    did allege that there was a duty, it would not explain the

9    source of that duty.  It's also unclear how, again, if this

10   is unpled duty, of which we're not sure of the source of,

11   how that caused the damage here.

12        And this is where I tend to go back and look at

13   the inconsistent factual pleading argument.  On one hand,

14   there are allegations that some of these Lindberg defendants

15   controlled the debtors.  That's in the complaint.  Well, if

16   these Lindberg defendants controlled the debtors, then that

17   knowledge would be imputed to the debtors as well.  That's a

18   circular argument, no doubt, but it's hard to reconcile how,

19   on one hand, the debtors had no mind of their own.  They're

20   essentially lumped into this network as well.  But on the

21   other hand, these critical facts were concealed from them.

22   But in any event, there's no connection that shows how

23   Edwards Mill either had a duty to tell them.  There's really

24   -- I'm not aware of any connection at all between Edwards

25   Mill and the debtors that's pled in the RAC, and then how

Page 55

1    that damage could have occurred.

2            So the only way I think that the plaintiffs would

3    get there is if they were somehow able to tie Edwards Mill

4    back in through the group pleading that we've already talked

5    about is inappropriate.  And I know I've heard it mentioned

6    already several times today that there aren't many cases

7    like this one.  I certainly hope not.  There's a lot

8    happening here, Your Honor, as you well know.

9            But that being said, you know, I remember in law

10   school, we were told, we can't let bad cases make bad law.

11   The law still is what it is.  And when we start molding the

12   law, then that can take us down a slippery slope.  So I

13   think we have to go back to the foundational principles that

14   have gotten us here.  One of those in this district in

15   particular, it is well settled, and I'm quoting from the  In

16   re AlphaStar Insurance case, which is about the closest one

17   that I have seen in my reading as to what this case is.  I

18   think it was decided by the chief judge, who I think bears

19   this courtroom, and I think that Stevens & Lee were

20   representing the plaintiffs in that case, a bankruptcy

21   trustee case, in which I think there were over 500

22   allegations and 120 pages or so.  So another large

23   complaint, lots of things happening, Your Honor.

24           But there, in AlphaStar, it was noted, group

25   pleading is generally, and I should highlight generally for

Page 56

1    sake of completeness.  It doesn't say always, but group

2    pleading is generally forbidden because each defendant is

3    entitled to know what they are accused of doing.  That's

4    just a fundamental due process principle, Your Honor.  And

5    when fraud is alleged against multiple defendants, a

6    plaintiff cannot "simply clump defendants together in vague

7    allegations to meet the pleading requirements of Rule 9(b)."

8         This comes out of a very recent case.  On

9    September 4th, Judge Jones of this court issued In re RML.

10   And that was particularly instructive, Your Honor, because

11   Judge Jones in that case actually looked at the way the

12   plaintiff had pled his complaint, and it was a pro se

13   plaintiff.  And so even then, if we talk about permissive

14   pleading standards, Judge Jones actually noted in his

15   opinion that the pro se plaintiff was entitled to a -- I

16   think it's sort of difficult to define, but I think we all

17   recognize pro se parties get a little more indulgence than

18   other parties.  And there, Your Honor, Judge Jones actually

19   looked at examples where it was pled Smith and Jones did X,

20   or, you know, Davidson and Williams did Y.  And there, Your

21   Honor, Judge Jones found that even that wasn't enough.

22   Pleading, even in pairs, by a pro se plaintiff wasn't enough

23   to work around the bar on group pleading.  So I would

24   commend that case to Your Honor.  that is 2004 WL 4048758.

25        So with that, we've spoken about the fraud.  I can

1    run through the elements of fraud, whether there's -- I'm

2    not sure what EMAM concealed, certainly no attempt to allege

3    that whatever EMAM concealed, it did so intentionally, like,

4    there's no requirement to prove intent.  I understand that's

5    where parties are allowed some inferences.  But that doesn't

6    even come into play because they can't plead our intent if

7    they can't plead what we allegedly did, Your Honor.  So at

8    the risk of sounding colloquial, that dog just doesn't hunt.

9           There's no admission.  It doesn't say -- I think

10   Your Honor understands my point, and I don't want to belabor

11   it.  But there's simply not a well pled allegation in this

12   complaint that could sustain a fraud claim against IMAM.

13          Same thing with actual, really with all the

14   transfers, Your Honor.  I could sum it up very simply.

15   Under Rule 8 or under Rule 9, whether actually fraudulent or

16   constructively fraudulent, there's got to be an allegation

17   of a transfer.  You know, the who, the what, the when, the

18   where, and they're not there.  There's not an allegation in

19   this complaint that says EMAM received the transfer,

20   fraudulent or otherwise, so that we can even begin to have a

21   discussion about it, Your Honor.  And certainly there's no

22   specification of the property that was conveyed, the time

23   and frequency of the conveyance and the consideration paid

24   that's required by the case law of this district and other

25   districts.  That's the same with the constructive frauds and

1   transfers as well under Rule 8.

2          And the pattern here, Your Honor, continues.  We

3   could do to unjust enrichment, the elements of unjust

4   enrichment cited in our brief.  Well, at a fundamental

5   level, there has to be some benefit conferred.  There's no

6   allegation of what benefit was conferred upon EMAM.

7   Constructive trust, that is another scenario where it's not

8   really a claim, it's a remedy.  Well, so assuming that there

9   was something upon which to predicate that remedy, there

10  would have to be a showing of what property EMAM received

11  upon which a constructive trust could be imposed.  So it

12  fails for that reason as well, Your Honor.

13         And that brings me, as I sort of wrap up, the

14  North Carolina-based claims, brings us back to piercing the

15  corporate veil.  As we've said, Your Honor, we would

16  acknowledge that it is possible -- not saying plausible,

17  it's certainly possible that the court could dismiss fraud

18  or fraudulent conveyance, but still have to do a separate

19  analysis under piercing the corporate veil, because if the

20  claim survives against any of Mr. Pace's clients, then that

21  analysis on piercing the corporate veil would still need to

22  be done.

23         So we look at EMAM specifically, and we would ask

24  the court to review EMAM specifically, not as an amorphous

25  group of 700-some-odd defendants, but as the one defendant

1    standing before you, based on due process, asking how is it

2    supposed to defend itself.  And with this -- pardon me, Your

3    Honor, with this veil piercing or instrumentality rule, I

4    know the court has read a great deal about it, I'm sure.

5    But at the end of the day, what is actually alleged that

6    will establish the conclusory allegation that Mr. Lindberg,

7    controlled directly or indirectly, Edwards Mill Asset

8    Management?  Even there, he controls -- he owned it and

9    controlled it directly or indirectly.  Well, I think it

10   could be plausible.  We at least ought to know, are they

11   saying that he owns it actually, as a member, owns

12   membership units in the LLC, which if we get past this

13   point, we'll learn that he doesn't.  But that's not the

14   purpose of today.

15           So again, we understand very well the sandbox we

16   have to play in here this morning, Your Honor.  But we

17   actually look at what's alleged.  With these elements, there

18   must be plausible allegations to establish control.  And we

19   would acknowledge that mere ownership is not dispositive.  I

20   think that case law is very clear on that point.  But what

21   does have to happen for there to be control that's going to

22   establish complete domination.  There's nothing but just

23   formulaic recitations about Lindberg defendants.  There's no

24   allegation that says Mr. Lindberg controlled.  It's not even

25   enough to say that someone is controlled.  You have to

1    explain how they're controlled, Your Honor, and that's just

2    not here.  And then, so there has -- control is not enough.

3    Ther has to be control.  And then this control has to be

4    used to commit a wrong.  And this wrong or breach of duty

5    must be the proximate cause of injury.  It has to be with

6    respect to the transaction attacked.

7            Which transaction?  We don't know.  As we sit here

8    today, we don't know if what they're alleging EMAM was

9    involved in, we don't know if they're statute of limitations

10   defenses.  We just -- we don't know.  And we can't defend

11   ourselves on the complaint that's been proffered.

12           And we look at these different factors.  Your

13   Honor knows them well.  But I think the takeaway from all

14   the things, Your Honor, is it's not a formulaic recitation.

15   We can look at the different factors, but at the end of the

16   day, under North Carolina law, under Glenn v. Wagner, in

17   order to get there, the control has to be so complete that

18   the entity being controlled has no separate identity, mind

19   or will of its own.  And those allegations, simply plausible

20   allegations, simply aren't here.

21           So for that reason, Your Honor, number one,

22   piercing the corporate veil can't be used to bootstrap the

23   other claims.  But number two, the veil piercing claim

24   should be dismissed as the IMAM independently.

25           And finally, Your Honor, I would like to talk a

Page 61

1     little bit about Bermuda law.  I am not -- it won't

2     surprise, Your Honor, perhaps you've heard me talk.  I'm not

3     an expert on Bermuda law.  I don't believe we have anyone

4     here who is at least professing to be an expert on Bermuda

5     law.  So where does that lead us, Your Honor.  Mr. Pace

6     already mentioned Rule 44.1 and laid out his argument for

7     why it is that the plaintiffs haven't satisfied the

8     requirements of that rule.

9            Well, where does that lead us, though?  The

10    plaintiffs have said Bermuda law applies, I believe, to

11    eight claims, and frankly, defendants, at least EMAM, we

12    haven't said that it doesn't because we don't know.  We

13    don't know what Bermuda law is.  But I think Mr. Pace's

14    point and the point of the case law is it's the plaintiffs'

15    job to put to the court and to the defendants what that law

16    is.

17           And the question then would be, well, what

18    happens?  What happens?  And of course, I know the court

19    perhaps -- you referenced the Second Circuit library.

20    Perhaps the court may have already researched Bermuda law.

21    But I don't think the court has to here.  There's precedents

22    in this district, Your Honor, that when a party is given

23    written notice that it intends to assert foreign law in

24    support of or in opposition to the complaint or to a claim,

25    but provides the court with no or insufficient information

Page 62

1    about foreign law, the forum will usually decide the case in

2    accordance with its own local law.  And I'm citing here CBS

3    Broadcasting Inc. v. Counterr Group, 2008 WL 11350274 and it

4    is quoting Shaw v. Rizzoli International Publishing, Inc.,

5    which is at 1999 U.S. Dist. LEXIS 3233, which is a 1999

6    Southern District of New York case.  The reason I'm citing

7    these, Your Honor, is these were not included in our brief.

8           The CBS Broad case provides that the court may

9    make this determination even in deciding a  motion to Rule

10   12(b)(6) motion to dismiss.  So my understanding of how this

11   works, never having the privilege of dealing with foreign

12   law like this, is folks could have brought forward experts

13   in Bermuda law.  I think that happened in the AlphaStar

14   case, too, as it turned out, but hasn't happened here.

15          So that leaves us to look at what is the law of

16   the forum, which here is New York, and we look at these

17   common law analogs for fraudulent conveyance in Bermuda law,

18   or fraud under Bermuda law, and we look back around to the

19   arguments I made earlier and that Mr. Pace has made.  If we

20   apply New York law to these Bermuda claims, then they fail

21   for the same reason the other claims fail, Your Honor.  So,

22   for that reason, Your Honor, we believe that there's clear

23   authority in this district for Your Honor to apply New York

24   law without having to resort to Bermuda law.  And we believe

25   that that application of law will require the dismissal of

Page 63

1    these claims for failure to state a claim.  So that would

2    conclude -- I spoke perhaps a little longer than I intended,

3    but --

4              THE COURT:  No, that's fine.  So, question for

5    you.  You started out by saying that your client shouldn't

6    be lumped in, in that definition of Lindberg defendants.

7    Why?

8              MR. HASH:  Well, Your Honor, may I answer that

9    without converting this to summary judgment?

10             THE COURT:  Yes.

11             MR. HASH:  Thank you, Your Honor.  Your Honor,

12   frankly, because our client is owned by people other than

13   Mr. Lindberg.  It has its managers who are other than Mr.

14   Lindberg.  In prior proceedings, it's answered subpoenas.  I

15   can't represent it's been a 2004 request here, but I know

16   that it has provided documents.  I believe it was a 2004

17   request, and I believe that information, including a

18   deposition, that's actually referenced in the complaint has

19   been provided to plaintiffs, and we simply believe that the

20   evidence will show that EMAM is separate.  It's not

21   controlled as a Lindberg affiliate.  And that's why it's

22   been a hard pill to swallow for EMAM to be lumped in with

23   all these other folks.

24             THE COURT:  The next question is, you mentioned

25   before that there's very little reference, although not

Page 64

1    zero, to EMAM in the complaint.  You're saying -- but you

2    were arguing there's no transactions that IMAM was flagged

3    with in the complaint.

4           So are you -- I was just trying to understand what

5    you were talking about that you reference that your client

6    is referenced in then because the complaint generally has

7    factual background in it, and a lot of it, and a lot of

8    transactions, although clearly, in some respects, not

9    enough, since we have a lot of people not mentioned, but

10   nevertheless, and there are then, of course, various types

11   of transactions discussed and agreements discussed that were

12   entered into, et cetera.  So I'm trying to make sure I

13   understand what specifically was your client mentioned

14   within.

15          MR. HASH:  And, Your Honor, thank you for asking

16   for clarification, because our client was involved.  Edwards

17   Mill is a party to the MOU and to the interim amendment.

18          THE COURT:  Right.

19          MR. HASH:  So to be clear, what I meant to say,

20   and I apologize for confusing the issue, when I say there's

21   no transactions, I'm referring to these fraudulent

22   conveyances, these fraudulent transfers.

23          THE COURT:  So only in connection with the MOU and

24   the IALA.

25          MR. HASH:  Oh, Your Honor, the allegation is that

1      Edwards Mill was formed and that Edwards Mill participated

2      in the creation of the so-called SPVs.  And so that's what's

3      alleged as to EMAM, is that it formed those.  And then it is

4      alleged that EMAM held controlling voting interest in those

5      SPVs.  And that, Your Honor, I believe, is where it stops.

6      There's no allegation of EMAM's role in these subsequent

7      transactions, whether a role or lack thereof.

8                But again, so that's why I want to be clear, and

9      I'm very grateful that Your Honor asked for clarification.

10     We're not saying that the complaint doesn't mention EMAM,

11     because it certainly does.  I think that sets us apart from

12     these amorphous folks that Mr. Pace is representing.

13               THE COURT:  Right.

14               MR. HASH:  But the point, I think, is even

15     stronger.  They clearly know who EMAM is, and they still

16     can't get there.  We would say that's one of those -- the

17     fact that they know who we are and they couldn't allege

18     anything we think speaks volumes.

19               THE COURT:  Well, in fairness, I mean, I looked at

20     this to see which SPVs we're talking about, but it's

21     certainly possible that they allege things that happen with

22     some of the SPVs, and maybe that goes into that veil

23     piercing argument we just talked about before.  And also,

24     it's certainly possible that because they weren't involved

25     with the SPVs, to the extent that the SPVs were involved in

Page 66

1     any RICO allegations, that might move that in arguably as

2     part of an enterprise, there may be some argument about

3     that.  You still may have the predicate act problem, I grant

4     you there.  But I could see why somebody might loop that in.

5              MR. HASH:  Well, I think there's -- I have two

6     reactions to Your Honor's comment, and the first was, I

7     believe you said possible three times, and it's -- other

8     stuff is possible.  We could tease out things that could

9     happen.

10             THE COURT:  No, I understand.

11             MR. HASH:  But to your point, it's, it's possible.

12    I don't know that the facts support that, but it's possible.

13    But again, I would respectfully submit that it's not

14    plausible based on what's actually in the complaint.

15             THE COURT:  I understand.

16             MR. HASH:  And as far as the RICO and the

17    predicate act and the enterprise, EMAM is not a RICO

18    defendant.

19             THE COURT:  All right.  Thank you.

20             MR. HASH:  Thank you, Your Honor.

21             MR. LINNEROOTH:  Very briefly, Your Honor, Brian

22    Linnerooth, here on behalf of Pavonia and Axar.  Just a

23    quick timeline.  After Pavonia and Axar filed a motion to

24    dismiss, the court granted the (indiscernible) defendants'

25    motion to dismiss based on the very same rehabilitation

Page 67

1    proceeding that both Pavonia and Axar were parties to, after

2    multiple requests to the JPLs' counsel that they voluntarily

3    dismiss their claims against Pavonia and Axar in light of

4    the court's ruling, all of which were rejected.  And after

5    Pavonia and Axar filed a reply in support of the motion to

6    dismiss, the JPLs' counsel filed a notice of voluntary

7    dismissal without prejudice, if memory serves me right, on

8    Monday, September 16, 2024.

9         We objected to the dismissal being classified as

10   being without prejudice and filed a response in the form of

11   a declaration on September 17th requesting instead that the

12   dismissal be with prejudice, laying out the communications

13   we had with the JPLs' counsel requesting that dismissal, as

14   well as requesting that the court entertain fees, in part to

15   offset the fees Pavonia and Axar incurred in their filing.

16   In response, JPLs' counsel filed a note of voluntary

17   dismissal with prejudice on September 19th, last Thursday,

18   and as of today, as best as I can see, neither dismissal has

19   been processed.  We're here to make sure that the dismissal

20   is processed with prejudice.  And based on the court's prior

21   comments today, I understand that (indiscernible) --

22        THE COURT:  Yes.  we will prejudice it with -- we

23   will process it with prejudice with dismissal for certain.

24   The reason that I didn't process it after you had filed your

25   pleading is because I was giving the JPLs a chance to go

Page 68

1    ahead and after they had filed their original pleading, and

2    then I saw your pleading was to give them a chance to

3    actually do what they did, which is to request that it be

4    dismissed with prejudice.  And also, just for what it's

5    worth, under the Federal Rules of Civil Procedure, they're

6    entitled to just dismiss, even without prejudice, if they

7    wanted to, because no answer, you know, obviously has been

8    filed here.  And so at this point, they had the right to

9    voluntarily dismiss.

10           So that's why I wasn't going to, I'm sorry to say,

11   grant your fees either because I don't find that there was

12   anything inappropriate about their voluntary dismissal.  I'm

13   glad that they've agreed to dismiss with prejudice, but that

14   was their right.

15           MR. LINNEROOTH:  Understood, Your Honor.

16           THE COURT:  Okay.

17           MR. LINNEROOTH:  Because that hadn't been

18   processed and not to prejudice our client, we appeared.

19           THE COURT:  No, I'm sorry about that.  If you --

20   if you -- if that was the problem, we would have fixed that

21   before you had to show up.  I'm really very sorry about

22   that.  We will process your dismissal with prejudice.

23   That's fine.  If we -- I will go back and take a look and

24   see what we need to do.  I'm guessing just enter it on

25   our -- that we just haven't -- sorry, we just haven't

1    completed it for purposes of our docket and our process.

2    But we will do that after this, I promise you.

3              MR. LINNEROOTH:  Thank you, Your Honor.

4              THE COURT:  Okay.  All right.

5              MR. KAJON:  Your Honor, we've been going nearly

6    two hours now.

7              THE COURT:  Do you need a break?

8              MR. KAJON:  Would it be possible to take a

9    five-minute break?

10             THE COURT:  Sure.

11             MR. KAJON:  Thank you.

12             THE COURT:  You should know me -- I guess you

13   don't know by now because you haven't been here enough, that

14   I could go -- I'm one of those people that's like five hours

15   probably before I would ask myself.  But if you -- it's

16   fine.

17             MR. KAJON:  If you wouldn't mind.

18             THE COURT:  No problem.  Okay.  I'll give you ten.

19             (Recess)

20             THE COURT:  You may be seated.

21             MR. KAJON:  Good afternoon, Your Honor.

22             THE COURT:  Good afternoon.  Time is going by

23   here.

24             MR. KAJON:  Nicholas F. Kajon, Stevens & Lee, on

25   behalf of the plaintiffs.  Your Honor, my clients are the

1    duly appointed liquidators of the four Bermuda insurance

2    companies before you in this Chapter 15 case.  They've been

3    tasked with recovering assets for the benefit of the

4    debtors, their policyholders and other constituents.

5    Movants' actions, as detailed in the JPLs' complaint,

6    defrauded the debtors of over $500 million and thereby

7    caused the insolvency of the debtors, which are now in

8    liquidation in Bermuda.

9         Mr. Lindberg orchestrated a convoluted and opaque

10   fraudulent scheme utilizing over 900 of his affiliates to

11   improperly siphon billions of dollars from foreign domestic

12   insurance companies that he controlled, including the four

13   Bermuda insurance companies that are plaintiffs in this

14   case.

15        I forgot to mention, Your Honor, I'll be dealing

16   with Mr. Pace's motion.  My partner, Mr. Koenecke, will be

17   dealing with the EMAM motion.

18        THE COURT:  Thank you.

19        MR. KAJON:  On February 23, 2023, Mr. Lindberg was

20   indicted on charges of conspiracy to defraud the United

21   States, wire fraud, false insurance business statements

22   presented to regulators, false entries about the financial

23   condition or solvency of an insurance business and money

24   laundering conspiracy.  These charges are directly related

25   to its wrongful acts, amounting to racketeering causing

Page 71

1      damage to the debtors, as alleged in our complaint.  The

2      United States government has also brought criminal charges

3      against Mr. Lindberg's chief lieutenants, Chris Herwig and

4      Devin Solo, including charges that mirror the JPLs' civil

5      fraud and RICO claims.

6              As alleged in our complaint, Messrs. Herwig and

7      Solo have already pled guilty, and another of the senior

8      decision-makers, Eric Bostic, has entered into a non

9      prosecution agreement with the United States.  Separately,

10     Mr. Lindberg was recently convicted of bribery.

11             There are also civil lawsuits against Mr. Lindberg

12     and/or his affiliates by the United States Securities and

13     Exchange Commission and others, including PBLA's

14     policyholder, ULICO, that is owed over $500 million.  The

15     Wall Street Journal and other news media have been covering

16     Mr. Lindberg's misconduct since at least February 2019.

17             In light of the foregoing and the detail provided

18     in the JPLs' complaint, it strains credulity that the JPLs'

19     complaint is not particular enough for Mr. Lindberg and his

20     instrumentalities to understand what we are alleging they

21     did.  Federal pleading is notice pleading.  Rule 8(a)

22     requires a short and plain statement of the claim showing

23     that the pleader is entitled to relief.  Rule 8(e) provides

24     that pleadings must be construed so as to do justice.  The

25     JPLs have amply satisfied the pleading standards enunciated

Page 72

1    by the Supreme Court in Bell Atlantic v. Twombly and

2    Ashcroft v. Iqbal.  To survive a motion to dismiss,

3    plaintiffs must allege facts that render a claim plausible

4    on its face.  The facts alleged must permit the court to

5    draw a reasonable inference based on judicial experience and

6    common sense that the plaintiff has asserted a claim for

7    relief that is plausible on its face.

8         Judicial experience can include consideration of

9    other courts that have decided similar issues and matters of

10   public record, such as the of aforementioned indictments,

11   convictions and guilty pleas relating to the same misconduct

12   alleged in our complaint.  Common sense shows that we are

13   dealing with a sophisticated fraudster and a massive, opaque

14   fraudulent scheme that was designed to conceal how it ripped

15   off its victims.

16        Your Honor, before going into the fraud claims,

17   I'd like to address what Mr. Pace started with, which is his

18   contention that the North Carolina insurance companies are

19   necessary parties for dozens of claims.  It might be a

20   threshold issue, so I'll get that one out of the way first.

21   The simple matter is the North Carolina insurance companies

22   are no longer necessary parties, so failure to join them is

23   irrelevant.  Their argument fails for the simple reason that

24   the North Carolina insurance companies were only necessary

25   parties for the claims against them; i.e., the North

Page 73

1    Carolina insurance companies themselves, including the

2    claims to void the MOU and the IALA.  All of those claims

3    are now of the case.  So the North Carolina insurance

4    companies are no longer necessary parties.

5            The movants' argument that the North Carolina

6    insurance companies are inextricably intertwined and that

7    prosecuting this case without the North Carolina insurance

8    companies creates a substantial risk of imposing

9    inconsistent obligations, fundamentally misapprehends our

10   complaint.

11           Plaintiffs' claims arise from two separate sets of

12   improper transactions.  The first set concerns the vast and

13   intricate scheme orchestrated by Mr. Lindberg and his senior

14   decision-makers to defraud the debtors.  The North Carolina

15   insurance companies did not perpetuate that misconduct.  To

16   the contrary, they were fellow victims of Mr. Lindberg and

17   his senior decision-makers' pillaging.  There is no good

18   reason why plaintiffs' claims against the movants arising

19   from their own misconduct should not move forward at this

20   time, nor have the movants otherwise established how the

21   prosecution of these claims may subject them to multiple or

22   inconsistent obligations.

23           These claims sounded fraud, fraudulent trading,

24   avoidance of fraudulent transfers, breach of fiduciary duty,

25   civil RICO, et cetera.  Since the North Carolina insurance

Page 74

1    companies did not perpetuate this fraudulent scheme and are

2    not the subject of these claims, they are, at best,

3    permissive parties.  This is especially glaring for

4    plaintiffs' allegations and claims sounding in civil RICO

5    which have nothing to do with the North Carolina insurance

6    companies and everything to do with the RICO defendants,

7    including Mr. Lindberg, as the principal RICO defendant.

8            As explained on Pages 34 to 35 of our belief, even

9    joint tortfeasors are merely permissive parties and thus not

10   necessary parties for purposes of Rule 19.  Nor is there any

11   merit in the movants' undeveloped reliance on Landress v.

12   Tier One Solar, 243 F.Supp.3d 633, a case where the court

13   stayed the action because the principal defendant and

14   fraudster filed for bankruptcy, making his joinder

15   temporarily impossible.  The North Carolina insurance

16   companies are plainly not principal defendants and

17   fraudster, as in the Landress case.

18           The second set of improper transactions set foot

19   in the complaint also center on Lindberg and his senior

20   decision-makers' misconduct beginning in the spring of 2019,

21   when Lindberg's insurance empire began to crumble and

22   regulatory oversight became acute.  These allegations show

23   that after Lindberg and his senior decision-makers had

24   already severely impaired the debtors' assets and capital,

25   they engaged in a new set of misconduct and self-dealing

Page 75

1      aimed at Lindberg retaining control over his companies and

2      assets by appeasing insurance regulators.  This includes

3      plaintiffs' allegations and claims that by subjecting the

4      debtors to the MOU and the IALA, Lindberg and his senior

5      decision-makers breached their duties and harmed the

6      debtors.

7             The plaintiffs can no longer prosecute their

8      discrete claims as to enforceability of the MOU and the IALA

9      to which the North Carolina insurance companies would be

10     necessary (indiscernible).  Yet there is no good reason to

11     stay plaintiffs' claims against Lindberg for breach of

12     fiduciary duty, which is Count 14, breach of loan and

13     preferred equity agreements, Counts 18 and 19 -- pardon e,

14     Count 13 and 14, trouble reading Roman numerals, and

15     unconscionable receipt, Count 34, in connection with the MOU

16     and the IALA.

17            Those claims, each involving misconduct by

18     Lindberg in his role as a fiduciary of the debtors, are

19     distinct from plaintiffs' separate claims against the North

20     Carolina insurance companies.  Mr. Pace referred to the

21     imminent contribution of the so-called SACs, which are the

22     specified affiliated companies, to New Holdco, or NHC, and

23     it's just irrelevant to the claims before this court.  We

24     are creditors of the SACs.  We have litigation claims

25     against the SACs.  If NHC wants to become a shareholder of

Page 76

1    the SACs, so what?  That doesn't insulate NHC or anyone else

2    from the claims of creditors, distinct claims of creditors

3    against those particular entities.  The claims of creditors

4    don't get washed away if you have a new shareholder.  So

5    it's irrelevant.

6            There are at least three separate sets of

7    insurance company creditors here who were defrauded by Mr.

8    Lindberg and his cohorts.  You have, obviously, the

9    plaintiffs in this case, our largest policyholder, ULICO and

10   the North Carolina insurance companies, three sets of

11   defrauded plaintiffs, three sets of creditors.  They're all

12   seeking to enforce their rights against miscellaneous

13   Lindberg companies and assets.  It's not relevant that the

14   SACs are going to be contributed to NHC supposedly any

15   minute.  It's been supposedly any minute for years.  But it

16   doesn't matter if the shareholder of someone I'm suing

17   changes.  It doesn't affect my rights as a creditor.  In any

18   event, the defendant should not benefit from the fact they

19   created a convoluted structure and defrauded at least three

20   sets of insurance companies that are now seeking to enforce

21   their rights against the Lindberg empire.

22           Your Honor, plaintiffs have pled their fraud and

23   RICO claims with sufficient particularity.  Movants assert

24   that we have not pled, and Mr. Pace raised this issue

25   earlier in his argument, we have not pled the who, what,

1    when and where required for fraud claims.  Nothing could be

2    further from the truth.  The who is Mr. Lindberg, his senior

3    decision-makers and the hundreds of affiliates through which

4    the debtors' pilfered funds flowed and which were

5    misrepresented by Lindberg as legitimate counterparties for

6    the debtors.

7         As detailed in the complaint, the what is

8    egregious self-dealing while acting as the debtors'

9    fiduciaries.  And the complaint states, I don't know how

10   many times, that the fraudsters were fiduciaries and owed

11   fiduciary duties to the debtors.  Lindberg and his

12   co-conspirators engaged in a vast and intricate fraudulent

13   scheme to drain over $500 million of liquid assets from the

14   debtors.  They caused these liquid assets to be transferred

15   through a convoluted and opaque network of hundreds of

16   Lindberg affiliates, disguising these fraudulent transfers

17   as legitimate loans and equity investments.  They then

18   utilized the proceeds for one or more of three purposes,

19   none of which were of any benefit to the debtors: one, to

20   invest in unrelated businesses for Lindberg's benefit; two,

21   to pay exorbitant bonuses and other fees to the fraudsters;

22   and three, to pay Lindberg's personal expenses, including

23   multiple mansions, two private jets, a 200-plus-foot yacht,

24   egg donors and parties in Las Vegas.

25         The when, as detailed in the complaint, is 2017

Page 78

1    through 2019.  The complaint provides the relevant dates for

2    all of the representative transactions during this

3    timeframe, as well as the dates of the communications among

4    the defendants and other employees of the Lindberg empire

5    orchestrating the transfers.

6            The where is Durham, North Carolina, where Global

7    Growth, the ultimate holding company, was based and where

8    Lindberg and the senior decision-makers resided.  Also

9    Malta, where Standard Advisory Services Limited, which

10   requires a called SASL, the acronym S-A-S-L, was based, and

11   other jurisdictions specified in the complaint.

12           Rule 9(b) does not require plaintiffs to identify

13   every detail of every transaction.  Rather, the JPLs have

14   met their pleading (indiscernible) by providing details

15   specific enough to give the defendants notice the particular

16   misconduct so that they can defend themselves.  In fact, the

17   complaint provides multiple representative sham transactions

18   or each of the four debtors and describes the representative

19   transactions in excruciating, if not nauseating, detail.

20           A handful of the sham transactions detailed in the

21   complaint are summarized on Pages 7 through 11 of our

22   opposition brief.  These allegations demonstrate the play by

23   play mechanics and purpose of each sham transaction, the

24   specific bank accounts and wires used to complete each sham

25   transaction, the wrongful benefits obtained by Lindberg, the

1   senior decision-makers and other Lindberg affiliates,

2   including the absence of any rational benefit to the

3   debtors, companies to which Lindberg and his senior

4   decision-makers owed fiduciary duties and the resulting harm

5   the sham transactions caused to the debtors, their

6   policyholders and similar stakeholders.

7          For instance, Paragraphs 1183 through 1189 detail

8   how North Star was robbed of $17 million in liquid assets in

9   exchange for a sham preferred equity investment in Lindberg

10  affiliate and RICO defendant Triton, and how the cash was

11  used for the benefit of a multitude of Lindberg affiliates,

12  including the personal expense companies, all of which was

13  of absolutely no benefit to North Star.  The chart in

14  Paragraph 1188 shows how North Star's funds flow through

15  more than 20 Lindberg affiliates, and the preceding

16  paragraph explains those affiliates' involvement in this

17  particular -- one particular fraudulent transaction.

18         Plaintiffs provide this particular in part by

19  quoting from and reciting a plethora of documents,

20  including, without limitations, emails among Lindberg, his

21  senior decision-makers and other employees of the Lindberg

22  affiliates, deposition testimony of such individuals, bank

23  records and documents memorializing the fraudulent

24  investments.  Nothing more is required of plaintiffs.  If we

25  had to detail every facet of over 100 fraudulent transfers,

Page 80

1    plus hundreds of subsequent fraudulent transfers through

2    multiple layers of Lindberg affiliates, the complaint would

3    run to thousands of pages.  Five hundred pages is more than

4    enough to put the defendants on notice.

5         The complaint underscores these allegations with

6    the identification of specific instances where Lindberg and

7    the senior decision-makers decline to answer material

8    questions posed to them concerning their acts and omissions

9    relating to these sham transactions based on their Fifth

10   Amendment privilege against self-incrimination during their

11   Rule 2004 testimony.  An adverse inference from each

12   invocation is appropriate, especially given Lindberg's role

13   as a fiduciary of the debtors and that an attorney of his

14   choosing represented him throughout the Rule 2004

15   examination.

16        Contrary to Lindberg's assertion, plaintiffs need

17   not identify specific false or misleading statements because

18   our fraud claims are based on Lindberg's fraudulent scheme

19   to conceal the fact that he and his cohorts were depriving

20   the debtors of all their liquid assets in exchange for

21   worthless investments in related parties.  Our detailed

22   allegations of fraud are backed by indictments and criminals

23   convictions arising from the same frauds alleged in our

24   complaint, as well as consent judgments and admissions

25   relating to the frauds alleged in our complaint.

1           As described in Paragraphs 44 through 49 of our

2     complaint, on December 22, 2022 -- December 22 in the year

3     2022, Chris Herwig pled guilty to conspiracy to deformity

4     the United States, including underlying federal crimes of

5     wire fraud, money laundering and investment advisor fraud.

6     The bill of information alleged inter alia that Herwig, Solo

7     and Lindberg engaged in a series of sham repo agreements

8     totaling nearly $96 million.  That transaction, those sham

9     agreements, was a fraud on PBLA that is the subject of our

10    complaint, and it's one of our representative transactions.

11          As described in Paragraphs 50 to 53 of our

12    complaint, Devin Solo entered into a deferred prosecution

13    agreement with the United states on January 23, 2023.  In

14    it, he admitted guilt to conspiracy to defraud the United

15    States and all underlying crimes in exchange for deferred

16    prosecution and his promise of full cooperation with the

17    federal government's ongoing investigation.  The criminal

18    charges against Solo mirror the civil fraud and RICO claims

19    in the JPLs' complaint.

20          As described in Paragraph of 1579 of our

21    complaint, on July 20 -- excuse me, on July 3, 2023, Herwig

22    entered into a consent judgment against himself in a civil

23    regulatory enforcement action brought by the SEC.  That

24    consent judgment relates directly to the racketeering

25    enterprise operated, advanced and perpetuated by Herwig, the

Page 82

1    RICO defendants and the facilitating persons to the direct

2    harm of the debtors.  As one example, the repo transactions

3    involving PBLA alleged in the JPLs' complaint are at the

4    core of the allegations and claims for which Herwig

5    consented to judgment.

6          We also had admissions of the movants' joint

7    tortfeasors in our case.  At ECF Number 332 of this court's

8    docket is the consent to judgment of defendant Devon Solo,

9    pursuant to which he admitted to liability under 13 counts

10   in the JPLs' complaint, including several fraud counts,

11   breach of fiduciary duty and all five RICO counts under both

12   federal and North Carolina law.  Mr. Solo's consent to

13   judgment also contains admissions of many of the material

14   allegations of the complaint, including that Lindberg and

15   the senior decision-makers made all decisions concerning the

16   debtors' investments, that the Bermuda executives were kept

17   in the dark and had no control over the debtors' assets,

18   that Lindberg initiated transactions to get money to

19   affiliates needing cash or to himself for personal expenses,

20   and that 100 percent of the debtors' investments were with

21   Lindberg affiliates.

22          Mr. Solo also admitted to most of the associated

23   sham transactions, including the repos and other

24   representative transactions set forth in the complaint.  At

25   ECF Number 479 is the stay in cooperation between the JPLs

Page 83

1   and Christa Miller, former CFO of Global Growth, and Ms.

2   Miller's accompanying declaration in which she admits many

3   of the material allegations of our complaint, including the

4   lack of corporate separateness, commingling of assets and

5   insolvency.

6          At ECF Number 501 is the stay and cooperation

7   agreement between the JPLs and Eric Bostic and Mr. Bostic's

8   accompanying declaration, in which he admits many of the

9   material allegations of the complaint, including failure to

10  respect corporate separateness, commingling of assets,

11  diversion of corporate funds for Mr. Lindberg's personal

12  expenses, the debtors' insolvency and the representative

13  transactions underlying the fraud and RICO claims.

14         We would ask the court to take judicial notice of

15  the Solo consent to judgment and the Miller and Bostic

16  cooperation agreements and declarations.

17         For intentional fraudulent transfer claims, Rule

18  9(b)'s heightened pleading standard requires the complaint

19  to specify, one, the property subject to the transfer; two,

20  the timing and, if applicable, frequency of the transfer;

21  and three, the consideration paid with respect thereto.  In

22  re Saba Enterprises Inc., 421 B.R. 626 (Bankr. S.D.N.Y.

23  2009).

24         Plaintiffs have met this standard.  Plaintiffs

25  have led the property subject to the fraudulent transfers,

1    including the exact dates for the transfers, the amount of

2    the transfers, associated bank account numbers and wire

3    transfer identifiers.  Plaintiffs' allegations further

4    detail the consideration paid or absence thereof for each

5    transfer.  For example, the debtors' exchange of blue chip

6    liquid assets and cash in exchange for worthless, opaque

7    sham investments in a Lindberg affiliate with no rational

8    economic benefit to the debtors.

9            The intent element of an intentional fraudulent

10    transfer claim can be satisfied for purposes of Rule 9(b),

11    so long as plaintiff alleges facts that give rise to a

12    strong inference of fraudulent intent.  Saba Enterprises, at

13    642.

14            This strong entrance is established by where a

15    plaintiff alleges facts demonstrating certain badges of

16    fraud which are enumerated on Page 13 of our brief.  Again,

17    Saba, and also Sharp International Corp. v. State Street

18    Bank, 403 F.3d 43 (2d Cir. 2005).

19            Plaintiffs successfully pled all the badges of

20    fraud, thus underscoring the above elements and fraudulent

21    intent.  This includes, one, inadequate consideration; two,

22    Lindberg and his senior decision-makers' fiduciary

23    relationship to the debtors; three, Lindberg, his senior

24    decision-makers' and the Lindberg affiliates' retention of

25    the subject property which they employed for both personal

1    enrichment and to meet the cash needs of unrelated Lindberg

2    affiliates; four, the transactions, both individually and in

3    the aggregate, pillaged the debtors' liquid assets, causing

4    their insolvency and ultimate liquidation; five, a general

5    credit chronology of the subject transfers, including a

6    concerted effort to acquire and pillage insurance companies

7    like the debtors; six, Lindberg, his senior decision-makers

8    and the Lindberg affiliates actively disguised the

9    transactions to mislead the debtors and their regulators,

10   including the use of a complex web of shell companies and

11   other authorities as a means of secreting the transferred

12   assets; and seven, the unusualness of the transactions and

13   the resulting so-called investments, including that none

14   were appropriate investments for insurance companies like

15   the debtors.

16          Moreover, as the court noted earlier in the day,

17   courts have taken a more liberal view when examining

18   allegations of actual fraud that are pled by a bankruptcy

19   trustee in the context of a fraudulent conveyance, since the

20   trustee is an outsider to the transaction who must plead

21   forth from secondhand knowledge.  In re Saba Enterprises,

22   324 B.R. 641.

23          For the same reasons, plaintiffs have sufficiently

24   pled their constructive fraudulent conveyance claims, Counts

25   5 and 6, which involve the same predicate acts but which are

Page 86

1    not subject to Rule 9(b)'s heightened pleading standards.

2    Contrary to the assertion of movants, the JPLs have

3    adequately pled that they did not receive a reasonably

4    equivalent value in exchange for the fraudulent transfers

5    identified in the complaint.  The fact that in some

6    instances the debtors received some consideration does not

7    make that consideration reasonably equivalent, nor does the

8    fact that the debtors received some interest payments or

9    dividends with respect to the sham investments undermine the

10   JPLS' claims.

11           Just like in a Ponzi scheme, the fraudsters need

12   to pay off investors who are then entitled to cash to keep

13   their fraud hidden and maintain the existence of the scheme.

14   Receiving a few million dollars of interest on account of

15   hundreds of millions of dollars paid for fraudulent

16   investments is not reasonably equivalent value and does not

17   take these transactions outside the realm of properly pled

18   fraudulent transfers.

19           Next, the complaint does not engage in

20   impermissible group pleading because Lindberg controlled his

21   affiliates and used them as a single enterprise to

22   perpetuate fraud on the Bermuda insurance companies.

23           Lindberg's group pleading argument arises from a

24   fundamental misapprehension of a JPLs' complaint.  This is

25   not a case where a plaintiff is lumping claims against a

Page 87

1     group of unrelated defendants, nor is it a case asserting

2     claims against a group of nearly related defendants.  This

3     is a case against doubly indicted Lindberg and his hundreds

4     of shell companies and other affiliates which he owned,

5     controlled and operated as a single enterprise, one used by

6     Lindberg and his senior decision-makers to commit and

7     disguise vast set of frauds against the debtors.

8           This single enterprise is not only central to the

9     alleged fraud and RICO claims, it also gives rise to

10    plaintiffs alter ego and veil piercing claims.

11          Lindberg's group pleading argument also ignores

12    the fact that two or more persons can engage in a fraudulent

13    scheme together.  In fact, it would be impossible for one

14    person to consummate the fraudulent scheme described in a

15    complaint.  Here, as alleged in our complaint, Lindberg and

16    the senior decision-makers worked together with hundreds of

17    shell companies and other Lindberg affiliates to wrongfully

18    deprive the debtors of their assets.  These allegations

19    further show that Lindberg and the senior decision-makers

20    use this enterprise to provide perpetuate a vast set of

21    frauds against the debtors, including scores of sham

22    transactions aimed at extracting cash from the debtors for

23    the benefit of Lindberg, the senior decision-makers and

24    Lindberg affiliates.  These allegations also detail the

25    enterprise's complex and opaque web of shell companies,

Page 88

1    other Lindberg affiliates, a complexity Lindberg and his

2    senior decision-makers knowingly developed and exploited to

3    disguise and perpetuate their fraudulent scheme.

4         This included creating complex and opaque

5    investment structures, often involving dozens of Lindberg

6    affiliates for any given transactions aimed at disguising

7    sham investments at Lindberg affiliates.  The Triton

8    transaction I referred to earlier involved over 20 Lindberg

9    affiliates, obscuring the debtors' so-called investments in

10   layer of Lindberg affiliates and directing cash resulting

11   from a debtor's investment to the bank account of a host of

12   Lindberg affiliates, which then directed such cash to other

13   Lindberg affiliates, including Lindberg's personal expense

14   companies.

15        The 646 Lindberg affiliates about which the

16   movants complain are undeniably part of the enterprise.

17   They fall under one or more categories of it, including as

18   counterparties to one or more of the debtors' so-called

19   investments, as subsequent transferees with respect to these

20   fraudulent transfers, or as subsidiaries of one or more of

21   Lindberg's major holding companies, such as Global Growth.

22        The allegations detailing this are specific and

23   overdose overwhelming.  They include Lindberg's practice of

24   treating cash and assets of the enterprise, including those

25   of the debtors, as Lindberg's own money that Lindberg and

Page 89

1    his senior decision-makers would either raid, commingle and

2    direct to any purpose, including other Lindberg affiliates

3    then needing cash, schemes to defraud or mislead insurance

4    regulators, and to fund Lindberg's personal expenses.

5            The allegations also detail how Lindberg and his

6    senior decision-makers operated this enterprise with no

7    regard to corporate separateness or formalities.  The

8    complaint at Paragraphs 1095 to 1133 details Lindberg's

9    domination and control of the Lindberg affiliates,

10   particularly Lindberg and his senior decision-makers' serial

11   failure to respect corporate separateness and abide by

12   corporate formalities.

13           A simple and specific example is the testimony of

14   Sandy White, Global Growth's vice president and corporate

15   treasury until 2020, who addressed Lindberg's practice of

16   looking for available cash in Lindberg affiliates' operating

17   accounts and causing it to be "swept up" to Global Growth

18   and then transfer it to Lindberg's personal expense

19   companies.  Complaint, at 1141.

20           The complaint alleges that Ms. White testified

21   that Lindberg sent money directly to his personal expense

22   companies when he needed money and that she assisted with

23   the sweeping up cash since, "It was all within the Greg

24   world.  I just did it because it was all his money."

25   Complaint, at 1141.

Page 90

1            The complaint alleges that the senior

2       decision-makers also echoed this sentiment in written

3       correspondence between themselves.  For instance, at

4       Paragraph 1127, the complaint quotes a November 2018 email

5       from Devon Solo stating that, "It ultimately is all the same

6       cash," in response to an urgent need to move money between

7       Lindberg's affiliates.

8            Sandy White's testimony cited in Paragraph 1111 of

9       the complaint highlighted the absence of internal processes

10      and procedures for the so-called investments concerning the

11      debtors, including the lack of written policies for

12      intercompany transfers.  At Paragraph 1116, the complaint

13      cites Ms. White's testimony regarding Lindberg's regular

14      practice of moving money between Lindberg affiliates when

15      one affiliate "did not have enough money to pay a vendor or

16      a debt."

17           As another example, at Paragraph 1113, the

18      complaint alleges that the senior decision-makers were often

19      the only signatories for all parties to a transaction

20      involving the debtors' so-called investments.  At Paragraph

21      1102, the complaint alleges that Lindberg and his senior

22      decision-makers intentionally kept the debtors' Bermuda

23      employees in the dark as to how the debtors' revenue and

24      reserves were being diverted.

25           This is important and counters Mr. Pace's early

Page 91

1      argument that, oh, we allege in the complaint, Scott Boug,

2      who was president of North Star and they had all these

3      employees.  Yeah, there was a legitimate business there.

4      They were selling insurance products to policyholders.  They

5      were receiving hundreds of millions of dollars and it was

6      all looted by Lindberg.  But there was a real business under

7      there.  There was real cash under there.  Otherwise there

8      wouldn't be a fraud.

9            But Mr. Boug wasn't calling the shots.  The shots

10     were called, as alleged in the complaint repeatedly, from

11     the senior decision-makers in Durham, North Carolina.  At

12     Paragraph 1156, the complaint shows how Lindberg and his

13     senior decision-makers had total control of the debtors'

14     investments, with all decision making occurring outside the

15     purview of the debtors' executives.

16           Lindberg's invocation of his Fifth Amendment

17     privilege against self-incrimination during this pre-

18     complaint Rule 2004 examination further underscores these

19     allegations.  As cited extensively in the complaint and

20     Pages 18 through 19 of our opposition, Lindberg invoked his

21     Fifth Amendment privilege in response to material questions

22     with respect to his diversion of the cash and other assets

23     to his personal expense companies, the commingling of

24     assets, his practice of raiding the debtors' and Lindberg

25     affiliates whenever they had cash and his failure to respect

Page 92

1    corporate separateness.

2         A plaintiff circumvents concepts like claim

3    lumping and group pleading, whereas here the complaint

4    alleges alter ego liability.  This is true even in the

5    context of Rule 9(b)'s heightened pleading standards for

6    fraud.  In United States v. TEVA Pharmaceuticals, 2016 WL

7    750720, a Southern District of New York decision cited on

8    Page 20 of our brief, the court rejected defendant's motion

9    to dismiss a plaintiff's fraud claims on the theory that the

10   complaint had failed to distinguish each defendant's

11   fraudulent acts.  The court found that the complaint

12   sufficiently alleged that the defendants participated in the

13   fraud as it alleged that the defendants were agents and

14   alter egos of each other, including that they operated as a

15   single joint entity and integrated enterprise.  The TEVA

16   court opined that, "Where a complaint alleges a legal

17   relationship between four defendants, that makes the acts of

18   one attributable to each.  Rule 9(b) does not require

19   plaintiffs to allege a specific connection between the

20   fraudulent representations ... and particular defendants."

21         Similarly, in Ponzio v. Mercedes Benz, cited on

22   Page 20 of our brief, the court denied a motion to dismiss

23   plaintiffs' fraud claim based on purported group pleading,

24   reasoning that plaintiffs' claims could be sustained based

25   on their allegations that defendants are joined in a

Page 93

1    corporate structure and acted as alter egos of each other.

2    In so holding, the court emphasized where a complaint

3    alleges fraudulent concealment perpetrated by sophisticated

4    corporate entities that are related to each other, a

5    plaintiff need not distinguish the specific roles that each

6    entity played in the fraudulent concealment in order to meet

7    the Rule 9(b) standard.

8          The complaint's allegations also easily satisfy

9    the pleading requirements for plaintiffs' alter ego and veil

10   piercing claims, which are Counts 17 and 18.  Under North

11   Carolina law, piercing the corporate veil is appropriate

12   where the corporation is "a mere instrumentality or alter

13   ego" of the dominant actor.  That's known as the

14   instrumentality rule.  See Estate of Hearst ex rel Cherry v.

15   Moorland, cited on Page 23 of our brief.

16         Piercing the corporate veil requires the

17   satisfaction of three elements: one, complete domination and

18   control; two, use of such control to commit fraud or

19   wrongdoing; and three, proximate cause of the injury or

20   unjust loss.  Estate of Hearst, Glenn v. Wagner, both cited

21   on Page 23 of our brief.

22         Regarding the first element, complete domination

23   and control can be found through more than "just holding a

24   majority or complete stock control."  It also extends to

25   controlling the finances, policies and business practices of

Page 94

1    the corporation in relation to the transaction that is under

2    scrutiny, inadequate capitalization of the entity,

3    noncompliance with corporate formalities, no independent

4    identity and excessive fragmentation of a single enterprise

5    into separate corporations.  See East Market Street Square,

6    v. Ty Corp Pizza and Glenn B. Wagner, both cited on Page 23

7    of our brief.

8              That's exactly what the plaintiffs have alleged

9    and what Messrs. Solo and Herwig -- sorry, Solo and Bostic

10   have admitted to in the deals that we did with them which

11   were -- which I cited to earlier on the court's document.

12   Other factors that may be considered include insolvency of

13   the debtor corporation, siphoning of funds by the dominant

14   shareholder, nonfunctioning of other officers or directors

15   and absence of corporate records.  Again, Glenn B. Wagner

16   and again, that's what we've alleged in the complaint, and

17   that's what Mr. Lindberg's co-defendants have admitted to.

18             Plaintiffs easily satisfy these requirements.

19   Regarding the first element, plaintiffs' allegations

20   demonstrate Lindberg's ownership and control of the Lindberg

21   affiliates and the debtors, Lindberg and his senior

22   decision-makers' control over the finances of the Lindberg

23   affiliates and the debtors, the failure to respect corporate

24   separateness and the absence of corporate formalities and

25   corporate records, the absence of independent leadership in

Page 95

1    this enterprise, aside from Lindberg and his senior

2    decision-makers, excessive corporate fragmentation for 900

3    entities, including the serial use of multiple layers of

4    opaque corporate structures and siphoning of funds for the

5    benefit of Lindberg and its cohorts.

6            Regarding the second and third elements of veil

7    piercing claims, plaintiffs' allegations include the

8    representative transactions detailed at length.  The

9    representative transactions detail at length how Lindberg

10   and a senior decision-makers used the enterprise to commit

11   fraud and other wrongs, and how those misdeeds were the

12   proximate cause of the debtors' injuries.

13           Moreover, the fact that through today at least,

14   Lindberg, GGHI and 600 or 700 other defendants are

15   represented by the same counsel underscores our ultimate

16   allegations and claims concerning veil piercing and alter

17   ego.

18           Nor should this court credit movants' contentions

19   that plaintiffs' allegations do not put them on notice of

20   the claims against them.  These contentions are the

21   definition of a self-created hardship.  Lindberg created and

22   manipulated an intentionally opaque, disjointed and vast web

23   of companies as part of a central part of a fraudulent

24   scheme that he and his co-defendants exploited to defraud

25   the debtors, their regulators, policyholders and similar

1    stakeholders.  Lindberg and his hundreds of companies cannot

2    now rely on the intentionally opaque structure that they

3    engineer to fault the plaintiffs.  It is axiomatic that

4    movants, with the assistance of Lindberg and their counsel,

5    will be in a position to address and rebut the allegations

6    against particular movants in the normal course of

7    discovery.

8              The United States Securities and Exchange

9    Commission filed an action in the United States District

10   Court for the Middle District of North Carolina in 2022,

11   Case Number 22-cv-00715 against Mr. Lindberg, his affiliate

12   SASL and Chris Herwig.  The SEC action is described in

13   Paragraphs 27 through 39 of our complaint.  The SEC action

14   arises from the fraudulent scheme orchestrated by Lindberg

15   and others to defraud PBLA and the North Carolina insurance

16   companies, contains many allegations similar to the

17   allegations contained in our complaint, including the

18   prepurchase agreements and challenges the sham repos that we

19   challenged in our complaint.

20             Lindberg and SASL separately moved to dismiss the

21   SEC's complaint, alleging inter alia failure to plead fraud

22   with particularity and impermissible group pleading.  The

23   district court summarily disposed of both motions by orders

24   dated December 12, 2022, and January 6, 2023.  The entry of

25   the orders denying the motions to dismiss the SEC complaint

Page 97

1     is referenced in Paragraph 35 of our complaint.

2          We would ask the court to take judicial notice of

3     the orders dismissing the motions by Mr. Lindberg and SASL.

4     If you'd like, Your Honor, I can hand up copies.

5          THE COURT:  Yes.  That's fine.  You may approach.

6          MR. KAJON:  May I approach?

7          THE COURT:  Yes, you may approach.

8          MR. KAJON:  To the extent that the complaint lacks

9     specificity as to the 646 Lindberg affiliates, it is a

10    result of movants' wrongful conduct.  Plaintiffs allege that

11    the debtors' funds were fraudulently transferred through

12    multiple Lindberg affiliates to prop up unrelated entities,

13    pay exorbitant bonuses and other fees and/or to fund

14    Lindberg's lavish lifestyle.

15         The JPLs assert claims to recover both the initial

16    fraudulent transfer as well as the subsequent fraudulent

17    transfers to the other Lindberg affiliates.  See the

18    complaint generally at Paragraphs 1360 and 1134 to 39, at

19    Paragraphs 1815 to 1831 for Count 4, 1832 to 44 for Count

20    5, 1845 to 57 for Count 6, and 1903 to 1910 for Count 11.

21         Virtually all the debtors' investment

22    counterparties were simply shell companies, and the

23    investment proceeds were immediately transferred to other

24    Lindberg affiliates.  See complaint generally at Paragraphs

25    17, 19 and 25, Pt paragraphs 1172 through 1189 for the

1    Triton transactions and at Paragraphs 1421 through 1428 for

2    AFA transactions.

3           As a direct result of the movants' refusal to

4    comply with this court's discovery orders issued under

5    Bankruptcy Rule 2004, the plaintiffs lack complete

6    information concerning the fraudulent transfer of the

7    debtors' assets, as we alleged in the complaint at

8    Paragraphs 13, 18 and 63, including the identity of all

9    initial and subsequent transferees.  See complaint at

10   Paragraph 1186, which alleges that as part of the Triton

11   transaction, $200,000 was transferred to an unknown

12   (indiscernible) global entity for unspecified funding needs

13   and Paragraph 1320, which references a PBLA repo transaction

14   where two transfers totaling $333,306 was sent to unknown

15   entities.

16          Movants are trying to use their refusal to provide

17   the subpoenaed documents as grounds for dismissal for lack

18   of specificity.  This argument fails for one simple reason,

19   were the debtors' records or documents actually produced in

20   pre-complaint discovery provided the plaintiffs with details

21   to allege fraudulent transactions, the complaint of alleged

22   in granular detail those movants that received the initial

23   and subsequent transfers.  Again, I would point the court to

24   the Triton transaction in Paragraph 1188, where we show how

25   the money flowed through 20 Lindberg affiliates.

Page 99

1           Denial of the motion and commencement of discovery

2    will allow plaintiffs to seek discovery concerning the

3    subsequent transferees that the movants should have produced

4    in 2022 pursuant to the various Rule 2004 orders entered by

5    this court at Docket Numbers 285, 287.

6           Movants should not benefit from their

7    noncompliance with court orders and use that noncompliance

8    as a basis for dismissal of complaint.  See Strategic

9    Capital Bancorp v. St. Paul Mercury Insurance Company, cited

10   on Page 25 of our brief.

11          Next plaintiffs have sufficiently pled their civil

12   RICO claims.  Movants argue that plaintiffs' civil RICO

13   claims do not satisfy Rule 9(b)'s heightened standard for

14   pleading fraud.  However, movants ignore the fact that the

15   predicate acts for RICO incorporate and rest upon the same

16   specific sham transactions as plaintiffs' fraud claims,

17   which, as already discussed, have been pled with adequate

18   particularity.

19          Movants argue that civil RICO allegations are

20   insufficient in two respects: one, that the allegations do

21   not establish a RICO enterprise; and two, that the

22   allegations do not establish a pattern of racketeering

23   activity.  Those arguments ignore the allegations in the

24   complaint and disregard settled RICO law.  The sufficiency

25   of a civil RICO claim is judged in accordance with the

Page 100

1    notice pleading requirements of Rule 8(a).  SKS

2    Constructors, Inc. v. Drinkwine, 458 F.Supp.2d 68, Eastern

3    District of New York, 2006.

4         "To establish a RICO claim, a plaintiff must prove

5    a violation of the RICO statute, an injury to business or

6    property, and that the injury was caused by the RICO

7    violation."  Alix v. McKinsey & Company, 23 F.4th 196 (2nd

8    Circuit, 2022).

9         The first element is satisfied through seven

10   constituent elements: one, that the defendant, two, through

11   the commission of two or more acts, three, constituting a

12   pattern, four, of racketeering activity, five, directly or

13   indirectly invests in or maintains an interest in or

14   participates in, six, an enterprise, seven, the activities

15   of which affect interstate or foreign commerce.  Martin

16   Hilti Family Trust v. Knoedler Gallery, 137 F.Supp.3d 430

17   (S.D.N.Y. 2015).

18        Plaintiffs have sufficiently pled a RIC

19   enterprise.  An enterprise is defined under 18 USC Section

20   1961(4), as any individual, partnership, corporation,

21   association, other legal entity, and any union or group of

22   individuals associated in fact, although not a legal entity,

23   an enterprise need not be a form of legal entity, nor must

24   it have a hierarchical structure or chain of command.

25   "Rather, it may consist of a group of persons associated

Page 101

1    together for a common purpose of engaging in a course of

2    conduct, the existence of which is proven by evidence of an

3    ongoing organization, formal or informal, and by evidence

4    that the various associates function as a continuing unit."

5    Equinox Gallery Limited v. Dorfman, 306 F.Supp.3d 560

6    (S.D.N.Y 2018).

7            The broad definition has a wide reach, and the

8    very concept of an association, in fact, is expansive.

9    Martin Hilti, 137 F.Supp.3d, at 474.

10           It has, at a minimum, three structural features: a

11   purpose, relationships among those associated with the

12   enterprise, and longevity sufficient to permit these

13   associates to permit the enterprise's purpose.  Equinox, at

14   570.

15           Plaintiffs' allegations meet the three structural

16   features of a racketeering enterprise.  See complaint, at

17   Paragraphs 1576 through 1600, 1604 to 17.

18           Regarding the members of the racketeering

19   enterprise, including their relationships and individual

20   roles in advancing it, the allegations explain that Lindberg

21   and his senior decision makers were the primary actors who

22   devised, carried out and directed the racketeering

23   enterprise in furtherance of defrauding the debtors.

24   Lindberg, above all others, conceived, led and perpetuated

25   the fraudulent scheme.  Complaint, at Paragraphs 1582 to 84.

1          Herwig and Solo served as Lindberg's chief

2     lieutenant in the daily operation and advancement of the

3     fraudulent scheme.   Complaint, at Paragraphs 1577 through

4     81.

5          Plaintiffs' allegations detail the common purpose

6     of the racketeering enterprise, devising and executing a

7     complex fraudulent scheme intended to drain over $500

8     million from the debtors for the benefit of Lindberg and his

9     affiliates.   Complaint, at Paragraph 1604 to 05.

10          The manner and means of executing that fraudulent

11     scheme is set forth throughout the complaint.   The complaint

12     at Paragraphs 6 through 25 generally describes the vast and

13     intricate fraudulent scheme to drain over $500 million of

14     liquid assets from the debtors and cause these liquid assets

15     to be transferred through a convoluted and opaque network of

16     hundreds of Lindberg employers.   Paragraphs 1040 through

17     1088 describes Lindberg's exploitation of the insurance

18     industry.   Paragraphs 1089 to 94 described Global Growth's

19     organizational structure.   Paragraphs 1095 to 1133 alleged

20     that the RICO defendants failed to respect corporate

21     separateness and abide by corporate formalities.   Paragraphs

22     1134 through 49 describe the diversion of the debtors'

23     assets for Lindberg's personal purposes.   Paragraphs 1150 to

24     56 allege that the RICO defendants deliberately kept the

25     debtors' Bermuda executives in the bar.   These allegations

Page 103

1    also detail overt acts in furtherance of the racketeering

2    enterprise, including specific sham transactions.  See

3    complaint, at Paragraphs 1157 through 1285 for North Star

4    representative transactions, at Paragraphs 1286 to 1443 for

5    PBLA representative transactions, at paragraphs 1444 to 1530

6    for PBIHL representative transactions, and at Paragraphs

7    1531 to 75 for Omnia representative transactions.

8            In their reply, movants assert that we fail to

9    adequately plead each RICO defendant's involvement in the

10   alleged conspiracy as required under Section 1962.  In fact,

11   as previously mentioned, the representative transactions

12   described in the complaint demonstrate each RICO defendant's

13   involvement in the fortune scheme.  The complaint details

14   the RICO defendants' specific roles in advancing and

15   perpetuating the racketeering enterprise.

16           The RICO defendants include the complex web of

17   Lindberg affiliates, some of whose operations were intimates

18   with actual business activity.  Paragraph 1593 alleges that

19   Global Growth serves as the head of the funnel through which

20   debtors' assets flow.  Paragraph 1594 enumerates 22 entities

21   that reported to transact with debtor in one or more of the

22   representative transactions.  Triton is included in this

23   group of RICO defendants and the $17 million fraudulent

24   preferred equity investment that flowed through Triton and

25   about 20 other Lindberg affiliates that I previously

Page 104

1    mentioned is one of the many representative transactions

2    recapitulated in Paragraph 1603 in the RICO section of our

3    complaint.

4           Paragraph 1595 alleges that GBIG Holdings

5    frequently engaged in sham transactions involving the

6    debtors to further the racketeering enterprise.  Paragraph

7    1596 alleges that the company borrowers have at least one

8    unsatisfied obligation to a debtor from a sham loan extended

9    to them, or from the debtors' acquisition of preferred

10   equity fraudulently issued by the company borrowers.

11          Importantly, Judge, we sued over 900 Lindberg

12   affiliates, but there are only about 90 RICO defendants.  We

13   clearly did not take a scattergun approach, as movants would

14   have you believe.  We carefully selected defendants that

15   were deeply involved in the RICO enterprise, including,

16   obviously Mr. Lindberg, his senior decision-makers and

17   Global Growth, but also various Lindberg affiliates that

18   were essential for the enterprise.

19          For example, the whole scheme depended on taking

20   money from the debtors and dressing up each illegal

21   transaction as a legitimate investment.  Therefore, the

22   debtors' investment counterparties were an integral part of

23   the scheme.  Twenty of the debtors' investment

24   counterparties are identified as the company (indiscernible)

25   RICO defendants Paragraph 1596 of our complaint.

Page 105

1            As alleged at length in the complaint, the money

2       fraudulently transferred from the debtors was not actually

3       invested in the company partners.  Instead, the ill gotten

4       gains were quickly funneled through multiple Lindberg

5       affiliates before ultimately winding up with the intended

6       beneficiary, whether an unrelated operating company or a

7       personal expense company.  As detailed in the representative

8       transactions, the company borrower RICO defendants

9       participated in the conduct of the enterprise through

10      execution and delivery of fraudulent documents purporting to

11      be legitimate investments and the improper transfer of the

12      debtors' funds to other Lindberg affiliates in furtherance

13      of the unlawful scheme.

14            Paragraph 1597 of the complaint alleges that

15      individual RICO defendants and facilitating persons often

16      used Academy Financial Assets, LLC, known as AFA in our

17      complaint, to further the racketeering enterprise.  AFA is

18      one of the company borrowers identified in 1596 of our

19      company.

20            Paragraph 1598 alleges that the personal expense

21      companies use cash improperly taken from the debtors to

22      Lindberg's personal enhancement.  Paragraph 1599 alleges

23      that the operating companies obtained cash from the debtors

24      assets through SPVs, fincos and portfolio companies in

25      exchange for fraudulent loans or preferred equity interests.

Page 106

1    Paragraph 1600 alleges that the corporate service entities

2    used cash from the debtors' assets to pay for merger and

3    acquisition advisory services that were never rendered.  The

4    corporate service entity RICO defendants identified in

5    Paragraph 1600 of our complaint include SASL, which was also

6    sued for fraud by the SEC and for RICO violations by the

7    North Carolina insurance companies.

8         Your Honor, I have a demonstrative exhibit that

9    I'd like to hand off that reflects the legal defendants'

10   involvement in the enterprise.  May I approach?

11        THE COURT:  Yes.

12        MR. KAJON:  I just thought it might be a little

13   easier for the court to see this on a piece of paper rather

14   than babbling on and on about it.  I'll just walk you

15   through the first three, and then I'd ask Your Honor to

16   review it at your leisure.

17        The first one we've identified on Page 1 is Global

18   Growth Holdings, Inc., also abbreviated as GGHI in our

19   complaint.  The bullet points are GGHI is Lindberg's

20   ultimate holding company, under which Lindberg and the

21   senior decision-makers principally orchestrated their vast

22   and complex frauds.  GGHI, the parent of all the

23   nonindividual RICO defendants, with the exception of the

24   personal expense companies, which are owned directly by

25   Lindberg, was controlled by Lindberg and the senior

Page 107

1    decision-makers, and is named as a RICO defendant for its

2    role in orchestrating the frauds, including as the company

3    through which the debtors' cash and assets typically flow

4    both inside and outside the enterprise.  I'll dispense with

5    the paragraph citations in the demonstrative, Your Honor.

6              THE COURT:  Okay.

7              MR. KAJON:  Next, GGHI participated in every

8    representative transaction, with resulting unsatisfied

9    obligations to every debtor.  GGHI also arranged hundreds of

10   wire transfers, along with debtors, Lindberg affiliates and

11   the RICO defenders.  The second entity on the demonstrative

12   is GBIG Holdings.  GBIG Holdings is named as a RICO

13   defendant for its participation in the representative

14   transactions, associated unsatisfied obligations to a

15   debtor, and central role in furthering sham transactions

16   involving the debtors at the direction of Lindberg and Solo,

17   who signed closing instructions on behalf of GBIG Holdings.

18   GBIG Holdings played a central role in the SNA Capital

19   promissory note transaction.  At the direction of Lindberg

20   and the senior decision-makers, GBIG Holdings also played a

21   central role in the sweeping of cash within Global Growth.

22   For instance, the Triton transaction, Beaufort Transaction,

23   and (indiscernible) transactions.

24              Third, and this will be the last one I cover on

25   the record, is Academy Financial Assets, or AFA.  AFA is

Page 108

1    named as a RICO defendant for its participation in the

2    representative transactions, associated unsatisfied

3    obligations to a debtor, and as the portfolio company

4    utilized to fulfill the racketeering enterprise.  AFA

5    received a $34 million sham loan from PBLA, the proceeds of

6    which Lindberg and the senior decision-makers directed to

7    (indiscernible), a personal expense company via another

8    loan, later forgiven by AFA.

9           At the direction of Lindberg and his senior

10   decision-makers, AFA also played a central role in sweeping

11   and diverting assets within Global Growth.  See the UCAT

12   transaction and the Triton transaction.  AFA was a RICO

13   counterparty -- repo counterparty under the December 27 repo

14   agreements, which are part of our complaint and part of the

15   criminal indictments.

16          Moreover, as previously mentioned in connection

17   with the group pleading contentions, the JPLs assert veil

18   piercing and alter ego claims, which means that all the

19   nonindividual RICO defendants can essentially be treated as

20   the same defendant.  Paragraphs 1604 through 1605 of the

21   complaint described the longevity of the RICO enterprise,

22   including its multiyear existence, during which the RICO

23   defendants pursued the enterprise's common purpose of

24   devising and implementing the fraudulent scheme.

25          The movants' only rebuttal to this is the

Page 109

1    contradictory contentions that the term RICO defendants is

2    too broad because it contains too many subject definitions

3    of the RICO defendants, and that this amounts to something

4    akin to group pleading.  In the first place, these facts are

5    those that the RICO defendants themselves created and

6    perpetuated.  Second, their attempted breath and sub-

7    definitions argument swallows itself.  Objectionable group

8    pleading is absent here precisely because of the specific

9    definitions of the RICO defendants, definitions that also

10   describe their specific role in the racketeering enterprise.

11        For the same two related reasons, there is no

12   merit to movants' undeveloped string cite to case law

13   concerning broad and conclusory RICO claims on Page 14 of

14   their opening brief.  That includes Kress Construction and

15   the other cases cited thereafter.  Those cases have no

16   resemblance whatsoever to this case, for the JPLs pled all

17   facets of the RICO enterprise, including its membership,

18   activities and fraudulent purpose.

19        Next, the plaintiffs have sufficiently pled a

20   pattern of racketeering activity.  Racketeering activity is

21   broadly defined to accomplish dozens of state and federal

22   offenses known in RICO parlance as predicates.  A pattern of

23   racketeering activity, in turn, is demonstrated by the

24   occurrence of at least two predicate acts within a ten-year

25   period.  Predicate acts must be related and amount to or

Page 110

1      pose a threat of continued criminal activity.

2              Plaintiffs' allegations satisfy these

3      requirements.  The predicate acts alleged in the complaint

4      connect directly to the defendants' multiyear scheme to

5      defraud the debtors.  The representative transactions upon

6      which the predicate acts are partly based bear out a pattern

7      of racketeering activity, with each providing a standalone

8      example as to how the RICO defendants perpetuated their

9      fraudulent scheme.

10             Each of the representative transactions involve

11     the predicate acts of wire fraud, mail fraud, financial

12     institution fraud, money laundering and money transactions

13     and property derived from specified unlawful activity

14     through interstate and foreign commerce.  See the complaint,

15     at Paragraph 1602 and 1603.  See also the complaint, at

16     Paragraphs 15 -- excuse me, 1157 to 1285 for North Star

17     representation, Paragraphs 1286 to 1443 for PBLA

18     representations, Paragraphs 1444 to 1530 for PBIHL

19     representative transactions and Paragraphs 1531 to 1537 for

20     Omnia representations.

21             These allegations further underscore the predicate

22     acts of indictments and admitted felonies of Lindberg and

23     the senior decision-makers, all of which relate to the

24     overarching scheme to defraud set forth in the complaint.

25     See United States Private Sanitation Industrial Association

1    v. Nassau Suffolk, 811 F.Supp. 808 (E.D.N.Y. 1992), which

2    found that guilty pleas in a state court action

3    "conclusively established the defendant committed two

4    predicate racketeering acts" in civil RICO proceedings.

5    That's 811 F.Supp, at 813.

6            Movants' only rebuttal to these overwhelming

7    allegations is their contention that the RICO allegations

8    improperly incorporate by reference prior paragraphs in the

9    complaint.  This argument is at odds with black letter law.

10   Rule 10(c) especially provides a statement in a pleading may

11   be adopted by reference elsewhere in the same pleading.  See

12   Thomas v. JPMorgan Chase and Company, cited on page 32 of

13   our brief, which held that plaintiffs are not required to

14   restate the same facts outlined in a prior section of their

15   complaint for each subsequent claim, and the court will not

16   dismiss the claim simply because plaintiffs incorporate by

17   reference facts stated elsewhere in the complaint.

18           Nor is there any relevant merit in movants'

19   reliance on United States v. International Longshoremen's

20   association, the case where the government attempted to

21   establish its RICO claims by incorporating by reference

22   hundreds of pages of prior pleadings with no guidance as to

23   which specific allegations are intended to be deemed

24   incorporated.

25           That is clearly not our case.  The RICO

1    allegations here incorporate specific, detailed allegations,

2    for example, specific sham transactions and related misdeeds

3    set forth in our complaint.

4              On Page 12 of their reply, movants referred to a

5    recent decision granting in part and denying in part the

6    motion by Lindberg and certain his affiliates to dismiss the

7    RICO claims brought by the North Carolina insurance

8    companies, and Mr. Pace referred to that decision earlier

9    today.  Importantly, none of the claims against the control

10   person defendants were dismissed.  In the North Carolina

11   action, control person defendants include Lindberg, Herwig,

12   Solo, Global Growth, GBIG Holdings, SASL and AFA.  SASL is

13   one of the corporate service entity RICO defendants in our

14   complaint.

15             Moreover, there are two important distinctions

16   between the North Carolina insurance company RICO complaint

17   and our RICO claims.  First, our complaint is farther more

18   detailed, especially with respect to participation in the

19   enterprise by defendants other than the control persons as

20   shown by the representative transactions and the

21   demonstrative exhibit I handed up a few minutes ago.

22   Second, we assert veil piercing and alter ego claims,

23   whereas the North Carolina insurance companies did not do

24   so.  As previously mentioned, alter ego claims mean that all

25   the individual RICO defendants can essentially be treated as

Page 113

1    the same defendant.

2              In November 2023, Chris Herwig admitted liability

3    for all claims, including RICO claims, in the action brought

4    by the North Carolina insurance companies in the United

5    States District Court for the Eastern District of New York,

6    Case Number 23-cv-340.

7              In September 2023, Devin Solo also admitted all

8    RICO allegations and liabilities in the North Carolina

9    insurance company's RICO action.  Solo recently admitted

10   liability under all five of our RICO counts, ECF Number 332.

11   Paragraph 1096 of the complaint alleges that each Lindberg

12   affiliate is controlled, managed and/or operated by Lindberg

13   or as he directed or authorized by the senior decision-

14   makers, which includes Herwig and Solo.

15             Paragraph 1577 of the complaint alleges that

16   Herwig served as Lindberg's right hand in the daily

17   operation, perpetuation and advancement of the RICO

18   defendants' systematic pillaging of each debtor's liquid

19   assets.  Paragraph 1580 of our complaint alleges that Solo

20   served Chris Herwig's right hand in the daily operation,

21   perpetuation and advancement of the RICO enterprise.

22             Herwig and Solo were officers of the nonindividual

23   RICO defendants.  In such capacities, Herwig and Solo caused

24   the nonindividual RICO defenders to execute documents

25   memorializing the sham transactions and participate in the

Page 114

1    improper siphoning of funds from the debtors for the benefit

2    of Lindberg, his personal expense companies, Global Growth

3    and other RICO defendants or Lindberg affiliates.

4            In fact, it is axiomatic that corporations can

5    only act through their agents, here with senior decision-

6    makers, including Herwig and Solo.  As such, the

7    nonindividual defendants precariously liable under RICO for

8    the admitted RICO violations of Herwig and Solo under the

9    doctrine of respondeat superior.  See Board of Managers of

10   Trump Tower at City Center Condominium v. Palazzolo, 346

11   F.3d 432, at 460 (S.D.N.Y. 2018).  In that case, plaintiff

12   pled that the individual defendant's repeatedly claimed in

13   communications with plaintiff that they either owned or

14   controlled one of the defending companies, that in their

15   controlling positions they committed racketeering acts, and

16   that the corporation participated in and benefited from

17   those acts.  As a result, the court determined that

18   plaintiff had met its burden to plead a RICO claim based on

19   vicarious liability.  Our complaint does all that and more.

20   See also Needham & Company v. Access, 2016 WL 43999288

21   (S.D.N.Y. August 12, 2016), where the court held that a

22   defendant corporation can be held vicariously liable because

23   it is a central figure in and benefited from the schemes and

24   that the individual defendants owned and controlled the

25   corporate defendant.

1              Lastly, the movants contend that plaintiffs' RICO

2     claim under 18 USC Section 1962(a), which is Count 45, is

3     insufficient because there are no allegations showing that

4     the RICO defendants participated in the racketeering

5     enterprise as principled within the meaning of Section

6     1962(a).

7              That argument fails for simple reasons.  Section

8     1962 incorporates 18 USC Section 2, and its definition of

9     the term principles with specific reference to the

10    collection of unlawful debt, not a pattern of racketeering

11    activity.  The requirements of 18 USC Section 2 are

12    therefore inapplicable in this case.

13             Your Honor, I'm getting near the end.  I'd like to

14    turn briefly to the movants' Rule 44.1 foreign law argument.

15    Sixteen counts in plaintiffs' complaint arise from Bermuda

16    law.  The movants do not challenge the four counts arising

17    from Bermuda statutes, i.e., the Bermuda Conveyance Act of

18    1983 or the Companies Act 1981.

19             Movants instead challenge the other 12 counts

20    arising under Bermuda common law on the theory that those

21    counts fail to identify foreign law in violation of Rule

22    44.1.  This argument is at odds with the letter and the

23    spirit of Rule 44.1.  Rule 44.1's notice requirements simply

24    provide that the party who intends to raise an issue of

25    foreign law "give notice in his pleadings or other writing."

Page 116

1    Nothing in Rule 44.1 requires a party to specify by the

2    specific statute or rule of foreign law (indiscernible)

3    notice advisory committee note one to Rule 44.1 provides

4    that the party must instead provide "reasonable notice" so

5    as not to unfairly surprise opposing parties.  In the case

6    of Rationis Enterprises of Panama v. Hyundai Nepo Dockyard

7    Company, 426 F.3d 582 (2nd Circuit 2005), the Second Circuit

8    explained that the function of Rule 44.1 is not to spell out

9    the precise contents of law, but to inform the litigants

10   that it is relevant to the lawsuit.

11        It further explained that Rule 44.1 only obliges a

12   litigant to "provide the opposing party with reasonable

13   notice that an argument will be raised.  It need not flesh

14   out its full argument." (indiscernible) 586.  The court

15   reason the parties' pleading of potentially applicable

16   foreign laws will satisfy Rule 44.1 reasonable notice

17   requirements explaining that while it may force the opposing

18   party to conduct further research, such work is hardly the

19   undue surprise Rule 44 seeks to prevent.

20        Plaintiffs' counts sounding in Bermuda law satisfy

21   Rule 44.1's reasonable numbers requirements.  Each count

22   identifies the specific cause of action under Bermuda law

23   upon which it is based, with extensive and detailed actions

24   allegations set forth through the complaint establishing the

25   basis for the claims under Bermuda's law.  The Lindberg

Page 117

1    movants do not contend otherwise.

2         No one in this case has claimed that plaintiffs

3    have failed to properly state a claim under Bermuda law, as

4    was the case in AlphaStar, and the reason the party

5    submitted affidavits from Bermuda law experts.  That's not

6    an issue here.  They haven't said your counts in Bermuda law

7    should be dismissed because you haven't properly pled them

8    in Bermuda law.  They didn't raise that argument.  If they

9    had, then they would have needed to submit an affidavit of

10   Bermuda counsel, which is customary, and we would have

11   submitted an affidavit of Bermuda counsel setting forth what

12   Bermuda law is on that particular count in the complaint.

13   That's not our issue.

14        There is no merit in movants' reliance on Prow v.

15   Holland America Line, 234 F.Supp 530 (S.D.N.Y. 1964).  That

16   case, which predated Rule 44.1's promulgation by two years,

17   involve a specific pleading requirement under a superseded

18   admiralty rule.  It has no bearing whatsoever on this case.

19        The same is true with respect to movants' reliance

20   on In re Fairfield Sentry Limited, 627 B.R. 546 (Bankr.

21   S.D.N.Y. 2021) where the court briefly addressed Rule 44 as

22   one that provides the court with notice as to the

23   applicability of foreign law, including in choice of law

24   determinations.  While the parties actively disputed in that

25   case whether the foreign law or the forum's law apply in

Page 118

1    connection with defendants' dismissal motion, the Fairfield

2    Sentry court reasoned that the plaintiffs' complaint

3    sufficiently showed the application of foreign law and

4    therefore denied the dismissal motion, reasoning the parties

5    were free to reargue the issue at a later stage in the

6    litigation.  The Fairfield Sentry holding has no bearing on

7    foreign issues in this case.

8           There is another foundational flaw to the movants'

9    theory.  The 12 Bermuda law accounts about which the movants

10   complain are Bermuda common law claims.  The idea that

11   plaintiffs are required to identify something more so as to

12   notice their common war claims is farcical and at odds with

13   any known reading of Rule 44.1.  Unsurprisingly, movants do

14   not explain what additional notice they are looking for with

15   respect to the challenged Bermuda claims.

16          In conclusion, Your Honor, I respectfully request

17   that the court deny the motion of Mr. Pace's clients to

18   dismiss the complaint in its entirety.  In the alternative,

19   should the court be inclined to grant the motion, I'd just

20   respectfully request leave to amend their complaint pursuant

21   to Rule 15(a).  Now, I'll answer your questions and then

22   I'll defer to my partner on Edward Mills Asset Management.

23          THE COURT:  Okay.  As you'll know, I have

24   questions.  Okay.  So why don't we start, I guess, with the

25   RICO defendants.  I guess, what is the basis that you're,

Page 119

1    you know -- that the legal basis for not having to allege

2    specific predicate acts for each of the entities you named

3    as a RICO defendant?  Like two predicate acts?  Like, what's

4    the legal basis for that?  Because there is a lot of case

5    law that says even in group pleadings, you have to allege

6    predicate acts by the parties.  And I'm not here talking

7    about the senior decision-makers or Mr. Lindberg.  There's

8    definitely plenty of things alleged about them.  I'm not

9    questioning that.

10           MR. KAJON:  And Global Growth and AFA and GBIG

11   Holdings.

12           THE COURT:  Yeah, exactly.  Right.  I'm really

13   talking about some of the ones that on your demonstrative

14   would be sort of like at the end where there's not -- or

15   even aren't listed on the demonstrative.  But you pointed

16   out there were 90 defendants.  Not everyone's listed.  So

17   what about those where there's really nothing alleged at

18   all?  You know, how do I find -- you know, are you just

19   relying on your veil piercing argument?  Because I find that

20   a little troubling.  It's hard for me to know that, you know

21   -- it's not hard for me to look at some of these entities

22   and see what you allege and say, oh, yeah, there's

23   definitely, like, on its face, a veil piercing argument.  I

24   get that.  Because surely the complaint does allege certain

25   parties where that's clear.  I mean, you just pointed out

Page 120

1    some of them that were involved in a lot of transactions, a

2    lot of decision-making issues, a lot of issues where maybe

3    there would be an argument for veil piercing.

4            But some of these other ones that just aren't even

5    in your demonstrative, where there's nothing specific

6    described about them at all, you know, how do I decide

7    that's a basis there, that they've met the two predicate

8    acts to start with for the RICO decision, or they're somehow

9    exempt from them.  And then how do I just then rely on a

10   veil piercing claim when I don't even know how they fit in

11   the entire Lindberg hierarchy, et cetera?

12           MR. KAJON:  Well, we're certainly relying on veil

13   piercing, Your Honor.  We're relying on the allegations that

14   these entities acted as an enterprise, relying on the

15   vicarious liability argument.  We're relying on the fact, as

16   alleged in our complaint and in our opposition papers, and

17   as stated earlier today, that they did not comply with your

18   Rule 2004 orders, and give us all the documents that would

19   have shown where the money went.

20           THE COURT:  Stop there for a second.  Okay.  I

21   obviously have been living that with you all for the last

22   three and a half years.

23           MR. KAJON:  Right.

24           THE COURT:  So what I know is that I have gotten

25   certifications that this is it, and I've got certifications

Page 121

1      this is it again.  I'll just say it that way.  But what if

2      those documents just don't exist, whether they should or

3      shouldn't.  What if they're, like, destroyed and they don't

4      exist so that maybe the certification wasn't wrong and

5      somebody hasn't complied?  Maybe that's truly.  That they've

6      given us everything that's there.  I'm not saying I know

7      that.  I'm just saying it's possible.  So, you know, you're

8      asking me to decide that there was violations of my.  Of my.

9      I guess, of my orders beyond what I've already determined

10     was.  Was not in compliance with my orders and have already

11     ruled on.  How do I decide there's something else?

12             MR. KAJON:  Well, as a couple.  So, as I mentioned

13     earlier, there were specific instances in the complaint

14     where we showed where millions of dollars went.  The Triton

15     transaction was the one I referred to.

16             THE COURT:  Right.  I get that we don't have the

17     information.

18             MR. KAJON:  But for a few hundred thousand

19     dollars, it went somewhere, but it's not clear.

20             THE COURT:  Right.

21             MR. KAJON:  I get that it went somewhere in the

22     Lindberg Enterprise.  And two, somebody could have answered

23     our questions instead of taking the fifth.  Now he has the

24     right to take the fifth.  Okay.

25             THE COURT:  Yeah.  No, I mean, you're not going to

Page 122

1    get that from the people that are under.  I mean, we know

2    that, and that's an inference I'm allowed to make in that

3    circumstance.  I get that.

4            MR. KAJON:  A court appointed liquidator who

5    doesn't have firsthand knowledge, who gets incomplete books

6    and records, who gets incomplete documents in response to

7    various Rule 2004 subpoenas, who is met with Fifth Amendment

8    assertions against self-incrimination, how can we discover

9    where all the money went?

10           THE COURT:  They went through third-party bank

11   accounts.

12           MR. KAJON:  Okay, and.  But isn't that what

13   discovery's for?  I mean, can't we flesh out our complaint?

14           THE COURT:  Right.  But I, the problem I'm just

15   having is that, you know, yes, there are certain people, for

16   sure, or certain entities in this group, but I have no

17   problem when I look at this and saying, you're making this

18   argument because I think you've alleged enough things.

19   You've alleged enough acts.  Even if you hadn't, I would be

20   entitled to rely on the inferences that you just talked

21   about with respect to, you know, taking the fifth, etcetera.

22   But you get out of this, you know, you get out of the, of

23   the entities that were involved in these transactions that

24   we know about.  And you have a list of these entities that,

25   I'm sorry to say it this way, but they may have been, you

Page 123

1    know, they're just, you know, we have, there were legitimate

2    businesses in this group.  I mean, you just settled, for

3    example, with Cat, because that was a.  Yeah.

4         MR. KAJON:  The operating companies include,

5    including our debtors, were legitimate businesses.  They had

6    their money stolen, maybe.

7         THE COURT:  Right.  But maybe we don't.  In other

8    words, what I'm saying to you is I don't know if they

9    created a new entity and came up with this loan agreement or

10   came up with this, I guess, a preference preferential stock

11   and a preference stock.  If I, if I came up with that

12   preferred stock.  That's what I was trying to say.  I don't

13   know if they did that, if that necessarily means that is

14   part of an overall enterprise that was involved in some kind

15   of fraud, or if I can determine that that is somehow, you

16   know, there was, they had enough of a role that they.  You'd

17   be able to veil piercing based on that.  There are people

18   for sure, or entities for sure.  I can see where there's

19   clearly a veil piercing argument, a question based on that.

20   From what you've argued, you know, that there's, there's

21   certainly enough allegations.  I get that.

22        But where there's nothing, sorry to say it that

23   way, it's hard for me to make something of nothing.  And

24   that's where I go to my next question, which is going to be,

25   you know, is there any case laws you found where someone

Page 124

1     extended that trustee argument to Rico?

2               MR. KAJON:  We haven't found.

3               THE COURT:  Yeah, neither of us.

4               MR. KAJON:  I'd like to go back to the veil

5     piercing for a second.

6               THE COURT:  I don't want to.

7               MR. KAJON:  The dog doesn't want to let go of that

8     bone yet.  But we have not only allegations in the

9     complaint, including based on sworn testimony of Global

10    Growth for all the companies was just treated as, you know,

11    Greg's money.

12              THE COURT:  What does all the companies mean?

13              MR. KAJON:  Affiliates, we have the admissions of

14    Ms. Miller, Christa Miller, that I said this.

15              THE COURT:  List is all the course.

16              MR. KAJON:  And Solo and Bostic about lack of

17    corporate separateness and failure to observe corporate

18    formalities and commingling of funds.  And it's not limited

19    to a few companies.  Our allegation, our complaint that Solo

20    admitted to was Lindberg treated the debtors and all the

21    companies, all the Lindberg affiliates, as defined in the

22    complaint, and the RICO defendants are just a subset of the

23    Lindberg affiliates.  Treated them all like his piggyback.

24    So that's a alleged.  Now, you know, can I prove that case

25    today?  No, but we're not at trial today.  We're here on a

Page 125

1    motion.

2            THE COURT:  I know that.  I understand.

3            MR. KAJON:  I mean, actually might be able to

4    prove that today because we have so many admissions.  But

5    putting that aside, you know, here we're talking about.

6            THE COURT:  There's definitely a lot of evidence.

7            MR. KAJON:  A lot of evidence.

8            THE COURT:  I get that.

9            MR. KAJON:  More evidence than you've ever seen on

10   a twelve v.  Six membership.

11           THE COURT:  Yeah, well, that's nothing.  Anything

12   unusual here is always the same.  Unusual is the.  Is the

13   buzzword here.  And so Mr. Pace's comment that, or anyone's

14   comment that this is an unusual, you know, circle set of

15   circumstances, and there's no case like this, is probably

16   true.

17           MR. KAJON:  I've been involved in dozens of fraud

18   cases over the years.  I've never seen anything like that.

19   I understand Madoff was a joke compared to this.  Madoff was

20   a very simple fraud.  He took in a lot of people.  I get it.

21   It was a big deal.  It was very simple.

22           THE COURT:  Well, I won't comment on my other

23   cases since that's my case now.

24           MR. KAJON:  Oh, sorry, I forgot about that.

25           THE COURT:  Yes.  So I won't comment on that.

Page 126

1    Okay, then I guess my next question for you is on the group

2    pleading issues outside of the RICO defendants.  I think

3    the, you know, there certainly is case law that gives a lot

4    of lenience to trustees in the context of fraud or actual

5    fraudulent conveyance.  And you did, you've obviously

6    alleged badges of fraud.  But my question for you is really

7    outside of that, you know, in the complaint, because there

8    are a lot of things that are, you know, that don't fall into

9    that category.

10           So, for example, the case law doesn't give that

11   leniency, necessarily to constructive fraudulent transfer

12   arrangements because it's an eight a and it's not a nine b

13   standard.  You still have to meet that with respect to any

14   party.  So.  And obviously, you have a lot of other causes

15   of action here that.  Where you've alleged, you know, all

16   the Lindberg affiliates are involved in that aren't going to

17   fall into the fraud, put off all the fraud exception.

18   Fraud, fraud, actual fraud exception.

19           So explain to me why you don't think that you have

20   a problem, then with group pleading in that circumstance.

21   Is it just the veil piercing argument for everything?

22           MR. KAJON:  Well, if I understand your question,

23   are you limiting it to constructive.  Fortunately, no.

24           THE COURT:  I'm asking you and everything

25   constructive.

Page 127

1              MR. KAJON:  Fraudulent transfer claims are pretty

2    simple.  You know, it went from North Star to XYZ.

3    Whatever, right?  So this is not group.  Now, as we point

4    out in our own complaint, in some instances, we can trace

5    the money through multiple entities.

6              THE COURT:  Right, I get that.

7              MR. KAJON:  Including the personal.  You know,

8    where it wound up in the personal expenses.  In some

9    instances, we can't.  Right.  We don't know where the money

10   wound up.  It went from PBLA.

11             THE COURT:  Right, but, you know, it was.

12             MR. KAJON:  We know the initial transfer.  If you

13   get a judgment voiding the fraudulent transfer, then you

14   subpoena his records and you sue the next one.

15             THE COURT:  Right.  Understand?

16             MR. KAJON:  So you're also referencing the.  Just

17   like a common law fraud claim.

18             THE COURT:  I'm actually referencing all of your

19   accounts where you roped in the Lindberg affiliates, where

20   there's nothing specific pled.  That's where my problem is,

21   because I get to, you know, there's some sympathy I have for

22   Mr. Pace's 646 entity argument here, only in the sense that,

23   you know, it's.  Again, this isn't meant in any way with

24   respect to, like, the senior decision makers or Mr. Lindberg

25   or anybody that's got anything fled with specificity, but

Page 128

1    where there's nothing pled with specificity.  And now we're

2    talking about quite a number of other accounts here.  You

3    know, how does that not run afoul of the group pleading

4    rule?

5              I mean, for example, you know, I think one of the

6    examples that was used that's probably reasonable is, you

7    know, an unjust enrichment theory.  For example, like, don't

8    you have to show somebody actually received a benefit, you

9    know, that they were somehow unjustly enriched?  And how do

10   you do that?  Where you have nothing pled anything about

11   that person other than they're in the Lindberg group, sorry

12   to say, that of entities.  So how do you know that they were

13   enriched?

14             MR. KAJON:  Well, you know that, and you don't.

15             THE COURT:  Get to make that assumption.  I get to

16   do on the trustee claims, you know, with respect to fraud, I

17   don't have that leniency.  So what do I do with that?

18             MR. KAJON:  Right.  Well, the issue really boils

19   down to judge, is that Lindberg used hundreds of companies

20   in order to perpetuate this scheme.  If it had been Global

21   Growth, an intermediate company, and then our counterparty,

22   and you say, went from the debtor to company one, two, and

23   then one.

24             THE COURT:  Anybody got something about that?

25             MR. KAJON:  I don't know if you've ever seen the

Page 129

1   corporate chart or the chart I.  That goes on for 50 pages

2   or so.

3             THE COURT:  No, I haven't.

4             MR. KAJON:  Yeah, well, it's.

5             THE COURT:  Someday, I bet I will.

6             MR. KAJON:  Someday you will.  It's a very.  Well,

7   maybe complex.

8             THE COURT:  I could have just reported structure.

9             MR. KAJON:  And so we allege that the money

10  disappeared into the Lindberg affiliates.  In some instances

11  where we actually got the records, we were able to trace it.

12  In instances where we didn't get the records, we know it

13  went at least to the counterparty.  And then maybe one more

14  step.  But sometimes we don't even know beyond the

15  counterpart.

16             But there are allegations, backed up by testimony

17  and admissions and guilty pleas, that it was all one

18  enterprise.  Right?  I mean, Herwig and Solo have admitted

19  to criminal RICO violations that it was one enterprise

20  pulling off this convoluted fraud, to defraud the insurance

21  companies, their policyholders, and to fool regulators.  And

22  that's what this was about.  This is about, oh, look, North

23  Star has this lovely, secured, senior, secured promissory

24  note with the first lien on all the assets of XYZ company.

25  Oh, great.  What does XYZ asset.  You know, what assets does

1    it have?  None.

2          THE COURT:  I understand.  I think where I'm

3    saying, what I'm saying to you and what I'm asking you is

4    really, you know, I get there are circumstances where I get

5    a lot of leeway.  There are certainly counts here where your

6    argument of them being all one matters, but I'm not sure

7    that it matters in some of these other accounts that you've

8    alleged in this complaint, because the elements just don't

9    take that into consideration.  In other words, that's not

10   what the law looks at.  The law looks at.  Did somebody

11   like, yes, you may be able to get the money back on a veil

12   piercing or have them responsible for it on a veil piercing

13   argument, maybe someday.  Some of them.

14          I'm just being hypothetical, but it doesn't mean,

15   again, hypothetical.  I'm not saying any of this is valid,

16   but just saying.  But it does seem to me that you can.  And

17   certainly, you know, it's.  There are elements you have to

18   allege in certain of these causes of action that have to be

19   somewhat specific.  And the fact that you might be able to

20   pierce the corporate bail eventually is just one, one count.

21   But the others, you have to have some specificity.  I can't

22   rely.  I just don't see how I rely on veil piercing for all

23   these things that are either more contractual, for example,

24   or might even be an argument as a defense that there's a

25   contract, for example, like in an unjust enrichment

1    argument, where you might, you know, maybe something was

2    done pursuant to an agreement.  Just being hypothetical.

3    Okay.  So I just -- that's where I have trouble with this,

4    the way that this complaint is written.  I mean, believe me,

5    I can only imagine what it would have to be if it was.  If

6    it was totally specific.  But, yeah, I think it would be

7    impossible.

8            MR. KAJON:  There are many hundreds of.  There may

9    be over a thousand transactions, because each fraudulent

10   transfer, as I showed you the Triton, that was one

11   fraudulent transfer from North Star that went through at

12   least 20 Lindberg affiliates.

13           MR. KOENECKE:  Right.

14           THE COURT:  But I'm less worried about that for

15   the reasons you said, because subsequent transfer, and it's

16   normal that you fall from one to the other to the next.  I

17   mean, that just happens.  And if you know, a chain of it to

18   start with, you just start with that, and then maybe you get

19   to the end, you don't know, and then maybe you try to get

20   more information if you want to, if you haven't collected

21   enough from that point to find it.  I understand that, and

22   that's one of the reasons why we have the concept that we

23   might have litigation on an initial transferee, or even the

24   immediate subsequent transferee.  I'm just being, again,

25   hypothetical.  I know you have chains that go way longer

Page 132

1    than that in a complaint, but just saying, and then you

2    eventually, that's another process that's here, and that's

3    not going to be precluded by this.  That is just once you

4    have to prove something, you have options.

5              But I'm just having some trouble, you know, in

6    some of these others, you know, cause of action.  And I

7    guess the other thing I will say to you is that, you know, I

8    think your argument is right.  And Mr. Pace's argument, I

9    think, also is right on this as well, which is that you both

10   have parts of it that are corrupt.  You know, in terms of

11   what I have to do with some of this law, it's true that --

12   if I don't have more information about foreign law and

13   there's a similar law in our district, then I can just apply

14   our district's law.  That's correct.  It's also not

15   incorrect that judges have looked things up, like in Judge

16   Morris, for example, in Fairfield and other people.  And not

17   surprisingly, we have looked at the law, because I'm trying

18   to understand what the elements are so I can figure out if I

19   have a statute that's similar here or not, you know, not

20   having.

21             MR. KAJON:  Right.

22             THE COURT:  And there are some things that, that

23   don't really fall into that in the common law, necessarily.

24             MR. KAJON:  They haven't alleged insufficiency of

25   the count under Bermuda law.  They only alleged, oh, you

1    should have told us what particular Bermuda law is.  And if

2    you look at the counts, you know, for each one it describes

3    what it affords -- trading Bermuda, whatever.  I don't know

4    all the names off the top of my head, but they're right

5    there under the roman numeral.  And then in the paragraphs

6    for that particular count are pled the elements of that

7    count.  Now, we don't, sometimes we don't cite to a case,

8    but I don't, you know, I don't think you have to.

9            THE COURT:  I'll say sometimes, having looked at

10   it, but.  Okay, it doesn't matter.  I'm not.  But to your

11   point, it's not what I'm here to decide today.

12           MR. KAJON:  It doesn't matter for today's purpose.

13           THE COURT:  It does.

14           MR. KAJON:  They haven't had, they haven't made

15   that argument, or we would have come in with the Bermuda law

16   expert citing, you know, the Lauren Shelley's case from, you

17   know, 1492 or whatever.

18           THE COURT:  Yeah, I know there's some that go

19   back.  I think they do, because we have to go back to

20   England and look at some of the laws.

21           MR. KAJON:  We should all take a field trip to

22   decide.

23           THE COURT:  I don't know.  All right.  Well, let

24   me ask you another question, though.  There, there was an

25   argument that was raised.  That's right.  And I think this

Page 134

1    isn't necessarily just limited to this point.  What about

2    where, what you've brought as a complaint, as accountant,

3    the complaint is really a remedy under the applicable law.

4    Like, for example, constructive trust.

5              MR. KAJON:  Well, again, I don't think they

6    challenge that.

7              THE COURT:  Oh, I don't agree with that.  It

8    wasn't just raised today.  It's in the papers.

9              MR. KAJON:  I think he said that.  I thought he

10   was saying that it applied to the North Carolina insurance

11   companies, and they're a necessary part of that.  The

12   constructive trust count, I know, was against the North

13   Carolina insurance companies.  It was probably another one

14   against the Lindberg affiliates.  But, but no one said,

15   their motion didn't say it should be dismissed because it's

16   not a cause of action recognized.

17             THE COURT:  Yeah, I mean, I hear you.  I, that's

18   not the only one.  I would have probably raised myself.

19   That doesn't matter because I'm stuck with whatever anybody

20   else raised.  But that one was raised, I believe.  I don't

21   know, in the.  I'll have to look at the context.  Okay,

22   let's see what else I was going to ask you.  I think that's

23   it.  I'll hear from Mr. Koenecke next.

24             MR. KAJON:  Thank you.

25             MR. KOENECKE:  Good afternoon, Your Honor.

Page 135

1              THE COURT:  Good afternoon.

2              MR. KOENECKE:  Wade Koenecke, of Stevens & Lee, on

3       behalf of the plaintiffs.  To spare everyone, I'm going to

4       keep this very short, since I think one thing we can all

5       agree, there's been a lot of redundancy so far, particularly

6       as it relates to EMAM.  There's a few points I just want to

7       stress here.

8              The first is, we'd submit that EMAM passes over

9       what the complaint actually says as to it and its role in

10      all this, in the fraudulent scheme.  This is pretty simple.

11      EMAM is a company owned and controlled by Lindberg.  Limburg

12      created EMAM in and around 2018, EMAM played a specific and

13      important role in advancing and disguising Lindberg's large

14      language community.

15             To that end, Lindberg created EMAM for one

16      purpose, to mislead insurance regulators by creating the

17      appearance of disaffiliation with respect to how

18      policyholder funds were invested.  More specifically,

19      Lindberg and the senior decision makers created EMAM to

20      allay concerns from the North Carolina Department of

21      Insurance with respect to Lindberg's regular practice of

22      investing nearly all or all of policyholder reserves and

23      funds in companies affiliated with Lindberg, that is,

24      Lindberg affiliates.  As the court is aware, this practice

25      of investing policyholder funds in affiliated companies has

Page 136

1    a big part of the scheme we've been talking about that the

2    complaint sets forth in detail.  So is the concealment of

3    those affiliated investments.

4           So to accomplish this disaffiliation, Lindberg and

5    his senior decision-makers use EMAM to create these things

6    called special purpose vehicles, which made conduit loans

7    from one of the North Carolina insurance companies or

8    another company to an operating company also owned by Greg

9    Lindberg.  In this scheme, EMAM held a 100 percent voting

10   interest in each SPV.  The purpose of this voting interest

11   was to create an artificial disaffiliation between Lindberg

12   and the loan in question, so that it appeared that these

13   were not, these investments were disaffiliated with

14   Lindberg.

15          As we detail in the restated amended complaint,

16   the SPVs were shams with the whole goal of hiding Lindberg's

17   ownership and control both the lending and borrowing sides

18   of these so called investments.  A brief note.  Defendant

19   Devon Solo, in his consent to judgment.  He entered in this

20   case, I believe, at the beginning of July, even admitted as

21   to how Lindberg used EMAM in this fraudulent scheme.  That

22   is ECF number 332 with regard to solar consent to judgment.

23   The SPVs, along with the later conversion of the SPVs into

24   these financing companies, also known as fincos, were a

25   central part of Lindberg's convoluted and opaque corporate

Page 137

1    structure.  The complaint details at length how these

2    corporate structures, including the SPVs and fincos, played

3    a critical role in perpetuating and advancing sham

4    transactions that eventually harmed the debtors.

5          More specifically, these SPVs and fincos are

6    referenced throughout the complaint.  There's specific

7    transactions dealing with them, one of which is

8    (indiscernible).  It's 1484 to 1486 of the restated

9    amendment complaint.  And it also points the yarrow three

10   representative transaction is another one involving the

11   SPVs.  Due to the fact EMAM holds a voting interest in each

12   SPV, it remained intertwined with the dozens of sham

13   transactions detailed in restated amendment complaint.  As a

14   result of this, it is named in what is now 20 counts in

15   restated amendment complaint.

16         I believe at this juncture, EMAM is challenging 18

17   of them.  EMAM is not challenging the sufficiency of the

18   allegations generally, but just as to it, EMAM as to each of

19   these counts, the main argument being that it's grouped with

20   the Lindberg affiliates and the allegations regarding EMM

21   are somewhat limited, notwithstanding the very material

22   allegations I just went through.

23         We submit that this fails for two principal

24   reasons.  The first is circle back to the joint failing

25   enterprise we have here, and EMAM operating what is

1    essentially as a part of the Lindberg affiliates that

2    operated as essentially one company owned and controlled by

3    Greg Lindberg.  I'm not going to repeat that again, because

4    we've already been through it quite a bit, but that's EMAM

5    falls squarely in there in terms of how it was involved in

6    the enterprise and more specifically, the Lindberg

7    affiliates.

8         The second reason is EMAM cannot overcome the veil

9    piercing claims against the Lindberg affiliates, which,

10   under these circumstances, we believe operates to sustain

11   all of these claims.  If anything, Emam's reply brief, we

12   believe, actually goes a long way in showing how Vale Percy

13   applies here.  And the case that I'm talking about is, I

14   think it's the principal case they reply brief.  And that is

15   Fisher Investment Capital v. Catawba Development

16   Corporation, 689 S.E.2d 143.  And it's a North Carolina

17   appellate division case for 2009.

18        What it talks about is the instrumentality rule

19   and the instrumentality rule is the idea that whether a

20   separate identities of parent and separate identities of

21   parent and subsidiary and affiliate corporations may be

22   disregarded where one entity is an altered ego or mere

23   instrumentality of another entity, shareholder or officer,

24   like regular veil piercing, the instrumentality rule

25   requires a plaintiff to establish three things.  We've been

Page 139

1    through it again already before, but I'll just briefly note

2    this.

3            The first is complete domination and control not

4    only of finances, but of policy and business practices with

5    respect to the transactions specifically attacked the use of

6    that control to commit a fraud or wrong, and that that fraud

7    or wrong resulted in injury to the plaintiffs.  EMAM's

8    principal challenges to the first and second prongs the veil

9    piercing analysis, and they claim that allegations fail to

10   show that the domination of control with respect to any

11   specific transaction at issue, that also includes that

12   Limburg used that control to commit a wrong.

13           We submit that this ignores what the complaint

14   actually says.  Lindberg created and then administered EMAM

15   for a specific purpose, to mislead insurance regulators as

16   to his use of affiliate investments, which is part and

17   parcel to the greater fraud we've been discussing here

18   today.  Lindberg, through email accomplished this purpose

19   through the creation of SPVs for sham transactions.

20           We do respectfully submit that a company created

21   by an individual to advance a fraud, and which did in fact

22   advance a fraud as intended, undoubtedly falls within the

23   purview of bail period the allegations has alleged.  This is

24   especially true when you consider the broader allegations in

25   this complaint as it relates to not only EMAM, but the

Page 140

1    Lindberg affiliates.  And this is further underscored by all

2    the separately pending criminal actions in this case as

3    well.

4            The last point I would make deals with EMAM

5    challenges are two counts dealing with declaratory relief

6    under the grounds that there's no subject matter

7    jurisdiction over those two claims.  We respect.  This meant

8    the opposite.  These declaratory reliefs that assault needs

9    to we're talking about Count 16 and Count 42.  Those are the

10   two dealing with declaratory relief relate to a series of

11   transactions in which SPVs created by EMAM and in which EMAM

12   had a voting interest and was involved in these

13   transactions, is as a direct interest in this declaratory

14   relief and a direct adversarial interest in these actions.

15           We have the law set out in our opposition brief to

16   Eman on that point.  I won't read it over because it's just

17   basically the fundamental concepts of declaratory relief

18   under federal rules.  So we'll repeat that again, but we

19   respectfully submit that email is very much involved in that

20   declarative release.  So at this point, Your Honor, if you

21   have any questions -- I promised to try to keep it pretty

22   short.  We've been over a lot here today in terms of the

23   substance of some of these claims.

24           THE COURT:  Okay.  Sorry.  I was just trying to

25   see which 16 and 42 are, I guess.  Let me ask you a question

Page 141

1    about 42.  Does that even continue?  Now that's a question.

2              MR. KOENECKE:  Sorry.  Does it continue?

3              THE COURT:  Yeah.  Isn't 42 the Axar one?  Sorry.

4              MR. KOENECKE:  Yes, it does pertain to Axar.

5              THE COURT:  So what would the declaratory relief

6    be?

7              MR. KOENECKE:  Well, this one, it relates to

8    Lindberg's acquisition, Pavonia, back in, I believe it was

9    late 2017, where he used a series of SPVs and other sham

10   transactions.  Some of that involved money from one of the

11   debtors, specifically PBLA.

12             THE COURT:  Right.

13             MR. KOENECKE:  And he used that to acquire

14   Pavonia.

15             THE COURT:  Through an entity to other entities.

16             MR. KOENECKE:  Yes, you're right, Your Honor, but

17   the SPVs were absolutely involved in that transaction.  More

18   recently, through the Michigan proceedings, Lindberg sold

19   Pavonia to Axar.  The proceeds of that transaction, Lindberg

20   diverted to purposes other than repaying it, such as PBLA.

21             THE COURT:  I guess I'm just trying to understand

22   the declaratory nature of it, of your release that you're

23   seeking under that circumstance.  If I'm not going to unwind

24   the transaction underneath it, the original, the sale

25   transaction on Axar.

Page 142

```
 1                MR. KOENECKE:  Correct.
 2                THE COURT:  So, I mean, then it seems to me it's a
 3    -- isn't that all caught up in fraudulent transfer
 4    arguments, then?  Because what you're really saying, I
 5    think, is that the transaction of the funds from the use of
 6    the funds from PBLA for this purpose was not appropriately
 7    authorized or appropriately or, you know, what didn't
 8    benefit PBLA.  So therefore, it was a sham transaction.  I
 9    get that.  Or a fraudulent transfer.  I could do that, but I
10    guess I'm just trying to understand, what am I declaring?
11                MR. KOENECKE:  Yeah, well, you're right.  It is
12    absolutely.  There is the fraudulent transfer aspect of it.
13                THE COURT:  What's left to declare?
14                MR. KOENECKE:  Well, we have the proceeds left
15    with respect to Pavonia, Axar purchased Pavonia.
16                THE COURT:  Right.  And the funds went to GBIG, if
17    I was, like.
18                MR. KOENECKE:  Correct, which is still a Limburg
19    entity.
20                THE COURT:  Right.
21                MR. KOENECKE:  So it's.
22                THE COURT:  Again, it's not a declaratory action.
23    That's.  I don't see.  Well, what the relief is that you're
24    seeking.  I mean, I've already found previously, and would
25    have found if I had to decide this again, I think, as you
```

Page 143

1    all know, because I think, said that.  That that transaction

2    was authorized by the Michigan court, so, you know, through

3    the Michigan process, so I wouldn't be unwinding that or

4    declaring something about it.  So what am I asking?

5            MR. KOENECKE:  No.  Yeah, correct.  We're not

6    touching the Michigan.

7            THE COURT:  Right.  So that's my question.

8    What's.  What declaratory relief are you seeking?

9            MR. KOENECKE:  Well, there's the question first of

10   the fraudulent transfers, whether PBLA has an interest in

11   Bodia.

12           THE COURT:  No, not based on the sale transaction.

13           MR. KOENECKE:  Well, there's the proceeds from the

14   sale.

15           THE COURT:  Right.  Okay, so you're saying that

16   they had a.  Okay, sorry, my recollection, and it might be

17   wrong, because I haven't seen a while.  This was -- tThat

18   was a -- that was like a sale of stock and assets, depending

19   on the circumstance.  Right.

20           MR. KOENECKE:  It was a complete sale, as I

21   understand.

22           THE COURT:  Right.

23           MR. KOENECKE:  I don't have it in front of me.

24           THE COURT:  Right.  So then I'm just trying to

25   understand, what am I declaring.

1          MR. KOENECKE:  That there.  Well, there's the

2    first.  The question of the interest in Pavonia, and now

3    it's the proceeds.  It's what it's been converted to.

4          THE COURT:  Yeah.  Right.  But I don't understand

5    what the argument was about the interest in it.  I guess

6    I'll have to go back and read your complaint.  I don't.  My

7    understanding was slightly different about this transaction,

8    just that it was that there was funds that went from PBLA

9    that were used elsewhere, but that didn't mean that there

10   was some ownership interest.  In other words, PBLA didn't

11   buy the stock and then have Lindberg sell it out from under

12   them.  That didn't happen.

13         MR. KOENECKE:  Correct.

14         THE COURT:  So I guess I'm just trying to

15   understand why this isn't a dead point topic, but okay.  All

16   right.  I'm not sure I understand that, but that's -- okay.

17         MR. KOENECKE:  And then, just to clarify, Your

18   Honor, there's the other declaratory -- no, I have it in

19   front of me now.

20         THE COURT:  Okay, go ahead.

21         MR. KOENECKE:  Count 42, pledge to request the

22   court enter a judgment in order declaring that PBLA retains

23   ownership rights and interest with respect to Pavonia and

24   directing acts of repay PBLA for ownership interest in

25   Pavonia and amount to be determined at trial.

Page 145

1            THE COURT:  Okay.  This is not resolved with Axar

2     and Pavonia dismissing your count with.

3            MR. KOENECKE:  Go back to the proceeds.  But we'd

4     ask --

5            THE COURT:  Okay, again, I'm just.  I'm having

6     trouble because declaratory relief is equitable relief.

7     Usually it's relief for me to do something like that.  And

8     it's not usually a monetary, like, determination of right to

9     monetary proceeds.  That's usually something that doesn't

10    usually involve declaratory relief.  Unless you have some

11    kind of ownership argument.  And you don't have an ownership

12    argument.

13            We just discussed that, so I'm actually just

14    trying to understand.  Like what?  Like where does that come

15    from?  I understand why you have arguments to the proceeds.

16    There's a lot of theories under which arguments to proceeds

17    could be made.  I mean, you know, certainly there's all the

18    fraudulent transfer arguments we've talked about, both

19    constructive, actual whatever.  And then of course there's

20    other contractual rights you might have had, you know, based

21    on the loan or anything else that occurred.  I could

22    understand that.  That's a contractual argument.  Not sure

23    that's asserted, but if it is, it is.  But I'm not sure

24    where I see declaratory relief, but.  Okay, that's fine.

25    I'm just trying to understand what that was.  Okay.

Page 146

1              MR. KOENECKE:  Okay.  The other declaratory count

2    pertains to more of the broader set of the sham transactions

3    involving SPVs.

4              THE COURT:  Right.

5              MR. KOENECKE:  And that part is quite likely, but

6    it very specifically involves those sort of interest.

7              THE COURT:  Right, no, I understand.  And that

8    hasn't been in any way.  The circumstances have been changed

9    by virtue of the dismissal of prejudice in that

10   circumstance.  Because those aren't.  That's not related to

11   that transaction.  Those are other transactions.  Yes,

12   understood.  Okay.  All right.  Thank you.

13             MR. KOENECKE:  Thank you, Your Honor.

14             THE COURT:  All right.  Okay.  Mr. Pace?  So I'm

15   very excited to hear from you again.  I'm always excited to

16   hear from you, Mr. Pace.

17             MR. PACE:  I think everyone has --

18             THE COURT:  I don't know how many hours I've spent

19   listening to both you and Mr. Kajon over the course of my

20   three and a half years on the bench.  But it isn't short

21   from all your disputes.  But that's okay for a while.  I had

22   Mr. Connell in the interim.  Like taking over some of your

23   time.

24             MR. PACE:  That's true.

25             THE COURT:  It's not so bad (indiscernible) --

Page 147

1              MR. PACE:  I miss Mr. Connell.  Yes, I'll just

2     address these.

3              THE COURT:  Sure.

4              MR. PACE:  In order of my notes.

5              THE COURT:  That's fine.

6              MR. PACE:  North Carolina insurance companies

7     being necessary parties.  I think Mr. Kajon said that he

8     agrees that counts against North Carolina and counts that

9     require North Carolina should be gone.  And I think he said

10    including claims to void the MOU and IALA.

11             THE COURT:  No, I don't think I heard that.  I

12    think I heard counts that were actually against North

13    Carolina being eliminated.  I'm not sure it's eliminated.

14    Unless Mr. Kajon tells me I'm wrong.  But any counts that

15    happen to involve the NCIC.  But they weren't the only party

16    you're going away to, right?

17             MR. KAJON:  With respect to the MOU and the IALA.

18    We have counts against Mr. Pace's clients and the NCIC are

19    probably included in there, but they're gone.  But their

20    counts against Mr. Pace's clients that you harm the debtors

21    and breached your duty by entering into these contracts that

22    impaired our rights.  And those claims, as far as we're

23    concerned, are still in the case.

24             THE COURT:  Right?

25             MR. KAJON:  You reduce the interest rate, you

1    deferred interest payments.  So those harms aren't going

2    anywhere because they're against the Mr. Pace's clients for

3    having orchestrated the impairment of our rights.

4              THE COURT:  Pretend counts that they're that North

5    Carolina had only against them.  You can cross up your list

6    or in my case like I have them in red, but whatever.  You

7    understand my point?

8              MR. PACE:  I see.

9              THE COURT:  Yeah, I didn't think they were going

10   away.

11             MR. PACE:  Okay, I misheard.  He did say I think,

12   and I did have trouble hearing for everything.  But I think

13   he said our argument that North Carolina insurance companies

14   are inextricably intertwined in this lawsuit fundamentally

15   misapprehends his position.  That's what I heard him say.

16   In response to that, I have, to Mr. Kajon at

17   (indiscernible).  Here's what he said.  So the parties are

18   inextricably intertwined whether we like it or not.  We

19   continue to be co investors and maybe hundreds of companies,

20   either directly or indirectly.  And we're going to need to

21   sort that out someday, one way or the other.  Dot, dot, dot.

22             It goes to how inextricably intertwined the North

23   Carolina insurance companies are with the Bermuda insurance

24   companies.  And I know the court, I think the court is

25   probably leaning against me on how far the necessary parties

Page 149

1       argument reaches into particular claims.  But what he just

2       said is our, that's basically the legal standard when it

3       comes to, quote maybe hundreds co investors and maybe

4       hundreds of companies either directly or indirectly.  That

5       goes to their, what I think goes to their claims to void

6       those transactions.  And what was helpful to me in trying to

7       figure out what they wanted with each in particular claim

8       and whether it did reach to North Carolina was their prayer

9       for relief section where for each count they asked the court

10      precisely what it is they want to do.

11              And on those fraudulent transfer claims, most of

12      them start with avoiding or set aside or setting aside all

13      transfers made from each of the debtors to any of the debtor

14      investment counterparties.  I read that to mean literally

15      all these loan agreements and all these prefect agreements.

16              THE COURT:  Okay, I guess it depends on whether

17      the loan agreements or the equity agreements are transfers

18      or if it's the cash that came up each way that's the

19      transfer.  Because I agree with you, if you're trying to

20      avoid all the loan agreements and all the preference,

21      preference preferred stock agreements that would involve

22      other counterparties.  But I'm not sure that's what the

23      relief is.

24              I think their argument is that money went into buy

25      into these investments and then it went elsewhere.  And that

1     I'm not sure that involves the North Carolina insurance

2     companies just because they were also lenders, because money

3     came from them and went into the same company and maybe went

4     somewhere else, too.  We don't know.  Or maybe it all there.

5     It's all there.

6            MR. PACE:  I don't know.

7            THE COURT:  But I'm just saying to you, I think

8     you're confusing the loan agreements and the preferred stock

9     agreements with cash transfers, and I don't think they're

10    the same, but I don't think all they're seeking to do is

11    void the loan agreements and the preferred stock agreements.

12    I think they're looking to get their cash back.  So.  Okay,

13    I hear you.

14           MR. PACE:  There's a lot of references to

15    consented judgment, guilty pleas, deferred prosecutions,

16    etcetera in this case and in other cases.  I think the only

17    thing I would say on that is the court has to accept their

18    pleadings as true.  At this point.  At this stage in the

19    litigation, it's simply irrelevant whether someone admits

20    they're true or not.  Where is assuming they're true for

21    purposes of stating a claim or not.  So to the extent that

22    any of those things are used to color the court's view of

23    the claims, I don't think they matter.  I think the court

24    assumes the truth of the statements right now.

25           THE COURT:  Okay.

1           MR. PACE:  Okay.  At one point in talking about

2      the 646 defendants, to which there is no reference to, I

3      think I heard Mr. Kajon say something along the lines of, we

4      believe the recipients of funds tracing funds through his

5      global network, and all these folks are part of his global

6      network.  So it's possible, and you can create inferences

7      that they received some of these funds.

8           The problem is, unlike the RICO case in North

9      Carolina, where those entities stayed in on RICO claims

10     solely because they had been pleaded to have received funds,

11     they've got allegations here against the 646 plus that

12     include actual fraud, actual fraudulent transfer,

13     constructive fraud, dishonest services under Bermuda law,

14     conspiracy to injure by unlawful means, and the RICO

15     predicates.  And that gets us back to what your questions

16     were to Mr. Kajon about what is the legal basis for charging

17     those folks with those particular claims, both that have a

18     nine B component, which can be relaxed, and which maybe can

19     be relaxed?  We're not sure that's an open question.

20          Maybe it can be relaxed in some things.  And the

21     non-9(b) claims, which are just under Rule 8.  And I think

22     the only point I would make on that, and this was based on

23     the court's questions to Mr. Kajon.  I think that if there

24     is a relaxed standard for pleading 9(b), I think everyone

25     recognizes that there probably is some relaxed.  As to

Page 152

1    actual fraudulent transfer claims, does it apply to any

2    other claims?  I don't think we know or haven't.  No one's

3    been able to decide it today.  But if it does, whatever that

4    standard is, has got to be higher than Rule 8.  So I thought

5    of a good point to make on that and just went blank with the

6    standard.

7                THE COURT:  You were going very well there.

8                MR. PACE:  It's got to be higher than ruling.  So

9    I think when I was hearing the court's questions on that, I

10   understood the court.

11               THE COURT:  Yeah, I was asking about ruling.

12               MR. PACE:  Right.  Could apply.

13               THE COURT:  Well, and also no more ruling group

14   leading.

15               MR. KAJON:  Right.

16               MR. PACE:  So if they had pleaded that the 646

17   were merely recipients, maybe that would be a different

18   argument under some of these claims.  That's not what they

19   have pleaded.  They pleaded much, much more than that.  And

20   if you're going to plead much, much more than that against

21   one or 900 defendants, you have to be specific.  That's

22   where we say the law lands the RICO defendants' arguments.

23   I think the court thoroughly addressed this in its

24   questioning.  I had the same question about the

25   demonstrative.  Basically they're saying we've made

1    particularized allegations against 19 or 20 folks.  If you

2    look at the RICO defendants section of the pleadings, I

3    think it's something like 70 or something individual.

4              THE COURT:  You said 90.

5              MR. PACE:  Ninety

6              MR. KAJON:  I'm told I misspoke.  And it's only

7    about 35.

8              MR. PACE:  Thirty-five.

9              THE COURT:  Thirty-five, sorry.

10             MR. PACE:  So I knew it was more.  I knew it was

11   more than what I saw in that demonstrative.

12             THE COURT:  Yeah, there is.

13             MR. PACE:  Which kind of goes back to the argument

14   I originally made was I don't think the way they pleaded

15   this case, they're actually relying on alter ego to reach

16   RICO defendants.  Except Mr. Kajon said no.

17             THE COURT:  He said they are.

18             MR. PACE:  They are.

19             THE COURT:  And vicarious liabilities.  Yes, yes.

20             MR. PACE:  And that the point I would simply make

21   on that is the law does not allow that.  I think that's all

22   I have in my notes that the court didn't expressly address

23   with Mr. Kajon anything.

24             THE COURT:  Thank you.

25             MR. PACE:  Thank you.

Page 154

1            MR. HASH:  Good afternoon, Your Honor.

2            THE COURT:  Good afternoon.  Good morning.

3            MR. HASH:  Good morning, when we started.

4            THE COURT:  I know.  It's okay.  It's how these

5     things go.

6            MR. HASH:  Sometimes I will try to be very brief.

7     So I'll start not necessarily in the order that counsel

8     addressed EMAM, but we'll start with the declaratory

9     judgments.  Our position coming in was that we didn't think

10    that was justiciable dispute before the court.  And having

11    sat here all morning, we still don't believe there's a

12    justiciable dispute that involves us before the court.  So

13    that's why we're moving to dismiss those claims.

14           We think that the dismissal of the NCIC and Axar

15    are that furthers that point.  But still, we're not sure

16    what the dispute was as it related to us -- excuse me, the

17    EMAM in the first place.

18           Turning back to the specific allegations in the

19    complaints, I think it's fair to say that we've heard the

20    specificity that's in the complaint counsel laid out the

21    allegations that we chatted about earlier when we were

22    speaking the allegations again, or that EMAM was created

23    form these SPVs.  And then there's the unsupported

24    allegation, we say, inference that they're making that it

25    was used to disaffiliate and to create a false impression

Page 155

1    with North Carolina insurance regulators.  Well, obviously

2    we dispute that, but now is not the time we get to dispute

3    that factually.  But what isn't in dispute is that those

4    allegations do not establish a duty with respect to the

5    debtors.

6         Those allegations don't establish a duty to

7    disclose.  They do not establish a fiduciary duty.  They do

8    not establish that imam received a transfer, whether

9    actually fraudulent or constructively fraudulent.  They do

10   not establish that EMAM received funds would constitute

11   unjust enrichment.  Unjust enrichment would be a predicate,

12   potentially for a constructive trust.

13        I was the one, Your Honor.  You thought someone

14   raised that, Your Honor, I think that was me that was saying

15   that constructive trust is really a remedy rather than a

16   claim.  But with respect to EMAM, at least there's no

17   allegation that imam received funds upon which a

18   constructive trust could be imposed.  So, Your Honor, simply

19   put, there aren't any allegations that meet the elements of

20   the claims that have been asserted against EMAM.

21        So for those reasons, we think those claims should

22   go away with respect to piercing the corporate veil, which,

23   as we talked about at length several hours ago, that's

24   separate.  We don't think that you can bootstrap piercing

25   the corporate veil, altering your instrumentality to say

Page 156

1    that imam committed fraud or received transfers.  I think,

2    Your Honor, whether you agree with us, I think you at least

3    understand our points.

4         But looking though specifically at what it takes

5    to pierce the corporate veil under North Carolina law, the

6    allegations of control.  This is one of those points, I

7    think, when counsel agree on the law, but then we sort of

8    get almost to the finish line and then we each take our turn

9    at the end.

10        But the point, Your Honor, is North Carolina law

11   is there have to be actual non conclusory allegations that

12   the control is such that the entity no longer has a mind, an

13   identity of its own.  You can't just say, oh, we control

14   them.  How do you control them?  If you can't say how, then

15   you're not specific enough.  You can't just say generically

16   that company had no will of its own.

17        Okay, well, that doesn't get there.  So there's no

18   allegations, for example, of who the board members of --

19   well, not board more and LLC, who the members are, who the

20   managers are, if the allegation is just generic control.

21   But if there's anything we've learned, generic allegations

22   aren't enough in federal court.  And that's all I have here.

23        THE COURT:  All right.  Thank you.  All right.

24   Thank you all very much.  Needless to say, this is one I'm

25   going to have to (indiscernible) something on.  I'm sure you

Page 157

1      all understand I'm not ruling from the bench.  So what --

2      sorry, excuse me.

3              MR. KAJON:  I'm sorry, Your Honor.  Mr. Pace was

4      asking about the traffic situation.  I was trying to fill

5      him in on its UN General Assembly week, so getting to the

6      airport is going to be difficult.  Okay.

7              THE COURT:  All right.  Thank you.  I was going to

8      say is thank you all very much for your arguments.  I

9      appreciate the fact that my law clerks get to see excellent

10     lawyers arguing in front of them in person, which is a rare

11     thing, and my interns as well.  So thank you for that.

12              I was saying that I'm going to have to write a

13     decision on this, needless to say, or decisions, because

14     this is not something I would be ruling from the bench on.

15     I'm sure you all understand that even though I've obviously

16     read all the cases cited in your papers and looked at all

17     the papers multiple times, but that's what I'll be doing.

18     So I'm taking this under advisement, and obviously I will

19     issue decision, and that's it.  You all may be -- court is

20     now adjourned for the day, and you all may be excused.

21              MR. KAJON:  Thank you.

22              (Whereupon these proceedings were concluded)

23

24

25

Page 158

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    *[signature]* Sonya M. Ledanski Hyde

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:   September 26, 2024